TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
KEITH CUSTIS
kcustis@ahdootwolfson.com, SBN 218818
THEODORE W. MAYA, SBN 223242
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
1016 Palm Ave.
West Hollywood, California 90069
Tel: 310-474-9111; Fax: 310-474-8585

Counsel for Plaintiff
  ANDREA PAPPEY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA PAPPEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Andrea Pappey, by and through her counsel, brings this Class Action Complaint against Defendant Uber Technologies, Inc. (collectively, "Uber" or "Defendant"), on behalf of herself and all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this consumer class action to seek restitution, declaratory relief and monetary damages for Defendant's unlawful and unfair assessment and collection of an undisclosed $1.00 "Safe Rides Fee" from Plaintiff and other Class members.

2.      Defendant operates a "ride sharing" service, commonly known as "Uber," which provides transportation services to consumers in cities throughout the United States.  Defendant operates its ride sharing service through a mobile phone application (the "Uber App") that permits consumers to summon, arrange and pay for transportation services electronically via their mobile phone.

3.      Two of Defendant's services, known as UberX and UberXL, allow any person with a late model car to provide transportation services to consumers for compensation.  Another service, known as Uber Plus, allows any person with a late model luxury car to provide transportation services to consumers for compensation.  The UberX, UberXL and Uber Plus transportation services are referred to collectively herein as "UberX" or "UberX Transportation Services."

4.      When creating an account with Defendant, consumers place a credit or debit card on file with Defendant, which eliminates the need for cash payments.  When a consumer completes an UberX ride, Defendant obtains payment from the consumer's credit or debit card, retains a portion for itself and pays the balance to the driver.

5.      In April 2014, Defendant began to charge all consumers of its UberX Transportation Services an undisclosed, mandatory $1.00 "Safe Rides Fee" ostensibly to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including an *industry-leading* background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app. . . ."

6.      Defendant, however, does not and has never provided a "*industry-leading* background

check process." To the contrary, the background check process used by Defendant does not use fingerprint identification and therefore cannot ensure that the information Defendant obtains from a background check actually pertains to the UberX driver that submitted the information. By contrast, taxi regulators in the most populous parts of the United States require drivers to undergo criminal background checks using fingerprint identification, usually employing a technology called "Live Scan." Requiring fingerprints for background checks ensures that the person whose criminal history has been run is, in fact, the applicant – and is the industry leading background check process.

7.    Furthermore, Revenue generated from the Safe Rides Fee is not used to provide "regular motor vehicle checks" for all vehicles used to provide UberX Transportation Services. In most cases, Uber drivers pay for the annual inspection of their own vehicles.

8.    Revenue generated from the Safe Rides Fee is not used to provide "driver safety education" for all UberX drivers. Defendant does not require Uber drivers to participate in any type of mandatory driver safety education. Instead, Defendant offers Uber drivers the opportunity to pay between $40.00 to $65.00 for an optional driver training course, provided by a third party, that includes detailed reviews of a particular city's neighborhoods as well as "driver professionalism tips and basic safety concepts for commercial drivers."

9.    Revenue generated from the Safe Rides Fee has not been used to launch any safety features for the Uber App that are available nationwide. In late December 2014, Defendant made a single-page, pop-up "Safe Ride Checklist" available to consumers only in Chicago and Boston, and has otherwise ignored the remainder of the United States.

10.    Upon information and belief, the revenue that Defendant generates by charging the Safe Rides Fee exceeds the amount that Defendant spends on "efforts to ensure the safest possible platform for Uber riders and drivers," on an annualized basis, by more than $20,000,000. As a consequence, by assessing and charging consumers the $1.00 Safe Rides Fee, Defendant has been, and will continue to be, unjustly enriched.

11.    Defendant's assessment of the $1.00 Safe Rides Fee for services that Defendant fails to provide, or that are funded by Uber drivers and not through the Safe Rides Fee, constitutes an unlawful and unfair business practice. Defendant's assessment of an undisclosed fee likewise constitutes an

2

unlawful and unfair business practice.

12.     Plaintiff brings this class action against Defendant for: (1) breach of implied contract; (2) unjust enrichment; (3) violations of the unlawful prong California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL"); and (4) violations of the unfair prong of the UCL. Plaintiff seeks an order requiring Defendant to, among other things: (1) cease the unlawful assessment and collection of the Safe Rides Fee; (2) conduct a corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and Class members.

## **PARTIES**

13.     Plaintiff Andrea Pappey is an individual residing in Middlesex County, Massachusetts.

14.     Defendant Uber Technologies, Inc. is a Delaware corporation with its headquarters and principal place of business located in San Francisco, California.

## **JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendant, on the other, are citizens of different states.

16.     This Court has personal jurisdiction over Defendant because its principal place of business is located in San Francisco, California, it conducts business in California and otherwise intentionally avails itself of the markets in California to render the exercise of jurisdiction by this Court proper.

17.     Venue is proper in this District (San Francisco Division) pursuant to 28 U.S.C. § 1391(a)(1) because Defendant is headquartered in San Francisco County, conducts business in San Francisco County and many of the acts and omissions complained of occurred in San Francisco County.

18.     Intra-district Assignment: Pursuant to Civil Local Rules 3-2(c) a substantial part of the events or omissions giving rise to this action occurred in San Francisco County; therefore, it is appropriate to assign the action to the San Francisco Division.

