1  IRELL & MANELLA LLP
   Andra Barmash Greene (123931)
2  agreene@irell.com
   A. Matthew Ashley (198235)
3  mashley@irell.com
   840 Newport Center Drive, Suite 400
4  Newport Beach, California 92660-6324
   Telephone:   (949) 760-0991
5  Facsimile:   (949) 760-5200

6  Attorneys for Defendant

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO

11  JULIAN MENA, TODD SCHREIBER, NATE )   Case No. 3:15-CV-00064-JST
    COOLIDGE, AND ERNESTO MEJIA      )
12  individually and on behalf of all others )   **DEFENDANT'S NOTICE OF MOTION**
    similarly situated,              )   **AND MOTION TO STAY PROCEEDINGS**
13                                   )   **PENDING ARBITRATION;**
                                     )   **MEMORANDUM OF POINTS AND**
14                  Plaintiffs,      )   **AUTHORITIES IN SUPPORT THEREOF**
                                     )
15         vs.                       )   [Filed Concurrently with: Declarations of  R.
                                     )   Michael Cianfrani, J.J. Ford, Paul Holden,
16  UBER TECHNOLOGIES, INC.,         )   Jeremy Lermitte, and Amir Memon;
                                     )   [Proposed] Order]
17                  Defendant.       )
                                     )   Date:   June 11, 2015
18  _____ )   Time:   2:00 p.m.
                                         Judge: Hon. Jon S. Tigar
19                                       Place   San Francisco Courthouse
                                                 Courtroom 9, 19th Floor
20                                               450 Golden Gate Ave.
                                                 San Francisco, CA 94102
21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2

**Page**

3

I.      INTRODUCTION.............................................................................................................2

4

II.     BACKGROUND..............................................................................................................3

5

        A.      The Uber Registration Process .............................................................................3

6

        B.      The Arbitration Agreement ...................................................................................9

7

III.    LEGAL STANDARD .....................................................................................................10

8

IV.     PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS ON AN
        INDIVIDUAL BASIS.....................................................................................................11

9

        A.      The Agreement is Governed By The FAA...........................................................11

10

        B.      The Arbitrator Should Decide Any Questions Of Arbitrability ..........................12

11

        C.      Plaintiffs Assented To The Arbitration Agreement ............................................14

12

                1.      Plaintiffs Mena, Schreiber and Mejia.....................................................15

13

                2.      Plaintiff Coolidge .....................................................................................18

14

        D.      The Arbitration Agreement Encompasses Plaintiffs' Claims ..............................20

15

        E.      The Arbitration Agreement Is Not Unconscionable ............................................21

16

V.      CONCLUSION...............................................................................................................22

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION
Case No. 3:15-cv-00064-JST

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*5381 Partners LLC v. Shareasale.com, Inc.*,
No. 12cv426, 2013 WL 5328324 (E.D.N.Y. Sept 23, 2013) ............................................ 16

*Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*,
855 F.2d 1470 (9th Cir. 1988) ............................................................................................. 1

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
513 U.S. 265 (1995) ........................................................................................................... 12

*AT&T Mobility v. Concepcion*,
131 S. Ct. 1740 (2011) ....................................................................................................... 10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ..................................................................................................... 11, 21

*Bernal v. Southwestern & Pac. Specialty Fin., Inc.*,
No. C-12-05797, 2014 U.S. Dist. LEXIS 63338 (N.D. Cal. May 7, 2014) ...................... 13

*Binder v. Aetna Life Ins. Co.*,
75 Cal. App. 4th 832 (1999) .............................................................................................. 14

*Buckeye Check Cashing*,
546 U.S. 440 (2006) ........................................................................................................... 11

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
No. 04-04825, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) .............................................. 16

*Carnival Cruise Lines, Inc. v. Shute*,
499 U.S. 585 (1991) ........................................................................................................... 14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ........................................................................................... 14

*Conrad v. Phone Directories Co.*,
585 F.3d 1376 (10th Cir. 2009) ........................................................................................... 1

*Crawford v. Beachbody, LLC*,
No. 14CV1583, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) .......................................... 16

*Cronus Invs., Inc. v. Concierge Servs.*,
35 Cal. 4th 376 (2005) ....................................................................................................... 11

*Crook v. Wyndham Vacation Ownership, Inc.*,
No. 13-CV-03669, 2013 WL 6039399 (N.D. Cal. Nov. 8, 2013) ................................ 13, 20

*Dollar Phone Corp. v. Dun & Bradstreet Corp.*,
936 F. Supp. 2d 209 (E.D.N.Y. 2013) ............................................................................... 19

*Dream Theater, Inc. v. Dream Theater*,
124 Cal. App. 4th 547 (2004) ...................................................................................... 13, 21

**Page(s)**

*Fteja v. Facebook, Inc.,*
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) ........................................................................... 17

*Garcia v. Enter. Holdings, Inc.,*
  Case No. 14-00596, 2015 U.S. Dist. LEXIS 8799 (N.D. Cal. Jan. 23, 2015) ................. 14

*Grant-Fletcher v. Collecto, Inc.,*
  No. 13-3505, 2014 WL 1877410 (D. Md. May 9, 2014) ........................................... 18, 20

*Green Tree Fin. Corp. v. Randolph,*
  531 U.S. 79 (2000) ...................................................................................................... 11

*Hancock v. Am. Tel. & Tel. Co.,*
  701 F.3d 1248 (10th Cir. 2012) ................................................................................. 19

*Howsam v. Dean Witter Reynolds, Inc.,*
  537 U.S. 79 (2002) ...................................................................................................... 12

*Hubbert v. Dell Corp.,*
  835 N.E.2d 113 (Ill. App. Ct. 2005) ........................................................................... 17

*iLOR, LLC v. Google, Inc.,*
  631 F.3d 1372 (Fed. Cir. 2011) ................................................................................... 3

*Kuehner v. Dickinson & Co.,*
  84 F.3d 316 (9th Cir. 1996) ....................................................................................... 11

*Leong v. Myspace, Inc*, No. CV 10-8366,
  2011 WL 7808208 (C.D. Cal. March 11, 2011) ....................................................... 17

*Levin v. Alms & Associates, Inc.*, 634 F.3d 260, (4th Cir. 2011) ................................. 21

*Major v. McCallister,*
  302 S.W.3d 227 (Mo. Ct. App. 2009) ....................................................................... 17

*Minton v. Mitchell*, 89 Cal. App. 361 (Cal. Ct. App. 1928) ......................................... 20