19.     The unlawful and unfair practices alleged herein were conceived, reviewed, approved and otherwise controlled from Defendant's headquarters in San Francisco, California.  When Plaintiff and Class members used Defendant's services, those transactions, including the billing and payment for those services, were processed on Defendant's servers in San Francisco, California.

## FACTUAL ALLEGATIONS

**A.     The Uber App and Defendant's Transportation Services**

20.     Defendant operates a "ride sharing" service, commonly known as "Uber," which provides transportation services to consumers in cities throughout the United States. Defendant operates its ride sharing service through a mobile phone application (the "Uber App") that permits consumers to summon, arrange and pay for transportation services electronically via a mobile phone.

21.     Two of Defendant's services, known as UberX and UberXL, allow any person with a late model car to provide transportation services to consumers for compensation.  Another service, known as Uber Plus, allows any person with a late model luxury car to provide transportation services to consumers for compensation.  The UberX, UberXL and Uber Plus transportation services are referred to collectively herein as "UberX" or "UberX Transportation Services."

22.     In order to book transportation services via the Uber App, passengers must first download the Uber App to a mobile phone and create an account with Defendant.

23.     When creating an account with Defendant, consumers place a credit card on file with Defendant, which eliminates the need for cash payments.  When a consumer completes an UberX ride, Defendant obtains payment from the consumer's credit card, retains a portion for itself and pays the balance to the driver.

**B.     Defendant Charges A $1.00 Safe Rides Fee Ostensibly To Provide "Industry-Leading Background Checks" And Other Safety-Related Services For The Benefit Of Consumers**

24.     In April 2014, Defendant began to charge all consumers of its UberX Transportation Services a mandatory $1.00 "Safe Rides Fee."

//

//

//

25.     Defendant does not clearly and conspicuously disclose the Safe Rides Fee to consumers.  For example the Safe Rides Fee is not disclosed when consumers obtain a "Fare Estimate."



26.     The Uber App's Fare Estimate features discloses that the estimate "does not include discounts or promotions" but unfairly fails to include or even refer to the Safe Rides Fee.

27.     Instead, before a consumer requests that an Uber driver pick the consumer up, the Safe Rides Fee is only disclosed to a consumer on the Uber App if the consumer pushes the UberXL, UberX or Plus symbols to trigger a pop-up screen that discloses the Safe Rides Fee as follows:

  

28.     After a ride has been completed, the Safe Rides Fee is separately itemized on an electronic receipt sent to the customer.  Next to the words "Safe Rides Fee" on the receipt is a question mark that hyperlinks to an explanation of the Safe Rides Fee.



29.     However, because most consumers receive and review Defendant's electronic receipt on their mobile phones, the miniscule size of the font and light grey color used by Defendant to itemize the Safe Rides Fee is so small that it is virtually illegible to most consumers without a magnifying glass, as in evident from the following screen shot which is equivalent to the screen of an Iphone 5s.



30.     Beginning with Defendant's April 2014 introduction of the Safe Rides Fee and

6

continuing through October 2014, Defendant explained that the Safe Rides Fee was assessed to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including an *industry-leading* background check process, regular motor vehicle checks, driver safety education, [and] development of safety features in the app…"

31.     On April 24, 2014, Defendant explained the Safe Rides Fee on Defendant's website as follows:[1]

### What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road. Our new Safe Rides Fee is a $1 fee added to uberX fares in United States cities with uberX ridesharing. This Safe Rides Fee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

32.     In October of 2014, Defendant changed the words "industry-leading" to "a Federal, state, and local background check." Defendant also changed the words "and insurance" to "and more." Defendant currently explains the Safe Rides Fee as follows:[2]

### What Is The Safe Rides Fee?

From the beginning, we've always been committed to connecting you with the safest rides on the road.   The Safe Rides Fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD.

33.     In addition, Defendant advises consumers that "The Safe Rides Fee is a fee added to

---

[1] *See* http://web.archive.org/web/20140424014638/http://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

[2] *See* https://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

CLASS ACTION COMPLAINT

uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing."[3] However, Defendant advises UberX drivers that they retain the Safe Rides Fee entirely: "Rider fees are fees charged to the rider by Uber directly. They include the *safe rides fee*, airport tolls, and fare split fees, if applicable. *Uber receives rider fees in full.*"[4]

34.     Defendant continues to charge the $1.00 Safe Rides Fee purportedly to support "continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more."[5]

**C.     Defendant Does Not Provide Or Pay For "Industry Leading" Background Checks**

35.     Defendant does not, and has never, provided consumers of its UberX Transportation Services with an "industry-leading" background check process.

36.     To the contrary, the background check process used by Defendant does not use fingerprint identification and therefore cannot ensure that the information Defendant obtains from a background check actually pertains to the UberX driver that submitted the information.

37.     Instead of using fingerprints, Defendant's background check process relies upon its drivers to submit personal identifiers (name, address, driver's license number and state, and social security number) through an online webpage. Defendant, in turn, provides this information to Hireease, Inc., a private company that performs its background checks.

38.     This process cannot ensure that the information in the background check report is actually associated with the applicant since it does not use a unique biometric identifier such as a fingerprint. In fact, the sample report Hirease posts on its website has a disclaimer stating, "Final verification of an individual's identity and proper use of report contents are the user's responsibility."[6]

39.     Taxi regulators in the most populous parts of the United States require drivers to

---

[3] *See id.*

[4] *See* http://uberwest.weebly.com/payment-statements.html (last visited Jan. 6, 2015).