*Mortensen v. Bresnan Commc'n., LLC,*
  722 F.3d 1151 (9th Cir. 2013) ............................................................................... 10, 11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983) ................................................................................................... 10, 21

*Nguyen v. Barnes & Noble Inc.,*
  763 F.3d 1171 (9th Cir. 2014) ............................................................................. passim

*Nicosia v. Amazon.com, Inc.,*
  No. 14-CV4513, 2015 WL 500180 (E.D.N.Y. Feb. 4, 2015) ................................... 16

*Oracle Am., Inc. v. Myriad Grp. A.G.,*
  724 F.3d 1069 (9th Cir. 2013) ................................................................................... 13

- iii -

**Page(s)**

*Performance Plastering v. Richmond Am. Homes of California, Inc.*,
  153 Cal. App. 4th 659 (2007) ............................................................................................. 20

*Rent-A-Center West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ................................................................................................... 12, 22

*Rodman v. Safeway Inc.*,
  No. 11-CV-03003-JST, 2015 WL 604985 (N.D. Cal. Feb. 12, 2015) .............................. 19

*Sabatino v. Uber Technologies, Inc.*, et al.,
  No. 3:15-cv-00363 ........................................................................................................... 22

*Swift v. Zynga Game Network, Inc.*,
  805 F. Supp. 2d 904 (N.D. Cal. 2011) ............................................................................ 16

*Tompkins v. 23andMe, Inc.*,
  No. 5:13-CV-05682, 2014 WL 2903752 (N.D. Cal. June 25, 2014) .............................. 13

*Universal Protection Service, L.P., v. Super. Court of San Diego Co.*,
  Case No. D066919, 2015 WL 851090 (Cal. Ct. App. 2015) .......................................... 13

*Washington Mut. Bank, FA v. Superior Court*,
  24 Cal. 4th 906 (2001) ..................................................................................................... 14

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
  25 Cal. App. 3d 987 (1972) ............................................................................................. 14

**Statutes**

9 U.S.C. § 1 ........................................................................................................................... 1

9 U.S.C. § 4 ......................................................................................................................... 14

Cal. Civ. Code § 1589 ......................................................................................................... 20

**Other Authorities**

AAA COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES, Rule 7(a)
  (available at
  https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103)
  (effective October 1, 2013; last accessed March 20, 2015) .............................................. 12

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE THAT on Thursday, June 11, 2015, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 9, 19th Floor 450 Golden Gate Avenue, San Francisco, CA, 94102, before the Honorable Jon S. Tigar, Defendant Uber Technologies, Inc. ("Uber") will and hereby does move the Court for an order staying these proceedings pending arbitration of the claims pursued by Plaintiffs Julian Mena, Todd Schreiber, Nate Coolidge, and Ernest Mejia (collectively "Plaintiffs").  Defendant's motion is based upon this Notice of Motion, the Memorandum of Points and Authorities offered in support thereof, the supporting Declarations of Paul Holden, R. Michael Cianfrani, Jeremy Lermitte, J.J. Ford and Amir Memon and all exhibits thereto, all documents in the Court's file, any matters of which this Court may take judicial notice, and any evidence or argument presented on this matter.

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, Defendant seeks the following relief:  an order staying this litigation in favor of arbitration.[1]

Dated:  May 4, 2015

IRELL & MANELLA LLP
Andra B. Greene
A. Matthew Ashley


By:  /s/  A. Matthew Ashley
      A. Matthew Ashley
      Attorney for Defendant

---

[1] Uber reserves the right to file a motion to dismiss under Federal Rule of Civil Procedure 12(b) should the Court deny its motion to stay pending arbitration.  *See Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1475 (9th Cir. 1988) (because a motion to stay is not a Rule 12(b) motion, its filing does not bar a subsequent motion to dismiss); *see also Conrad v. Phone Directories Co.,* 585 F.3d 1376, 1383 (10th Cir. 2009) ("If a party files a motion under FAA §§ 3 or 4 [and] that motion is denied . . . nothing prevents that party from then filing a Rule 12 motion to dismiss.").

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2         Uber Technologies, Inc. ("Uber") respectfully submits this memorandum in support of its

3    motion to stay this action in favor of arbitration.

4    **I.     INTRODUCTION**

5         This is Plaintiffs' second attempt to bring a lawsuit that belongs in arbitration.  In response

6    to the original complaint, Uber filed a Motion to Stay Proceedings in Favor of Arbitration

7    demonstrating that the original plaintiff had agreed to arbitrate any dispute with Uber when she

8    created an Uber account.  Dkt. No. 22.  The Amended Complaint drops the original plaintiff in

9    favor of four new ones.  Dkt. No. 28.  However, these new Plaintiffs are no different.  They, too,

10   agreed to be bound by Uber's Terms and Conditions, which include a clear and conspicuous

11   agreement to arbitrate (the "Arbitration Agreement").

12        Plaintiffs admit that they registered for Uber *by creating an account*.  FAC ¶¶ 70, 79, 84,

13   89.  In doing so, they were directed to Uber's Terms and Conditions, including the Arbitration

14   Agreement, via a clickable button.  Under binding Ninth Circuit authority, supported by precedent

15   throughout the country, this constitutes assent to the Arbitration Agreement.  This is particularly

16   true where, as here, Plaintiffs have asserted that Uber is bound by alleged contractual terms that

17   are accessible in this same manner.  *See, e.g.,* FAC ¶ 32 (alleging that "[n]ext to the words 'Safe

18   Rides Fee' on the receipt is a question mark that hyperlinks to an explanation of the Safe Rides

19   Fee").

20        Having assented to the Arbitration Agreement, Plaintiffs are bound by its terms, which are

21   fair and indeed generous to the user (as demonstrated below).  This includes the requirement that

22   "any dispute, claim or controversy arising out of or relating to" the use of Uber's services

23   (language that undoubtedly encompasses the assertions in this litigation) be resolved either by

24   binding arbitration or in small claims court.  Plaintiffs' allegations are based entirely on their use

25   of Uber's services to arrange and pay for third-party transportation, and thus fall squarely within

26   the scope of the Arbitration Agreement.

27        For all of these reasons and those discussed further below, this action should be stayed in

28   favor of arbitration.

## II.     BACKGROUND

### A.     <u>**The Uber Registration Process**</u>

Uber is a technology company that enables riders to request transportation services from third-party transportation providers.  Holden Decl. ¶ 3.  Using Uber's technology platform, riders can request transportation services from their smartphones via the Uber App, and these requests are then transmitted to independent transportation providers in the area who are available to receive transportation requests.  *Id*.  But before riders can request transportation services via the Uber App, they must first register by creating an Uber account.  *Id.*; *see* FAC ¶ 26.