[5] *See* Uber App, "What is the Safe Rides Fee?" *also* https://support.uber.com/hc/en-us/articles/201950566-What-is-the-Safe-Rides-Fee- (last visited Jan. 6, 2015).

[6] *See* http://cdn2.hubspot.net/hub/212230/file-417622326-pdf/docs/Sample_report.pdf?t=1408638373271 (last visited Jan. 6, 2015).

undergo criminal background checks using fingerprint identification employing a technology called "Live Scan."  For example, taxi regulators in Defendant's home town of San Francisco, as well as California's most populous city – Los Angeles – all require Live Scan.  Taxi regulators in New York, another of Defendant's major markets, likewise require fingerprints for background checks for taxi drivers.

40.     Live Scan fingerprinting in California occurs at a facility designated by the California Department of Justice.  The fingerprints allow a biometric search of the California Department of Justice's criminal history databases and the option to obtain a search of the Federal Bureau of Investigation's database of multistate criminal history information.  The process of using a biometric identifier to search government databases is the gold standard for a background check process.

41.     Because of the unique identifying characteristics of fingerprints, the LiveScan Process provides assurance that the person whose criminal history has been run is, in fact, the applicant.  This would ensure that a registered sex offender could not use his law-abiding brother's identification information to become an Uber driver.  It would also ensure that a convicted burglar could not borrow his cousin's identification information to become an Uber driver in order to case the empty homes of customers he takes to the airport.

42.     Defendant's own background check provider, Hirease, explains that a fingerprint-based background check process is far superior: "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."[7]

43.     Defendant's background check process does not provide the level of security provided by the fingerprint-based Live Scan Process employed for performing background checks on taxi drivers in the most populous cities of the United States.

44.     Notably, as reported by the New York Times, while touting its "industry leading" background checks and collecting the Safe Rides Fee from consumers, "in statehouses across the country, Uber has fought against legislation requiring background checks as strong as those demanded

---

[7] *See* http://www.hirease.com/fingerprinting/ (last visited Jan. 6, 2015).

CLASS ACTION COMPLAINT

of traditional taxis."[8] "In Colorado, the company helped persuade lawmakers to ease drivers'

background checks in a bill that legalized ride-sharing companies. In Illinois, after a lobbying push,

Gov. Pat Quinn vetoed a bill that would have forced Uber to strengthen those checks.  And in

California, Uber and other companies like it helped kill a law that would have required drivers to

undergo a background check by the state's Justice Department, as is required of taxi drivers."[9]

**D.**     **Defendant's Failure To Provide Industry Leading Background Allows Drivers With**
           **Criminal Records To Become Uber Drivers**

45.     In January 2014, in an article entitled "Uber driver accused of assault had done prison

time for a felony, passed background check anyways," online news site PandoDaily.com reported that

an Uber driver in San Francisco, who had been accused of verbally and physically assaulting a

passenger, had passed Defendant's background check even though he had a significant criminal

history – including felony and misdemeanor charges, and at least one felony conviction involving

prison time – that should have disqualified him from becoming an Uber driver.[10]  In June 2014,

Forbes.com reported that the driver had been on probation for a battery conviction when Uber hired

him in October 2013.  Defendant claimed that the driver "had a clean background check in October."

46.     On December 31, 2013, an Uber driver struck and killed a six-year-old girl while

driving in San Francisco.[11]  The San Francisco Business Times subsequently reported that the driver

had been convicted of reckless driving in Florida in September of 2004.[12]

47.     In February 2014, the Chicago Tribune reported that a 24-year-old Uber driver had a

felony conviction for residential burglary in 2010, a misdemeanor conviction for criminal damage to

property in 2009, another misdemeanor conviction in 2008 for breaking into a car to steal a GPS and

---

[8] *See* http://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html (last visited Jan. 6, 2015).

[9] *Id.*

[10] *See* http://pando.com/2014/01/06/exclusive-uber-driver-accused-of-assault-passed-zero-tolerance-background-check-despite-criminal-history/ (last visited Jan. 6, 2015).

[11] *See* http://www.latimes.com/local/lanow/la-me-ln-uber-driver-girl-dead-20141209-story.html (last visited Jan. 6, 2015).

[12] *See* http://www.bizjournals.com/sanfrancisco/blog/2014/01/uber-uberx-sofia-liu.html?page=all (last visited Jan. 6, 2015).

satellite radio receiver. [13]  The same Uber driver had received numerous speeding tickets and had his driving license suspended twice in 2008.

48.     Two months later, on April 24, 2014, an NBC television affiliate in Los Angeles aired an investigative report about Uber's driver background checks in which the station enlisted a woman to apply to become an Uber driver.[14]  She was on felony probation for making criminal threats (willfully threatening to commit a crime which will result in death or great bodily injury to another person), and during the broadcast described the conduct leading to her arrest: "I pulled a girl out of a car and almost beat her to death."  On March 3, 2014, Uber sent the woman an email notifying her that she passed her background check.  According to the NBC report, Uber would not respond to the station's request for comment about this case.  Instead, Uber spokesperson Lane Kasselman sent an email explaining Uber's background screening policy.  The email ended with, "We're confident that every ride on Uber is safer than a taxi."