**Plaintiff Ernest Mejia** used his iPhone to create an Uber account using the Uber App on October 24, 2014.  Memon Decl. ¶ 3.  The iPhone registration process during the time that Mejia created his account involved three basic steps, each of which was confined to a single screen: (1) "Create an Account;" (2) "Create a Profile;" and (3) "Link Payment."  *Id.* ¶ 5.  In the Create an Account step/screen, prospective registrants entered their email address, mobile phone number, and a chosen password.  The prospective registrant then hit the "next" button, which would light up at the top right of the screen, to move to the next step.  *Id.* ¶ 5(a).  In the Create a Profile step/screen, prospective registrants entered their first and last names (their user profile).  Once again, the prospective registrant had to hit the "next" button at the top right of the screen to move to the next step.  *Id* ¶ 5(b).

In the Link Payment step/screen, which is the final step in the Uber App registration process, prospective registrants entered their credit card or PayPal information.  *Id*. ¶ 5(c).  In addition, they were informed on the same screen that:  "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy," with the words "Terms & Conditions and Privacy Policy" distinguished in bolded text and a rectangular box that was a clickable button similar to a hyperlink.  *Id*.  When the button was clicked, the rider was taken to a screen that contained clickable buttons, one of which was entitled "Terms & Conditions," and another entitled "Privacy Policy."  *Id*.; *see iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1374 (Fed. Cir. 2011) (a hyperlink is a "string of text or a computer graphic that a user can 'click' with the mouse pointer" to open a new browser page).  To complete the Uber App registration process and create an Uber account,

registrants then either entered their credit card information and clicked the "DONE" button, which
would light up at the top right of the screen, or clicked on the PayPal option to enter their PayPal
information:



*Id.* Ex. A.

**Plaintiff Julian Mena** also used his iPhone to create an Uber account using the Uber App
on October 13, 2013.  Holden Decl. ¶ 5.  During the time that Mena created his account, the
iPhone registration process included the same three basic steps discussed above.  *See id.* ¶ 7.  At
the final "Link Card" screen/step, registrants were informed:  "By creating an Uber account, you
agree to the Terms of Service & Privacy Policy," with the words "Terms of Service & Privacy
Policy" distinguished in bolded text and a rectangular box that was a clickable button similar to a

DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION
Case No. 3:15-cv-00064-JST

hyperlink.  *Id.* ¶ 7(c).  To complete the Uber App registration process and create an Uber account, the registrant then clicked the "DONE" button, which would light up at the top right of the screen:



*Id.* Ex. A.

**Plaintiff Todd Schreiber** created an Uber account on the Uber App using an Android operated smartphone on May 14, 2014.  Ford Decl. ¶ 3.[2]  The registration process for the Android at the time Plaintiff created his account was virtually identical to the registration process for the iPhone described above.  *See id.* ¶ 6.  Prospective registrants were taken through the same three step process in which they were asked to input their information and then could proceed to the subsequent step by clicking the "next" button in the top right of the screen.  *Id*.  At the final step, prospective registrants were presented with the Link Payment step/screen where they entered their

---

[2] Android is an operating system for certain smartphones, such as the Samsung line of smartphones.

1   credit card or PayPal information.  *Id.* ¶ 6(c).   In this same screen, registrants were informed that:

2   "By creating an Uber account, you agree to the Terms of Service & Privacy Policy," with the

3   words "Terms of Service & Privacy Policy" distinguished in a rectangular box that was a clickable

4   button similar to a hyperlink.  *Id.*

5

6

7

8

9

10

11

12   

13

14

15

16

17

18

19

20

21

22   *Id.*, Ex. B.  When the button was clicked, the rider was taken to a screen that contained clickable

23   buttons, one of which was entitled "Terms & Conditions," and another entitled "Privacy Policy."

24   *Id.* ¶ 6(c).  To complete the Uber App registration process and create an Uber account, the

25   registrant then clicked the "SAVE" button, which would light up at the top right of the screen, or

26   clicked on the PayPal option to enter their PayPal information.  *Id.*

27

28

DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION
Case No. 3:15-cv-00064-JST

1    **Plaintiff Nate Coolidge** created an Uber account on the Uber App using an Android

2  operated smartphone on February 14, 2014.  *Id.* ¶ 3.  According to Uber's records, Coolidge

3  registered using "Google Wallet," an application that allowed prospective registrants to register

4  for Uber using payment and contact information that they had already provided to a preexisting

5  Google Wallet account.  *Id.* ¶ 4.[3]  For a brief period, including the time that Plaintiff Coolidge

6  created his account, a small population of registrants who used Google Wallet were notified that

7  by registering for an Uber account they agreed that their information would be used in accordance

8  with Uber's Terms and Conditions, but were not immediately provided a link to Uber's Terms and

9  Conditions during the registration process.  *Id.* ¶ 4(b).



---

[3] Google Wallet is a program that stores the user's payment information so that it is quicker and easier to make purchases online or with a smartphone.

1    *Id.*, Ex. A.

2        However, on October 29, 2014, Uber sent Coolidge an email to the address that Coolidge

3 had provided during the registration process and to which Uber's records indicate Coolidge

4 received other email from Uber, including ride receipts and marketing emails, for example.

5 Lermitte Decl. ¶¶ 3-4.  This October 29, 2014 email, which was addressed with the subject line,

6 "Agree to Terms & Conditions," notified Coolidge of "the most recent version of [Uber's] Terms

7 & Conditions and Privacy Policy" and informed him that he needed to "review and accept them to

8 keep riding."  *Id.* ¶ 3, Ex. A.  The phrases "Terms & Conditions" and "Privacy Policy" were

9 hyperlinks on which the recipient could click to view each document.  Below this statement was a

10 box containing the phrase "I Accept" followed by the phrase "Click Above to Keep Riding."  *Id.*

11 The email consists of a single paragraph and requires no scrolling to see the hyperlinks.



1   *Id.* Ex. A.

2          After receiving this email, Coolidge requested and completed eleven rides on Uber,

3   including three rides that occurred after the date that Coolidge sued Uber in this case.  *Id.* ¶ 5.