49.     In July 2014, WDIV-TV 4 in Detroit reported that it had found Uber drivers who had previously had their licenses suspended, Uber drivers who had been in a serious accident with injuries, Uber drivers with speeding tickets, Uber drivers who had been cited for no proof of insurance, and Uber drivers who were driving vehicles registered to other people.[15]

50.     On November 17, 2014, as reported by the Chicago Sun Times, an Uber driver allegedly drove an inebriated passenger to his apartment on Chicago's Northwest Side, raped her and then told her, "I made you happy."[16]

51.     On December 17, 2014, the Boston Globe reported that an Uber driver pleaded not guilty to charges of rape, assault to rape, kidnapping, and two counts of assault and battery following

---

[13] *See* http://articles.chicagotribune.com/2014-02-14/news/ct-rideshare-background-checks-met-20140214_1_background-checks-ride-sharing-drivers (last visited Jan. 6, 2015).

[14] *See* http://www.nbclosangeles.com/news/local/Risky-Ride-Uber-Investigation-256604571.html (last visited Jan. 6, 2015).

[15] *See* http://www.clickondetroit.com/news/local-4-defenders-is-uberx-safe/26956476 (last visited Jan. 6, 2015).

[16] *See* http://chicago.suntimes.com/news-chicago/7/71/247604/will-ubering-anybody-judge-says-driver-charged-raping-woman (last visited Jan 6, 2015).

CLASS ACTION COMPLAINT

the Uber driver's violent assault against a young female Uber customer.[17] Uber confirmed that the alleged rapist had passed Uber's background check. In the same article, the Boston Globe reported that two additional women in the Boston area had reported indecent assaults by an Uber driver on a single day in December 2014.

**E.** **Defendant Does Not Pay For The Other Safety-Related Services It Claims Are Supported By The Safe Rides Fee**

52. Upon information and belief, Defendant does not use the revenue it generates from the Safe Rides Fee to provide for "regular motor vehicle checks" and "driver safety education."

53. Defendant does not use the Safe Rides Fee for "regular motor vehicle checks" of Uber drivers' vehicles. The vast majority of Uber drivers pay for the annual inspection of their own vehicles. By way of example, the list of potential inspection locations available to Uber drivers in California includes numerous repair shops that offer inspections for a fee that averages approximately $20.00.[18] Because many Uber drivers had difficulty scheduling an inspection in 2014, Defendant partnered "with YourMechanic.com" to provide Uber drivers with the opportunity to have a mechanic "come to you (usually your home address) at a time of your choosing . . . [to] . . . complete an on-site Uber vehicle inspection AND oil change for $50."[19] Some Uber drivers are offered free inspections provided they spend a set amount in repairs.

54. Defendant does not use the Safe Rides Fee to provide Uber drivers with "driver safety education." Defendant does not require Uber drivers to participate in any type of mandatory driver safety education. Instead, Defendant advises Uber drivers that if they want to learn how to be good drivers, they can pay anywhere from $40 to $65 on a class that will provide "detailed reviews" of a particular city's "neighborhoods and key routes, as well as driver professionalism tips and basic safety concepts for commercial drivers."

---

[17] *See* http://www.bostonglobe.com/metro/2014/12/17/uber-driver-accused-rape-kidnapping-customer/KYnOQczKFqggfbnri2FpGL/story.html (last visited Jan 6, 2015).

[18] *See* http://uberwest.weebly.com/vehicle-inspection.html (last visited Jan 6, 2015); *see also* http://www.weebly.com/uploads/2/8/4/2/28420371/ca_inspection_locations_september_2014.pdf (last visited Jan. 6, 2015).

[19] *See* http://uberwest.weebly.com/vehicle-inspection.html (last visited Jan. 6, 2015).

55.     For example, in Washington, D.C., Uber drivers are offered the following "training class."[20]



**WASHINGTON DC DRIVER TRAINING CLASS**

The Driver Training Class given by 7x7 Executive Transportation introduces beginning and experienced Uber partners to lessons and techniques designed to improve their driving and customer service skills.  Lecture topics include detailed reviews of Washington DC neighborhoods and key routes, as well as driver professionalism tips and basic safety concepts for commercial drivers.  Class discussion on each of these topics is encouraged, and another module includes discussion of common customer service issues and how to address them.  A major focus of the class is how drivers can improve their ratings from Uber users.  The class lectures are supplemented by video clips, map displays, white board drawings, written course materials as well as a final exam.

**All classes are held at the University of Phoenix. University of Phoenix is a trade name and registered trademark of the Apollo Education Group, Inc. Any use by 7x7 Executive Transportation to identify the event location is not intended to imply affiliation with, sponsorship or endorsement of the event by The University of Phoenix, Inc. or Apollo Education Group, Inc.**

**The address for the class is 25 Massachusetts Ave NW, Washington, DC 20001.  The nearest Metro station is Union Station.  Free parking is available by validation if you park in the garage in the basement of 25 Massachusetts Ave NW. (Validation is availabe ONLY from the Instructor and is not available for any other parking location.)  Go to the elevator lobby and you will be directed to the University of Phoenix lobby area and from there information on the classroom number will be available.  PLEASE DO NOT GO TO THE UNIVERSITY OF PHOENIX EXCEPT ON THE DAY OF YOUR CLASS. THERE WILL BE NO ONE THERE FROM 7X7 TO HELP YOU. IF YOU NEED TO CONTACT US, PLEASE USE THE CONTACT INFORMATION AT THE BOTTOM OF THIS WEB PAGE.**

The class will start on time. Please arrive 15 minutes early to allow time for registration. If you are more than 10 minutes late for the class you will not be able to come in and will need to sign up for another class. You must pay for the class online using a major credit card. We will accept Visa, Master Card, American Express, and Discover. Please follow the prompt after signing up to pay now. Please dress professionally as if you are working and bring your personal phone (NOT Uber phone) with you.