4          **B.          The Arbitration Agreement**

5          Uber's Terms and Conditions contain seven sections.  The first section provides that the

6   Terms and Conditions create a contractual relationship between the registrant and Uber.  Cianfrani

7   Decl., Ex. A at 1.[4]

8          Another section, entitled "Dispute Resolution," (Cianfrani Decl., Ex. A at 7-8), states that:

9          You and Company agree that any dispute, claim or controversy arising out of or
           relating to this Agreement or the breach, termination, enforcement, interpretation or
10         validity thereof or the use of the Service or Application (collectively, "Disputes")[5]
           will be settled by binding arbitration, except that each party retains the right to
11         bring an individual action in small claims court and the right to seek injunctive or
           other equitable relief in a court of competent jurisdiction to prevent the actual or
12         threatened infringement, misappropriation or violation of a party's copyrights,
           trademarks, trade secrets, patents or other intellectual property rights.  **You**
13         **acknowledge and agree that you and Company are each waiving the right to a**
           **trial by jury or to participate as a plaintiff or class User in any purported class**
14         **action or representative proceeding.**  Further, unless both you and Company
           otherwise agree in writing, the arbitrator may not consolidate more than one
15         person's claims, and may not otherwise preside over any form of any class or
           representative proceeding . . . .

16
           The Terms and Conditions also specify that the American Arbitration Association
17
    ("AAA") will oversee any dispute, and identifies the particular arbitration rules that will govern:
18
           Arbitration Rules and Governing Law. The arbitration will be administered by the
19         American Arbitration Association ("AAA") in accordance with the Commercial
           Arbitration Rules and the Supplementary Procedures for Consumer Related
20         Disputes (the "AAA Rules") then in effect, except as modified by this "Dispute
           Resolution" section. (The AAA Rules are available at www.adr.org/arb_med
21         (/web/20140905032202/http://www.adr.org/arb_med) or by calling the AAA at 1-
           800-778-7879.)  The Federal Arbitration Act will govern the interpretation and
22         enforcement of this Section . . . .

23          [4] Though the Terms and Conditions that were in effect at the time that Coolidge elected to
    sue Uber in this case differed slightly, the Dispute Resolution Section has not been materially
24  altered.  *See* Cianfrani Decl., Ex. B at 8-10.

25          [5] The terms "Service" and "Application" are defined in the Terms and Conditions as
    follows: "By using or receiving any services supplied to you by the Company (collectively, the
26  "Service"), and downloading, installing or using any associated application supplied by the
    Company which purpose is to enable you to use the Service (collectively, the "Application"), you
27  hereby expressly acknowledge and agree to be bound by the terms and conditions of the
    Agreement, and any future amendments and additions to this Agreement as published from time to
28  time at https://www.uber.com/terms (/web/20140905032202/https://www.uber.com/terms) or
    through the Service."  Cianfrani Decl., Ex. A at 1.

- 9 -

1   *Id.* at 8.

2          The terms of the arbitration provision heavily favor the user; they permit the user to

3   arbitrate the dispute in the county where he or she resides, and allow for recovery of attorneys'

4   fees only by the user, not Uber:

5          <u>Arbitration Location and Procedure</u>. Unless you and Company otherwise agree, the
           arbitration will be conducted in the county where you reside . . . . If you prevail in
6          arbitration you will be entitled to an award of attorneys' fees and expenses, to the
           extent provided under applicable law. Company will not seek, and hereby waives
7          all rights it may have under applicable law to recover, attorneys' fees and expenses
           if it prevails in arbitration.

8   *Id.* at 8.

9

10         Further safeguarding riders' access to the arbitral forum is Uber's agreement to bear the

11  burden of filing, administrative and arbitrator fees for non-frivolous claims:

12
           <u>Fees</u>. Your responsibility to pay any AAA filing, administrative and arbitrator fees
13         will be solely as set forth in the AAA Rules. However, if your claim for damages
           does not exceed $75,000, Company will pay all such fees unless the arbitrator finds
14         that either the substance of your claim or the relief sought in your Demand for
           Arbitration was frivolous or was brought for an improper purpose (as measured by
15         the standards set forth in Federal Rule of Civil Procedure 11(b)).

16  *Id.* at 7-8.

17         Thus, the Arbitration Agreement contains a detailed delineation of the waivers of the

18  parties, including the waiver of any jury trial right, as well as the numerous protections afforded

19  the user.

20  **III.   LEGAL STANDARD**

21         In enacting the Federal Arbitration Act (the "FAA"), Congress's "clear intent" was "to

22  move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as

23  possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22-25 (1983) (the

24  FAA embodies "a liberal federal policy favoring arbitration agreements"). The Ninth Circuit

25  recognizes that "the FAA's purpose is to give preference (instead of mere equality) to arbitration

26  provisions." *Mortensen v. Bresnan Commc'n., LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013) (*citing*

27  *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740, 1745 (2011)).

28

1    Accordingly, "[an] order to arbitrate the particular grievance should not be denied unless it

2    may be said with positive assurance that the arbitration clause is not susceptible of an

3    interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*,

4    475 U.S. 643, 650 (1986); *see also Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996)

5    (holding that the FAA "created a rule of contract construction favoring arbitration.").  "As

6    arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear

7    the burden of proving that the provision is unenforceable." *Mortensen*, 722 F.3d at 1157 (citing

8    *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000)).

9    **IV.    PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS ON AN  INDIVIDUAL**

10          **BASIS**

11    Plaintiffs admit they went through the entire Uber registration process and admit that they

12    knowingly and intentionally created (and used) their Uber accounts.  FAC ¶¶ 70, 79, 84, 89.

13    Plaintiffs are thus bound by the Terms and Conditions that they were expressly informed would

14    apply to their Uber accounts.  *See* Section IV(C), *infra*.  As discussed below, because the

15    Arbitration Agreement is governed by the FAA, and because Plaintiffs' claims fall within the

16    scope of the Arbitration Agreement, Plaintiffs are now bound by the Agreement's relevant

17    provisions including: the resolution of disputes by binding arbitration or in small claims court

18    (Section IV(D), *infra*); delegation of threshold arbitrability issues to the arbitrator (Section IV(B),

19    *infra*); and a waiver of any representative or class-wide proceedings (Section II(B), *supra*).