**CLICK ON A DATE IN THE CALENDAR BELOW:**

| Choose Appointment | Your Info | Confirmation |
| --- | --- | --- |

Returning? Log in

| 7x7 Washington DC Driver Training Class | ▼ |
| --- | --- |
| 4 hours @ $65.00 | |

56.     In an October 10, 2014 article entitled "Uber Skimps On Driver Training, Then Charges Drivers $65 For Basic Driver Skills Course," Forbes reported that new Uber drivers are not required to engage in any safety training whatsoever:

> When Michael Coe, 38, signed up to be an Uber driver in Washington, D.C. a few weeks ago, he was shocked to find that once his driver's license and identity paperwork had cleared, he was asked to come in to pick up a phone — then put on the road with no training except a 13-minute video on how to use the Uber app.  "When I got to one of the onboarding sessions at a local hotel, it was like, 'Here's your papers, go to the other room, get your phone, and great — get on the road and drive,'" Coe told Forbes.  No one from Uber had more than a passing conversation with him before he was set to give what the company calls "the world's safest, most reliable ride." Uber never looked at his car either, though he did have to provide proof of a recent Virginia state car

---

[20] *See* https://dctraining.7x7executive.com/ (last visited Jan. 6, 2015).

CLASS ACTION COMPLAINT

inspection."[21]

57.     Upon information and belief, Defendant has not used any significant amount of the revenue generated by the Safe Rides Fee for the "development of safety features in the app."

58.     Since the April 2014 introduction of the Safe Rides Fee, Defendant has not introduced *any* safety features for the Uber App in most locations where Defendant operates its UberX Transportation Services.

59.     In late December 2014, Defendant made a "Safe Ride Checklist" available only to Uber App users in Chicago and Boston in response to high-profile sexual assault accusations against Uber drivers in those two cities. An Uber driver in each city was charged in December 2014 with raping a female customer.[22]

60.     The Safe Ride Checklist available in Chicago and Boston is a relatively straightforward, single page that recommends that passengers confirm they're getting in the right car and that the in-app driver photo matches up:



61.     Although Defendant has charged and collected the Safe Rides Fee from consumers throughout the United States, Defendant has not made its "safe ride checklist" available to Uber App

---

[21] *See* http://www.forbes.com/sites/ellenhuet/2014/10/08/uber-skimps-on-driver-training-then-charges-drivers-65-for-basic-driver-skills-course (last visited Jan. 6, 2015).

[22] *See* http://chicago.suntimes.com/news-chicago/7/71/251756/uber-adds-safety-checklist-app-drivers-charged-sex-assault (last visited Jan. 6, 2015).

CLASS ACTION COMPLAINT

users throughout the United States.[23]  Consumers in cities other than Chicago and Boston have, thus, received no benefit whatsoever from Defendant's purported "development of safety features" in the Uber App.

**F.**    **The Safe Rides Fee Is A Profit Center For Defendant, Not A Genuine Fee Used To Obtain Background Checks And Fund Other Programs That Benefit Consumer Safety**

62.    Upon information and belief, Defendant generates far more revenue from the assessment and collection of the $1.00 Safe Rides Fee than it spends on efforts to provide safe rides for the consumers that pay the Safe Rides Fee.

63.    Uber is estimated to provide 800,000 completed rides per week.[24]  Of that amount, approximately 528,000 of the completed rides are UberX rides.  Thus, for a one-year period Defendant provides approximately 27,456,000 completed rides. Given that Defendant charges the $1.00 Safe Rides Fee for each of those 27,456,000 completed rides, Defendant's imposition of the Safe Rides Fee generates $27,456,000 in annual revenue.

64.    Upon information and belief, Defendant has far less than 100,000 drivers nationwide. As of December 2013, Uber had less than 7,000 active drivers in New York City, and less than 6,000 drivers each in Los Angeles and in San Francisco.[25]  As of March 2014, Uber had only 900 active drivers in Seattle.[26]

65.    Assuming *arguendo* that Uber paid for 100,000 background checks at an average cost of $50.00 per background check, Uber would have paid only $5,000,0000 for background checks, far less than $27,456,000 in annual revenue generated by the Safe Rides Fee.  Upon information and belief, Defendant incurred far less than $5,000,000 in costs in connection with the provision of background checks.

---

[23] *See* http://www.vocativ.com/money/business/ubers-rape-chicago/ (last visited Jan. 6, 2015).

[24] *See* Leaked: Uber's Internal Revenue and Ride Request Numbers, available at http://valleywag.gawker.com/leaked-ubers-internal-revenue-and-ride-request-number-1475924182 (last visited Jan. 6, 2015).

[25] *See* http://www.businessinsider.com/uber-revenue-rides-drivers-and-fares-2014-11#last-december-heres-how-many-uber-drivers-were-active-on-average-every-week-in-top-markets-5 (last visited Jan. 6, 2015).

[26] *See* http://www.geekwire.com/2014/3000-uberx-sidecar-lyft-drivers-seattle/ (last visited Jan. 6, 2015).

**G.      Uber's Download and Registration Process Obscures its Unconscionable Terms &**
**Conditions**

66.      Plaintiff Pappey downloaded the Uber App and created an Uber account in October 2014.

67.      Plaintiff followed the registration process for creating an account. This process is conducted within the Uber App itself, on the screen of the mobile phone.