20          **A.    The Agreement is Governed By The FAA**

21    Both the express terms of the Arbitration Agreement and the nature of the relationship

22    between Uber and Plaintiffs confirm that the FAA governs.  First, the Arbitration Agreement's

23    statement that "[t]he Federal Arbitration Act will govern the interpretation and enforcement" of

24    the agreement is a sufficient basis for application of the FAA.  *See Buckeye Check Cashing Inc. v.*

25    *Cardegna*, 546 U.S. 440, 442-43 (2006) (FAA found to preempt state law where arbitration

26    agreement expressly provided that the FAA would govern); *see also Cronus Invs., Inc. v.*

27    *Concierge Servs.*, 35 Cal. 4th 376, 394 (2005) ("[P]arties to an arbitration agreement [may]

28    expressly designate that any arbitration proceeding should move forward under the FAA's

- 11 -

procedural provisions rather than under state procedural law."). In addition, the FAA applies upon a finding that the transactions at issue affect interstate commerce. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 274-277 (1995) (interpreting the FAA's "involving commerce" provision as broadly as the words "affecting commerce," and confirming that the FAA should be applied coincident with the full reach of Congress's powers under the Commerce Clause). Where, as here, the transactions involve the use of internet technologies to transmit user requests across a network of independent drivers in over 100 cities across the United States, the "affecting commerce" requirement has been met. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (applying the FAA to a dispute involving internet commerce).

### B. The Arbitrator Should Decide Any Questions Of Arbitrability

The Court should stay this action and honor the parties' agreement to permit the arbitrator to decide the threshold question of arbitrability. "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010); *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-84 (2002) (questions of arbitrability may be submitted to the arbitrator if the parties clearly and unmistakably agree). Indeed, "[a]n agreement to arbitrate a gateway issue is simply an additional antecedent agreement the party seeking arbitration asks the federal court to enforce," and the FAA operates on this agreement just as it does on any other. *Rent-A-Center West, Inc.,* 561 U.S. at 70.

The Arbitration Agreement in this case delegates gateway questions of arbitrability to the arbitrator by incorporation of the AAA Commercial Arbitration Rules. Cianfrani Decl., Ex. A at 8. Specifically, Rule 7(a) of the AAA Rules provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES at R-7(a) (https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103) (effective October 1, 2013; last accessed March 20, 2015). Courts in this District addressing the effect of incorporation of the AAA Rules into contracts – including consumer contracts – have found that such

1  incorporation mandates delegation of the gateway question of arbitrability to the arbitrator. *See,*

2  *e.g.*, *Crook v. Wyndham Vacation Ownership, Inc.*, No. 13-CV-03669, 2013 WL 6039399, at *6

3  (N.D. Cal. Nov. 8, 2013) (Orrick, J.) (granting motion to compel arbitration of putative class

4  plaintiffs' claims and delegating questions of arbitrability to arbitrator); *see also Bernal v.*

5  *Southwestern & Pac. Specialty Fin., Inc.,* No. C-12-05797, 2014 U.S. Dist. LEXIS 63338, at *13-

6  17 (N.D. Cal. May 7, 2014) (Armstrong, J.) (same); *but see Tompkins v. 23andMe, Inc.,* No. 5:13-

7  CV-05682, 2014 WL 2903752, at *13 (N.D. Cal. June 25, 2014) (Koh, J.) (declining to delegate

8  questions of arbitrability to arbitrator).[6]

9       Applying the incorporation doctrine to delegate issues of arbitrability in a putative

10  consumer class action, the court in *Crook v. Wyndham Vacation Ownership, Inc.* noted that,

11  "[v]irtually every circuit to have considered the issue has determined that incorporation of the

12  American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable

13  evidence that the parties agreed to arbitrate arbitrability." *Crook*, 2013 WL 6039399, at *6 (citing

14  *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013)); *see also Universal*

15  *Protection Service, L.P. v. Superior Court of San Diego County*, Case No. D066919, 2015 WL

16  851090 at *5-9 (Cal. Ct. App. 2015) (holding that the parties' "agreement to resolve their

17  arbitration under the AAA rules constitutes clear and unmistakable evidence of their intent that the

18  arbitrator, not the court" decide threshold issues); *see also Dream Theater, Inc. v. Dream Theater*,

19  124 Cal. App. 4th 547, 557 (2004) (parties' agreement incorporating AAA Commercial

20  Arbitration Rules provided "clear and unmistakable evidence of the intent that the arbitrator will

21  decide whether a contested claim is arbitrable."). Other courts in this District have reached the

22  same conclusion. *Bernal*, 2014 U.S. Dist. LEXIS 63338, at *14-15 ("Indeed, when an arbitration

23  agreement explicitly incorporates the AAA Rules, numerous courts have held that the parties

24  clearly and unmistakably agreed that the issue of arbitrability would be submitted to arbitration for

25  resolution.").

26

27       [6] The Ninth Circuit has "express[ed] no view as to the effect of incorporating arbitration rules into consumer contracts." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 n.2

28  (9th Cir. 2013).

1   Consequently, this Court should stay this action and let the arbitrator decide the question of

2   arbitrability.

3       **C.      Plaintiffs Assented To The Arbitration Agreement**

4       As demonstrated above, the incorporation of the AAA Rules into the Arbitration

5   Agreement counsels that issues of arbitrability be delegated to the arbitrator.  However, if this

6   Court rules on issues of arbitrability, the Court's role under the FAA is "limited to determining

7   (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

8   encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126,

9   1130 (9th Cir. 2000) (citing 9 U.S.C. § 4).  "If the response is affirmative on both counts, then the

10  Act requires the court to enforce the arbitration agreement in accordance with its terms."  *Id.*

11      Mutual assent to contract "may be manifested by written or spoken words, or by conduct,"

12  *Binder v. Aetna Life Ins. Co*., 75 Cal. App. 4th 832, 850 (1999), and acceptance of contract terms

13  may be implied through action or inaction.  *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585,

14  593-95 (1991).[7]  Thus, "an offeree, knowing that an offer has been made to him but not knowing

15  all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains."

16  *Windsor Mills, Inc. v. Collins & Aikman Corp*., 25 Cal. App. 3d 987, 992 (1972).  In the context of

17  online transactions, "the terms of the agreement are binding, even if the user did not actually

18  review the agreement, provided that the user had actual knowledge of the agreement or the website

19  put a 'reasonably prudent user on notice of the terms of the contract.'"  *Garcia v. Enter. Holdings,*

20  *Inc*., Case No. 14-00596, 2015 U.S. Dist. LEXIS 8799 at *21-22 (N.D. Cal. Jan. 23, 2015) (citing

21  *Nguyen*, 763 F.3d at 1176).