68.      During the registration process, an electronic keyboard obscures the lower portion of the screen as information is inputted into the required fields for registration: email address, mobile telephone number, password, name, and credit card payment information.

69.      Throughout the registration process, the lower half of the screen remains obscured by the electronic keyboard.

70.      At the last step of the process, the Uber App displays a screen on which a hyperlink to Defendant's "Terms & Conditions and Privacy Policy" appears at the bottom.

71.      At no step during the registration process were the "Terms & Conditions" and/or "Privacy Policy" displayed to Plaintiff.

72.      Defendant's registration process never required Plaintiff to access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

73.      Each new Uber user must register and create an Uber account using the same steps and viewing the same screens as Plaintiff.

74.      Defendant's undisplayed and inconspicuously linked "Terms & Conditions" are unconscionably one-sided and purport to contract away all possible legal obligations from Defendant to its riders, including any obligation to provide a safe vehicle, or a safe driver, all while retaining its right to payment regardless of whether a given ride is even completed.

75.      Defendant's "Terms & Conditions" contain a complete disclaimer of warranties, which disavows substantially every basis upon which a reasonable user would rely in using the Uber App and the UberX Transportation Services:

> The company makes no representation, warranty, or guaranty on the
> reliability, timeliness, quality, suitability, availability, accuracy, or
> completeness of the service or application…

> The service and application is provided to you strictly on an "as is" basis. All conditions, representations and warranties, whether express, implied, statutory or otherwise, including, without limitation, any implied warranty of merchantability, fitness for a particular purpose, or non-infringement of third party rights, are disclaimed to the maximum extent permitted by applicable law…
>
> You acknowledge and agree that the entire risk arising out of your use of the application and service, and any third party services or products remains solely with you, to the maximum extent permitted by law.

76. Defendant's "Terms & Conditions" contain a "no refund" policy, which applies to "[a]ny fees that the Company may charge you…" This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, or any reason whatsoever.

77. Defendant's "Terms & Conditions" contain a complete Liability Disclaimer, wherein Defendant purports to absolve themselves of any and all liability that may arise out of the use of the Uber App or the UberX Transportation Services.

78. Despite Defendant's explanation of the Safe Rides Fee, Defendant disclaims "any and all liability… in any way related to the third party transportation provider…"

79. Despite Defendant's explanation about its background check process, Defendant disclaims any responsibility to "assess the suitability, legality or ability of any" of its drivers and disavow any responsibility for the rider's safety: "You understand, therefore, that by using the application and the service, you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or otherwise objectionable, and that you use the application and the service at your own risk."

80. One of Defendant's more controversial practices is to charge "surge pricing," wherein fees for transportation rise significantly during times of higher demand.  In contrast to its inconspicuous link to its "Terms & Conditions," Defendant goes out of its way to ensure that it has a consumer's informed consent before charging such prices. Defendant discloses the amount of the surcharge, and require the customer to type the surcharge into a separate field, ensuring that the customer is expressly consenting to the fee.  Defendant's purpose for this process is to ensure that the

CLASS ACTION COMPLAINT

terms of its surge pricing are "clear and straightforward" such that its customers "won't be surprised" by the terms of the contract.

**H.**     **Plaintiff Paid Defendant's Safe Rides Fee**

81.     On October 3, 2014, Plaintiff Pappey used the Uber App to obtain UberX transportation.  Defendant did not disclose the Safe Rides Fee to Plaintiff Pappey before she paid for the UberX Transportation Service and Plaintiff Pappey was not aware of the Safe Rides Fee.  As reflected on her electronic receipt, however, Plaintiff Pappey paid 50% of the $12.34 cost for the trip, which included the $1.00 Safe Rides Fee.

82.     On November 3, 2014, Plaintiff Pappey used the Uber App to obtain UberX transportation. Defendant did not disclose the Safe Rides Fee to Plaintiff Pappey before she paid for the UberX Transportation Service and Plaintiff Pappey was not aware of the Safe Rides Fee.  As reflected on her electronic receipt, Plaintiff Pappey paid $7.52 for the trip, including the $1.00 Safe Rides Fee.

83.     On November 9, 2014, Plaintiff Pappey used the Uber App to obtain UberX transportation. Defendant did not disclose the Safe Rides Fee to Plaintiff Pappey before she paid for the UberX Transportation Service and Plaintiff Pappey was not aware of the Safe Rides Fee.  As reflected on her electronic receipt, Plaintiff Pappey paid $13.39 for the trip, including the $1.00 Safe Rides Fee.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff seeks relief in her individual capacity and as a representative of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a Nationwide class and, alternatively, a Massachusetts subclass.  The Nationwide class is initially defined as follows:

> All persons residing in the United States who, from January 6, 2011 until the date notice is disseminated to the Class, paid any portion of the Safe Rides Fee to Defendant (the "Nationwide Class").

85.     The Massachusetts subclass is initially defined as follows:

> All persons residing in Massachusetts who, from January 6, 2011 until the date notice is disseminated to the Class, paid any portion of the Safe Rides Fee to Defendant (the "California Class").

86.   Excluded from each of the above Classes are Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendant.  Also excluded are the judges and court personnel in this case and any members of their immediate families, as well as any person who purchased the Product for the purpose of resale.

87.   Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

88.   <u>Numerosity</u>.  Fed. R. Civ. P. 23(a)(1).  Each Class is so numerous that joinder of all members is unfeasible.  While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that millions of consumers have paid the Safe Rides Fee during the class period.