22      In a recent decision, the Ninth Circuit noted that:  "While new commerce on the Internet

23  has exposed courts to many new situations, it has not fundamentally changed the principles of

24  contract.  One such principle is the requirement that mutual manifestation of assent, whether by

25

26      [7] Where, as here, the plaintiff alleges subject matter jurisdiction based on diversity of
27  citizenship, federal courts look to the choice of law principles of the forum state.  *Nguyen*, 763
    F.3d at 1175.  The default choice of law presumption in California is that California law applies.
28  *See Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919 (2001) ("[T]he forum will
    apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.").

written or spoken word or by conduct, is the touchstone of contract." *Nguyen,* 763 F.3d at 1175
(internal citations omitted).  The key question is whether the user had inquiry notice of the terms
and conditions.  *Id.* at 1176-77.  "[W]here the website contains an explicit textual notice that
continued use will act as a manifestation of the user's intent to be bound," courts have enforced
the agreements.  *Id.* at 1177.  The Ninth Circuit also noted that "the conspicuousness and
placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and
the website's general design all contribute to whether a reasonably prudent user would have
inquiry notice" of the terms and conditions.  *Id.*

Here, all four Plaintiffs were on inquiry notice that they would be bound by the arbitration
agreement.  During the registration process, all four Plaintiffs were each conspicuously informed
of the existence of Uber's Terms and Conditions.  Plaintiffs Mena, Schreiber, and Mejia were
further informed that, by creating an Uber account, they were assenting to Uber's Terms and
Conditions, which included the arbitration agreement.  Plaintiff Coolidge was provided this same
notice when he received an email specifically dedicated to Uber's Terms and Conditions.  This
email expressly informed Coolidge that he had to accept Uber's Terms and Conditions to keep
using the Uber App, which he subsequently did by requesting multiple Uber rides, including even
after he filed the Amended Complaint.  Because Coolidge is the only Plaintiff to register via
Google Wallet, he is discussed separately from the other Plaintiffs.

        1.   <u>Plaintiffs Mena, Schreiber and Mejia</u>

The three step registration process that Plaintiffs Mena, Schreiber, and Mejia completed on
the Uber App is clear, simple and unequivocal.  It consists of three screens, with little
accompanying text, and requires the completion of just six data fields. *See* Ford Decl. ¶ 6; Holden
Decl. ¶ 7; Memon Decl. ¶ 5.  At the last step/screen, the potential registrant is expressly informed:
"By creating an Uber account, you agree to the 'Terms of Service and Privacy Policy,'" with the
"Terms of Service and Privacy Policy" appearing in bolded text and surrounded by a rectangular
box to indicate a clickable box.  *Id*.  This simple registration process then ends with a push of the
"DONE" or "SAVE" button at the top right hand corner of the screen, which finishes the creation
of the Uber account.  *Id*.  The Uber App registration process thus provides the required "explicit

textual notice that [creating an Uber account] will act as manifestation of the user's intent to be bound," satisfying the *Nguyen* standard. *Nguyen,* 763 F.3d at 1177.**[8]**

In situations like the one here – as *Ngyuen* recognizes – courts in this District and throughout the nation (federal and state) have repeatedly held users to terms and conditions when they were on notice that such terms would bind them if they proceeded. *See, e.g., Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 911 (N.D. Cal. 2011) (Mag. J. Laporte) (videogame user bound by Zynga's online terms and conditions because she was told that, "By using YoVille, you also agree to the YoVille [hyperlink] Terms of Service" and the user proceeded) (compelling arbitration); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-04825, 2005 WL 756610, at *4-5 (N.D. Cal. Apr. 1, 2005) (J. Ware) (enforcing forum selection clause in website's terms of use where website expressly stated: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site . . .") (granting motion to dismiss for improper venue); *see also Nicosia v. Amazon.com, Inc.*, No. 14-CV4513, 2015 WL 500180, at *5 (E.D.N.Y. Feb. 4, 2015) (online Amazon customer who placed order was bound by contract terms when website stated that, "By placing your order, you agree to Amazon.com's privacy, notice and conditions of use," which were reachable by a hyperlink on the same webpage) (compelling arbitration); *Crawford v. Beachbody, LLC*, No. 14CV1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (online customer who placed order was bound by contract terms when website stated that "By clicking Place Order below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions," which were at a hyperlink on the same webpage) (granting motion to transfer venue); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12cv426, 2013 WL 5328324, *4 (E.D.N.Y. Sept 23, 2013) (online purchaser who activated account was bound by contract when website stated that "by clicking and making a request to Activate, you

---

**[8]** In *Nguyen,* the court found that there was no such "explicit textual notice" in that case, because the only notice to the user that the terms and conditions would bind them was in the terms and conditions themselves – which the users were never prompted to review or told would be binding. *See Nguyen,* 763 F.3d at 1174 (noting that the requisite warning – "[b]y visiting [the site] . . . creating an account, [or] making a purchase . . . a User is deemed to have accepted the Terms of Use" – was not visible unless and until the user clicked to view the terms). The opposite is true in this case, where the user is expressly told during the account creation process that creating the account will subject the user to the terms and conditions.

1  agree to the terms and conditions in the Merchant Agreement," and a hyperlink to the terms and

2  conditions was available on the same page) (granting motion to transfer venue); *Fteja v.*

3  *Facebook, Inc.,* 841 F. Supp. 2d 829, 837-38 (S.D.N.Y. 2012) (Facebook account holder was

4  bound by contract when holder was expressly informed during the internet sign up process that

5  registering would manifest agreement to the terms of use) (granting motion to transfer venue);

6  *Major v. McCallister,* 302 S.W.3d 227, 229 (Mo. Ct. App. 2009) (binding online customer to

7  contract when: "There were spaces for Appellant to enter her contact information, followed by a

8  'Submit for Matching Pros' button. Next to the button was a blue hyperlink to the website terms

9  and this notice: 'By submitting you agree to the Terms of Use.'") (affirming dismissal for

10 improper venue); *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 122 (Ill. App. Ct. 2005) ("The statement

11 that the sales were subject to the defendant's 'Terms and Conditions of Sale' . . . accessible online

12 by blue hyperlinks, was sufficient notice to the plaintiffs that purchasing computers online would

13 make the 'Terms and Conditions of Sale' binding on them.") (compelling arbitration). Having

14 admitted that they completed the Uber registration process, and that they knowingly created and

15 used their Uber accounts, Plaintiffs must now abide by the Terms and Conditions that they were

16 informed would govern their Uber accounts.