89.   <u>Commonality</u>.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to each Class, which predominate over any questions affecting only individual members of each respective Class.  These common questions of law and fact include, without limitation:

a.   Whether Defendant conducts "industry leading" background checks on its drivers;

b.   Whether or the extent to which Defendant uses revenue generated by the collection of the Safe Rides Fee to provide "regular motor vehicle inspections";

c.   Whether or the extent to which Defendant uses revenue generated by the collection of the Safe Rides Fee to provide "driver safety education";

d.   Whether or the extent to which Defendant uses revenue generated by the collection of the Safe Rides Fee to "develop safety features for the app";

e.   Whether or the extent to which Defendant uses revenue generated by the collection of the Safe Rides Fee to support other efforts to ensure consumer safety;

f.   Whether Defendant breached an implied contract with consumers;

g.   Whether Defendant has been unjustly enriched;

h.   Whether Defendant violated California's Unfair Competition Law, California

CLASS ACTION COMPLAINT

Business & Professions Code § 17200, *et seq.*; and

       i.    The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

90.    <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class she seeks to represent.  Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendant's unlawful conduct.

91.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes.  Further, Plaintiff's counsel is competent and experienced in litigating class actions.

92.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this action since joinder of all Class members is impracticable and will waste judicial resources.  Moreover, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting outcomes.  Finally, there will be no difficulty in managing this action as a class action.

93.    <u>Injunctive and Declaratory Relief</u>.  Fed. R. Civ. P. 23(b)(2).  Defendant's unlawful and unfair conduct is uniform as to all members of each Class.  Defendant has acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

## **FIRST CAUSE OF ACTION**

### **Breach of Implied Contract**

**(On behalf of Plaintiff, the Nationwide Class and the Massachusetts Class)**

94.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

95.    An implied-in-fact contract was formed between Plaintiff and Class members on the one hand and Defendant on the other with respect to the $1.00 Safe Rides Fee (the "Safe Rides Fee Agreement").

96.    Between April and October 2014, Defendant offered to enter into the Safe Rides Fee Agreement when it demanded payment of the $1.00 Safe Rides Fee from Plaintiff and other Class members to "support continued efforts to ensure the safest possible platform for Uber riders and

drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app.…"

97.     Between October 2014 and continuing through the present, Defendant has offered to enter into the Safe Rides Fee Agreement with consumers when it demanded payment of the $1.00 Safe Rides Fee from Plaintiff and other Class members to "support continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app . . ."

98.     Plaintiff and other Class members accepted Defendant's offer by paying the Safe Rides Fee.  Through their payment of the Safe Rides Fee, Plaintiff and other Class members performed all conditions, covenants and promises required of Plaintiff and other Class members in accordance with the Safe Rides Fee Agreement.

99.     Defendant breached the Safe Rides Fee Agreement in at least the following respects:

   a.     Defendant did not use the Safe Rides Fee to provide an industry-leading background check process;

   b.     Defendant did not use the Safe Rides Fee to provide regular motor vehicle checks;

   c.     Defendant did not use the Safe Rides Fee to provide "driver safety education";

   d.     Defendant has not used the Safe Rides Fee to develop safety features on the Uber App for the vast majority of consumers in the United States; and

   e.     Upon information and belief, Defendant has retained considerable portions of the revenue generated from the Safe Rides Fee for purposes unrelated to the provision of safe rides for consumers.

100.     No express contract exists between Plaintiff and Class members on the one hand and Defendant on the other with respect to the imposition and collection of the Safe Rides Fee.

101.     Defendant's breaches were willful and not the result of mistake or inadvertence.

102.     As a result of Defendant's breach of the Safe Rides Fee Agreement, Plaintiff and other Class members have been damaged in an amount to be determined at trial.

## **SECOND CAUSE OF ACTION**

### **Unjust Enrichment**

### **(On behalf of Plaintiff, the Nationwide Class and the Massachusetts Class)**

103.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

104.    By charging and collecting the Safe Rides Fee, Defendant has unjustly received a benefit from Plaintiff and other Class members at the expense of Plaintiff and other Class members.

105.    Between April and October 2014, Defendant unjustly retained the benefit of the Safe Rides Fee because Defendant assessed and collected the Safe Rides Fee to provide Plaintiff and Class members with "an industry-leading background check process, regular motor vehicle checks, driver safety education [and] development of safety features in the app," but did not use the revenue generated from the Safe Rides Fee for those purposes or other purposes that would promote consumer safety.

106.    Between October 2014 and continuing through the present, Defendant unjustly retained the benefit of the Safe Rides Fee because Defendant assessed and collected the Safe Rides Fee to provide Plaintiff and Class members with "continued efforts to ensure the safest possible platform for Uber riders and drivers, including a Federal, state, and local background check process, regular motor vehicle checks, driver safety education, [and] development of safety features in the app," but did not use the revenue generated from the Safe Rides Fee for those purposes or other purposes that would promote consumer safety.

107.    Defendant also unjustly retains the benefit of the Safe Rides Fee because Defendant "does not guarantee the . . . safety" of consumers of UberX Transportation Services, expressly disclaims "any liability arising from or in any way related to your transactions or relationship with third party providers" and disavows any responsibility for providing consumers with a safe ride.

108.    To avoid an unjust result, Plaintiff and other Class members are entitled to restitution in the amount of all Safe Rides Fees paid to Defendant.