17        In an attempt to avoid this obligation, Plaintiffs Mena, Schreiber and Mejia argue that they

18 "did not see Uber's Terms and Conditions at the time [they] obtained [their] accounts."  FAC

19 ¶¶ 70, 79, 89.  However, this is irrelevant.  They do not dispute that the Terms and Conditions and

20 Privacy Policy were available *via a clickable button,* which was contained in the very sentence

21 informing them that, by creating an Uber account, they were agreeing to the connected terms and

22 conditions.  *See* Ford Decl. ¶ 6(c); Holden Decl. ¶ 7(c); Memon Decl. ¶ 5(c).  Nothing prevented

23 them from clicking through to read the terms.  That they chose not to do so makes no difference

24 under the law.  *See, e.g., Leong v. Myspace, Inc.*, No. CV 10-8366, 2011 WL 7808208, at *5 (C.D.

25 Cal. March 11, 2011) (plaintiff on notice where "[t]he text of the Agreement was only a mouse-

26 click away, but [plaintiff] apparently chose not to read its contents"); *see also Fteja,* 841 F. Supp.

27 2d at 839 (holding that hyperlinked terms provided adequate notice because courts have long

28

upheld contracts where "the consumer is prompted to examine terms of sale that are located somewhere else").

Further, Plaintiffs Mena, Schreiber and Mejia assert that representations that Uber makes on both its website and the App regarding the "Safe Rides Fee" created a binding contract with them. *See, e.g.*, FAC ¶¶ 107-133 (asserting cause of action for "Breach of Implied Contract"); *see also* FAC ¶¶ 32-33 (alleging that "[n]ext to the words 'Safe Rides Fee' on the receipt is a question mark that hyperlinks to an explanation of the Safe Rides Fee"). But Plaintiffs cannot have it both ways. They cannot claim that Uber's safety-related statements accessible via hyperlink created a binding contract, yet claim that they were not given notice of the Terms and Conditions made accessible to them in the same manner. *See Grant-Fletcher v. Collecto, Inc*., No. 13-3505, 2014 WL 1877410, at *7 (D. Md. May 9, 2014) (plaintiff's reliance on terms and conditions in her complaint "undercut[] any argument that the Arbitration Agreement was not available to her").

In summary, Plaintiffs Mena, Schreiber and Mejia were at the very least on inquiry notice that by creating their Uber accounts they were agreeing to Uber's Terms and Conditions, which include the Arbitration Agreement. That is all the law requires to stay this action in favor of arbitration.

## 2. Plaintiff Coolidge

As explained above, Coolidge registered using Google Wallet – a payment method used by a small population of users that, for a brief period of time, provided notice to users that by registering they permitted Uber to use their information in accordance with its terms and conditions, but did not immediately provide a hyperlink. Ford Decl. ¶ 4(b). However, Coolidge was later sent an email (to his registered email address, at which he received numerous other emails from Uber) expressly informing him that his continued use of the Uber App was conditioned on his acceptance of these terms, which were made available in this same email via a conspicuous hyperlink. Lermitte Decl. ¶ 3, Ex. A. After receiving this notice, Coolidge requested multiple rides using Uber and even continued to do so *after filing this complaint*. *Id.* ¶ 5. For at least three independent reasons, Coolidge is bound by the Arbitration Agreement.

1    *First*, Coolidge's admissions demonstrate that when he registered for his account he was

2    aware that Uber had Terms and Conditions that governed Coolidge's use of the Uber App.

3    *Second,* the notification at the time Coolidge registered that his information would be used

4    in accordance with Uber's Terms and Conditions, plus the separate email notice sent to Coolidge

5    on October 29, 2014 (see, *supra,* p. 4), combined with his continued use of Uber after that notice,

6    more than constitute assent to Uber's Terms and Conditions.  Under *Nguyen*, "[a]n explicit textual

7    notice that continued use will act as a manifestation of the user's intent to be bound" qualifies as

8    sufficient notice.  763 F.3d at 1177.  Accordingly, as this Court has previously stated, notification

9    by email is binding where, as here, the terms are conspicuously displayed and the email informs

10   recipients that continued use of the service constitutes consent.  *See Rodman v. Safeway Inc.,* No.

11   11-CV-03003-JST, 2015 WL 604985, at *11 (N.D. Cal. Feb. 12, 2015) (noting that internet

12   retailer could have alerted consumers to a change in the terms and conditions by "send[ing] all

13   existing . . . customers an email in order to ensure that every consumer is aware of a change . . .

14   prior to making a purchase"); *see also Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1259 (10th

15   Cir. 2012) (email that provided link to terms of service and informed users that they would be

16   bound by their continued use was adequate notice); *Dollar Phone Corp. v. Dun & Bradstreet*

17   *Corp.*, 936 F. Supp. 2d 209, 215 n.6 (E.D.N.Y. 2013) (holding that the "conspicuousness" of the

18   terms and conditions in an email constituted sufficient notice).

19   Coolidge cannot dispute that he received this email, which was sent to the email address

20   that he provided during the registration process through Google Wallet and to which he received

21   numerous other emails from Uber.  Lermitte Decl. ¶ 4.  In fact, Coolidge admits that he received

22   other e-mails from Uber.  *See* FAC ¶ 88 ("Plaintiff Coolidge did not notice the Safe Rides Fee

23   hyperlink that appears on the electronic receipts he received following each UberX ride."); Ford

24   Decl. ¶ 4(a) (registrants are informed that electronic receipts are sent to the email address provided

25   during the registration process).  The notification at registration and the subsequent email

26   constituted an offer, which Coolidge accepted when he continued to use the Uber App.  The Terms

27   and Conditions unequivocally state:  "Your access and use of the Services constitutes your

28   agreement to be bound by these Terms, which establishes a contractual relationship between you

and Uber.  If you do not agree to these Terms, you may not access or use the Services."  Cianfrani

Decl., Ex. B at 1.  Under California law, accepting the benefits of a contract, as Coolidge has done

repeatedly since receiving notice, constitutes consent.  Cal. Civ. Code § 1589 ("A voluntary

acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising

from it, so far as the facts are known, or ought to be known, to the person accepting.").  This is

true even where the beneficiary has declined to sign the agreement.  *See, e.g., Performance*

*Plastering v. Richmond Am. Homes of California, Inc.*, 153 Cal. App. 4th 659, 668 (2007) ("[T]he

lack of a party's signature does not make a fully executed contract unenforceable."); *Minton v.*

*Mitchell*, 89 Cal. App. 361, 370, 265 P. 271, 275 (Cal. Ct. App. 1928) ("A party who accepts the

benefits of a contract is bound thereby, even if he has not signed it.").  Likewise here, whether or

not Coolidge clicked on the box labeled "I Accept" makes no difference.

*Third*, like the other Plaintiffs, the crux of Coolidge's complaint is that his mere use of the

Uber App created a binding contract between him and Uber, which contained terms that Coolidge

claims he never read.  *See, e.g.*, FAC ¶¶ 107-133 (asserting cause of action for "Breach of Implied

Contract"); *see also* FAC ¶ 87 (alleging that Coolidge did not read the description of the Safe

Rides Fee).  Coolidge cannot have it both ways.  If his use of the Uber App, including completing

three trips after filing his complaint, created a binding contract as he alleges, then he must abide

by the Terms and Conditions.  *See Grant-Fletcher*, 2014 WL 1877410, at *7 (Plaintiff's reliance

on terms and conditions in her complaint "undercut[] any argument that the Arbitration Agreement

was not available to her").

In summary, Coolidge was at the very least on inquiry notice of the Arbitration Agreement

when he repeatedly used the Uber App.  Therefore, like the other three Plaintiffs, Coolidge is

required to arbitrate his dispute in accordance with the terms of the Agreement.

### D.  The Arbitration Agreement Encompasses Plaintiffs' Claims

As demonstrated above, it is the arbitrator who should decide the scope of the Arbitration

Agreement and whether it encompasses Plaintiffs' claims.  *See* Section IV(B), *supra*; *Crook*, 2013

WL 6039399, at *6 (holding that incorporation of AAA Rules in consumer contract required that

"plaintiffs' objections to the scope of the dispute resolution clause must be decided by the

- 20 -

1    arbitrator").  However, to the extent this Court decides the issue, under the FAA a court must

2    compel arbitration "unless it may be said with positive assurance that the arbitration clause is not

3    susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs., Inc.*, 475 U.S. at

4    650.  Moreover, "any doubts concerning the scope of arbitrable issues should be resolved in favor

5    of arbitration."  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

6          The Arbitration Agreement provides that "any dispute, claim or controversy arising out of

7    or relating to this Agreement . . . or the use of the Service or Application (collectively, 'Disputes')

8    will be settled by binding arbitration [or] in small claims court."  *See* Cianfrani Decl., Ex. A at 8.

9    The Court need look no further than Plaintiffs' description of the alleged "Nature of the Action" to

10   see that this case arises out of and relates to Uber's services and application.  *See, e.g.,* FAC § I

11   "Nature of the Action": ¶ 2 ("Defendant operates its ride sharing service through a mobile phone

12   application."); ¶ 11 ("Defendant's assessment of the $1.00 Safe Rides Fee for services that

13   Defendant fails to provide . . . constitutes an unfair and unlawful business practice.").[9]  Indeed, all

14   of Plaintiffs' allegations in one way or another "aris[e] out of or relat[e]" to Uber's services.  *See*

15   *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 553 n.1 (2004) ("An arbitration

16   clause that covers *any claim arising out of or relating to* the contract or the breach thereof is very

17   broad.") (emphasis in original) (internal quotation marks omitted).  Consequently, the Arbitration

18   Agreement encompasses Plaintiffs' claims in this case.

19          **E.     The Arbitration Agreement Is Not Unconscionable**

20          In the original complaint, Plaintiffs asserted that various aspects of the Terms and

21   Conditions were unconscionable.  Dkt. 1 at ¶¶ 66-80.  However, Uber demonstrated in its motion

22   to stay in favor of arbitration that, in addition to being wrong, these assertions were irrelevant

23   because they did not show, or even claim, unconscionability *of the arbitration provision*.  Dkt. 22

24

25          [9] The arbitration provision also applies to rides that Plaintiff Coolidge took before he
26   received notice of the terms and conditions.  The clause's scope, which covers "any dispute, claim
     or controversy arising out of *or relating* to this Agreement . . . *or the use of the Service or*
27   *Application*," Cianfrani Decl., Ex. A at 8 (emphasis added), is broad enough to encompass the
     parties' prior dealings.  *See, e.g.*, *Levin v. Alms & Associates*, Inc., 634 F.3d 260, 267 (4th Cir.
28   2011) ("[C]ourts have generally applied broad 'any dispute' language retroactively, especially
     when combined with language that refers to all dealings between the parties.").

1  at 14-15; *see Rent-A-Center v. Jackson*, 561 U.S. 63, 70-71 (2010) ("[A] party's challenge to

2  another provision of the contract, or to the contract as a whole, does not prevent a court from

3  enforcing a specific agreement to arbitrate.").  Uber also demonstrated, as it does in Section II.B,

4  *supra,* that the Arbitration Agreement provides numerous safeguards to the rider.  *Id.*

5      Tellingly, in their Amended Complaint, Plaintiffs have now dropped their allegations of

6  unconscionability.  Moreover, it should also be noted that in a related action, *Sabatino v. Uber*

7  *Technologies, Inc.*, et al., No. 3:15-cv-00363, the plaintiff (Jacob Sabatino) has filed a notice of

8  non-opposition to Uber's motion to stay in favor of arbitration.  Dkt. 35.

9      The Arbitration Agreement is not unconscionable and should be enforced.

10  **V.      CONCLUSION**

11      The named Plaintiffs themselves allege that they created an Uber account, registered to use

12  the Uber App, and in fact used the Uber App to arrange transportation services.  There is no

13  dispute that Uber's Terms and Conditions contained an Arbitration Agreement that (i) required the

14  parties to resolve disputes either by binding arbitration or in small claims court, and (ii) included a

15  class action waiver.  The only disputed issue here is whether the Arbitration Agreement is valid

16  and enforceable.  For all the reasons discussed herein, it is.  Consistent with the "liberal federal

17  policy favoring arbitration agreements," Uber respectfully requests that the Court stay this

18  litigation in favor of the arbitration proceedings to which the parties agreed.

19

20  Dated:  May 4, 2015                                          IRELL & MANELLA LLP
                                                                Andra B. Greene
21                                                              A. Matthew Ashley

22

23

24  By:  /s/  A. Matthew Ashley
                                                                A. Matthew Ashley
25                                                              Attorney for Defendant

26

27

28

DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

1

## **ECF ATTESTATION**

2     I, Michael D. Harbour, am the ECF user whose ID and password are being used to file

3  **DEFENDANT'S NOTICE OF MOTION AND MOTION TO STAY PROCEEDINGS**

4  **PENDING ARBITRATION**.  I hereby attest that I received authorization to insert the signatures

5  indicated by a conformed signature (/s/) within this efiled document.

6                  By:   /s/  Michael D. Harbour

7                       Michael D. Harbour

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28