//

//

//

CLASS ACTION COMPLAINT

### THIRD CAUSE OF ACTION

**Unlawful Business Practices In Violation of Bus. & Prof. Code § 17200, *et seq*.**

**(On behalf of Plaintiff and the Nationwide Class)**

109.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

110.     Defendant's conduct constitutes unlawful business acts or practices under California's Unfair Competition Law, California Business & Professions Code § 17200, et seq. (the "UCL").

111.     Defendant's business practices are unlawful because, as detailed above, they constitute a breach of the implied contract between Plaintiff and Class members on the one hand and Uber on the other and because Defendant has been unjustly enriched.

112.     As a result of Defendant's unlawful business acts and practices, Plaintiff and other Class members have suffered injury in fact and lost money or property.

113.     Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendant not engaged in unfair competition, including by ordering restitution of all funds that Defendant may have acquired as a result of its unfair competition and an injunction prohibiting the charging of the Safe Rides Fee.

### FOURTH CAUSE OF ACTION

**Unfair Business Practices In Violation of Bus. & Prof. Code § 17200, *et seq*.**

**(On behalf of Plaintiff and the Nationwide Class)**

114.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

115.     The UCL proscribes unfair business acts or practices.

116.     A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.  A business act or practice is also "unfair" under the UCL if the Defendant's conduct practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. A business act or practice is also "unfair" under the UCL where the consumer injury is substantial; the injury is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers themselves could not reasonably have avoided.

117.     Defendant's conduct as detailed herein constitutes unfair business acts and practices.

118.   Defendant charged and collected a Safe Rides Fee for "industry leading background checks" but did not provide "industry leading background checks."

119.   Defendant charged and collected a Safe Rides Fee "to support . . . driver safety education" but did not use revenue generated from the collection of the Safe Rides Fee to provide driver safety education for Uber drivers.  Instead, Defendant offered Uber drivers an optional "driver training class" at a cost between $40.00 to $65.00, which would be paid by the Uber driver, and not by revenue generated from the Safe Rides Fee.

120.   Defendant charged and collected a $1.00 Safe Rides Fee "to support . . . regular motor vehicle inspections" but did not use revenue generated from the collection of the Safe Rides Fee to provide regular motor vehicle inspections for all Uber drivers.  The vast majority of Uber drivers pay the costs for their own motor vehicle inspection. Other Uber drivers are offered free inspections provided they spend a set amount in repairs.

121.   Plaintiff and other Class members had no way of reasonably knowing that Defendant would not use the Safe Rides Fee for the purposes for which they paid that fee.  Nor did Plaintiff and other Class members have a means to reasonably know that Defendant was overcharging Plaintiff and other Class members for the safety-related services that were not provided.

122.   The consequences of Defendant's conduct as detailed herein outweigh any justification, motive or reason for Defendant's conduct.  Defendant's conduct is and continues to be unlawful, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and members of the Class.  Defendant's conduct has caused substantial injury to Plaintiff and other Class members (because it results in windfall for Defendant estimated to be in excess of $20,000,000), that injury is not outweighed by any countervailing benefits to consumers (because Defendant does not use the Safe Rides Fee revenue for the purposes for which it was collected) and Plaintiff and Class members could not have avoided such injury since the assessment and collection of the Safe Rides Fee was mandatory and automatic, and was not clearly and conspicuously disclosed.

123.   As a result of Defendant's unfair business acts and practices, Plaintiff and other Class members have suffered injury in fact and lost money or property. Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had

1   Defendant not engaged in unfair competition, including by ordering restitution of all funds that

2   Defendant may have acquired as a result of its unfair competition and an injunction prohibiting the

3   charging of the Safe Rides Fee, and by requiring Defendant to correct its labeling and to engage in a

4   corrective advertising campaign.

5   **JURY DEMAND**

6   Plaintiff demands a trial by jury of all claims in this Complaint that are so triable.

7   **REQUEST FOR RELIEF**

8   **WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes

9   proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and

10  against Defendant, as follows:

11       A.     Declaring that this action is a proper class action, certifying the Class as requested

12  herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class

13  Counsel;

14       B.     Ordering Defendant to pay actual damages (and no less than the statutory minimum

15  damages) and equitable monetary relief to Plaintiffs and the other members of the Nationwide and

16  Massachusetts Classes;

17       C.     Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiffs and the

18  other members of these Classes;

19       D.     Ordering Defendant to pay statutory damages, as allowable by the statutes asserted

20  herein, to Plaintiffs and the other members of these Classes;

21       E.     Awarding injunctive relief as permitted by law or equity, including enjoining

22  Defendant from continuing the unlawful practices as set forth herein;

23       F.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other

24  members of the Nationwide and Massachusetts Classes;

25  //

26  //

27  //

28  //

CLASS ACTION COMPLAINT

1    G.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts

2   awarded; and

3    H.    Ordering such other and further relief as may be just and proper.

4   DATED:  January 6, 2015                    Respectfully submitted,

5                                              **AHDOOT & WOLFSON, PC**

6                                              By:  /s/ Tina Wolfson

7                                              Tina Wolfson
                                               Robert Ahdoot

8                                              Keith Custis
                                               Theodore W. Maya

9

10                                             1016 Palm Avenue
                                               West Hollywood, California 90069

11                                             Tel: 310-474-9111
                                               Fax: 310-474-8585

12                                             twolfson@ahdootwolfson.com
                                               rahdoot@ahdootwolfson.com

13                                             kcustis@ahdootwolfson.com
                                               tmaya@ahdootwolfson.com

14

15                                             Counsel for Plaintiffs
                                                 ANDREA PAPPEY

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT