1  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
2  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
3  KEITH CUSTIS, SBN 218818
   kcustis@ahdootwolfson.com,
4  THEODORE W. MAYA, SBN 223242
   tmaya@ahdootwolfson.com
5  AHDOOT & WOLFSON, P.C.
   1016 Palm Avenue
6  West Hollywood, California 90069
   Telephone: 310-474-9111
7  Facsimile: 310-474-8585
8
9  NICK SUCIU III (pro hac vice application
   forthcoming)
10 nicksuciu@bmslawyers.com
   BARBAT, MANSOUR & SUCIU PLLC
11 434 West Alexandrine #101
   Detroit, Michigan 48201
12 Telephone: (313) 303-3472
13
   Counsel for Plaintiffs
14   JULIAN MENA, TODD SCHREIBER,
     NATE COOLIDGE and ERNESTO MEJIA
15

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN MENA, TODD SCHREIBER, NATE COOLIDGE and ERNESTO MEJIA individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>         v.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation,<br><br>                  Defendants. | Case No. 3:15-cv-00064-JST<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION**<br><br>Date:         June 11, 2015<br>Time:         2:00 p.m.<br>Judge:        Hon. Jon S. Tigar<br>Courtroom:    San Francisco Courthouse<br>              Courtroom 9, 19th Floor<br>              450 Golden Gate Ave.<br>              San Franciosco, CA 94102<br><br>Action Filed: August 5, 2014<br>Trial Date:   TBD |

1

**TABLE OF CONTENTS**

2    I     INTRODUCTION.....................................................................................1

3    II.    STATEMENT OF FACTS......................................................................2

4          A.    Uber's Registration Process For Smartphones.............................2

5          B.    Uber's Terms of Service and Arbitration Provision......................6

6    III.   ARGUMENT.........................................................................................7

7          A.    This Court—And Not An Arbitrator—Determines Questions Of
8                Arbitrability.................................................................................7

9          B.    Plaintiffs Did Not Agree To Arbitrate Their Claims...................10

10               1.    Arbitration May Be Compelled Only When A Valid Agreement To
11                     Arbitrate Exists..................................................................10

12               2.    No Valid Agreement To Arbitrate Was Formed.........................11

13                     a.    Plaintiffs Lacked Actual Knowledge Of The Arbitration
14                           Provision...................................................................13

15                     b.    Uber Did Not Provide Inquiry Notice Of Its Arbitration
16                           Provision...................................................................13

17                     c.    Plaintiff Coolidge Did Not Agree To Arbitrate His Claims......18

18                     d.    Plaintiffs' Cause of Action for Breach of Implied Contract
19                           Does Not Bind Plaintiffs To The Arbitration Provision.........20

20                     e.    Uber Could Design An App To Provide Effective Notice.......21

21                     f.    Plaintiffs Did Not Unambiguously Assent To Arbitration.......22

22         C.    Alternatively, The Arbitration Provision Is Invalid Because It Is
23               Unconscionable...........................................................................22

24               1.    The Arbitration Provision is Procedurally Unconscionable..............23

25               2.    The Arbitration Provision is Substantively Unconscionable............24

26   IV.    CONCLUSION..................................................................................25

27

28

# TABLE OF AUTHORITIES

**Cases**

*5381 Partners LLC v. Shareasale.com, Inc.*,
    No. 12cv426, 2013 WL 5328324 (E.D.N.Y. Sept 23, 2013)..............................14

*Ajamian v. CantorCO2e, L.P.*,
    203 Cal. App. 4th 771 (2012)...........................................................................9

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal.4th 83 (2000) .......................................................................................23

*AT & T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011) ....................................................................................10

*AT&T Techs., Inc. v. Commc'ns. Workers of Am.*,
    475 U.S. 643 (1986) ........................................................................................10

*Be In, Inc. v. Google Inc.*,
    No. 12–cv–03373–LHK, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) .................13

*Berkson v. Gogo LLC*,
    Case 1:14-cv-01199-JBW-LB, 2015 WL 1600755 (April 9, 2015).......................13

*Bernal v. Sw. & Pac. Specialty Fin., Inc.*,
    No. 12–CV–05797–SBA, 2014 WL 1868787 (N.D. Cal. May 7, 2014)...................8

*Binder v. Aetna Life Ins. Co.*,
    75 Cal. App. 4th 832 (1999)............................................................................11

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
    No. 04–04825, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005)...........................14, 17

*Carey v. 24 Hour Fitness, USA, Inc.*,
    669 F.3d 202 (5th Cir. 2012).............................................................................25

*Chavarria v. Ralphs Grocery Co.*,
    733 F.3d 916 (9th Cir. 2013).............................................................................22

*Comer v. Micor, Inc.*,
    436 F.3d 1098 (9th Cir. 2006)...........................................................................11

*Conservatorship of Link*,
    158 Cal. App. 3d 138 (1984).............................................................................16

*Crawford v. Beachbody, LLC*,
    No. 14CV1583-GPC KSC, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014)...............14

*Crown Mortgage Co. v. Young,*
    989 N.E.2d 621 (Ill. Ct. App. 2013) ……………………………………..23

*Dollar Phone Corp. v. Dun & Bradstreet Corp.,*
    936 F. Supp. 2d 209 (E.D.N.Y. 2013) ………………………………………...19

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995)………………………9

*Fitz v. NCR Corp.,*
    118 Cal. App. 4th 702 (2004) …………………………………………………24

*Grant-Fletcher v. Collecto, Inc.,*
    2014 U.S. Dist. LEXIS 64163 (D. Md. May 9, 2014)…………………………..21

*Hancock v. Am. Tel. & Tel. Co.,*
    701 F.3d 1248 (10th Cir. 2012) ………………………………………………19

*Harper v. Ultimo,*
    113 Cal. App. 4th 1402, 1406 (2003) ………………………………………24

*In re Van Dusen,*
    654 F.3d 838, 843 (9th Cir. 2011)………………………………………………7, 8

*Ingle v. Circuit City Stores, Inc.,*
    328 F.3d 1165 (9th Cir. 2003)………………………………………………25

*Kilgore v. KeyBank, Nat'l Ass'n,*
    718 F.3d 1052 (9th Cir. 2013)………………………………………………10

*Kinkel v. Cingular Wireless LLC,*
    223 Ill. 2d 1, 306 Ill. Dec. 157, 857 N.E.2d 250 (Ill. 2006)…………………………..23

*Knutson v. Sirius XM Radio, Inc.,*
    771 F.3d 559 (9th Cir. 2014)………………………………………………12

*Lou v. Ma Labs., Inc.,*
    No. C 12-05409 WHA, 2013 WL 2156316 (N.D. Cal. May 17, 2013)………………24

*Machado v. System4 LLC,*
    471 Mass. 204 (2015)………………………………………………………23

*Macias v. Excel Bldg. Servs. LLC,*
    767 F. Supp. 2d 1002 (N.D. Cal. 2011) …………………………………………24

*Merkin v. Vonage Am. Inc.,*
    No. 2:13-CV-08026-CAS, 2014 WL 457942 (C.D. Cal. Feb. 3, 2014)………………24

*Meyer v. Benko,*
     55 Cal. App. 3d 937 (Cal. Ct. App. 1976) ……………………………………………12

*Mohebbi v. Khazen,*
     No. 13-cv-03044 BLF, 2014 WL 6845477 (N.D. Cal. Dec. 4, 2014)…………………24

*Momot v. Mastro,*
     652 F.3d 982 (9th Cir. 2011)………………………………………………………8

*Moody v. Metal Supermarket Franchising Am. Inc.,*
     No. C 13-5098 PJH, 2014 WL 988811 (N.D. Cal. Mar. 10, 2014)…………………...23

*Nagrampa v. MailCoups, Inc.,*
     469 F.3d 1257 (9th Cir. 2006)…………………………………………………...23

*Nguyen v. Barnes & Noble, Inc.,*
     763 F.3d 1171 (9th Cir. 2014)……………………………………..12, 13, 14, 21

*Nicosia v. Amazon.com, Inc.,*
     No. 14-CV4513, 2015 WL 500180 (E.D.N.Y. Feb. 4, 2015)…………………………14

*Oracle America, Inc. v. Myriad Group A.G.,*
     724 F.3d 1069 (9th Cir. 2013)……………………………………………………8, 9

*Pollstar v. Gigmania, Ltd.,*
     170 F. Supp. 2d 974 (E.D. Cal. 2000) …………………………………………14, 16

*Poublon v. Robinson Co.,*
     No. 2:12-CV-06654-CAS MA, 2015 WL 588515 (C.D. Cal. Jan. 12, 2015)…………24

*Rent–A–Center, W., Inc. v. Jackson,*
     561 U.S. 63 (2010)………………………………………………………....9

*Rodman v. Safeway Inc.,*
     No. 11-CV-03003-JST, 2015 WL 604985 (N.D. Cal. Feb. 12, 2015)…………..12, 19

*Sanford v. MemberWorks, Inc.,*
     483 F.3d 956 (9th Cir. 2007)…………………………………………………..11

*Specht v. Netscape Commc'ns Corp.,*
     306 F.3d 17 (2d Cir. 2002)………………………………………………6, 12

*Swift v. Zynga Game Network, Inc.,*
     805 F. Supp. 2d 904 (N.D. Cal. 2011) …………………………………………14

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.,*
     925 F.2d 1136 (9th Cir. 1991)…………………………………………………11

*Tompkins v. 23andMe, Inc.*,
    No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014)..........1, 8, 9

*Trans–Tec Asia v. M/V Harmony Container*,
    518 F.3d 1120 (9th Cir. 2008) ……………………………………………………...11

*Uptown Drug Co., Inc. v. CVS Caremark Corp.*,
    962 F. Supp. 2d 1172 (N.D. Cal. 2013) …………………………………………7, 10

*Varni Bros. Corp. v. Wine World, Inc.*,
    35 Cal. App. 4th 880, 41 Cal. Rptr. 2d 740 (1995)……………………………………21

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
    25 Cal. App. 3d 987 (1972)………………………………………11, 12, 20, 22

**Statutes**

Cal. Civ. Code § 1621…………………………………………………………………21

**Rules**

Fed. R. Civ. P. 11………………………………………………………………...2, 18

**Other**

Mark A. Lemley, *Terms of Use*,
    91 Minn. L. Rev. 459, 477 (2006) ………………………………………………13

PLAINTIFFS' OPPOSITION TO MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

# I.   INTRODUCTION

Plaintiffs allege that Defendant Uber Technologies, Inc. ("Uber") violated state consumer protection laws and an implied-in-fact contract by assessing and collecting from Plaintiffs and putative class members an undisclosed fee each time they used UberX transportation services. Uber now seeks to compel individual arbitration for each Plaintiff. Defendant's Motion should be denied for several reasons.

First, this Court should determine whether the parties agreed to arbitrate. As Judge Koh held last year, the incorporation of the AAA rules does not constitute "clear and unmistakable" evidence that the parties intended to delegate the issue of arbitrability to the arbitrator where, as here, the parties asked to accept the agreement are consumers. *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014).

Second, no valid agreement to arbitrate was formed.  Plaintiffs registered for Uber accounts using their smartphones.  Uber contends that Plaintiffs Mena, Schreiber and Mejia are bound to its Terms of Service ("TOS"), including its arbitration provision, because a single screen, briefly displayed on their smartphones during the account registration process, included a sentence that reads "By creating an Uber account, you agree to the Terms of Service & Privacy Policy" (the "Notice").  Uber's argument is meritless.

As detailed herein, Uber designed the Uber App so that consumers, including Plaintiffs, will *not* notice the Notice.  The Notice appears in small, dark grey text against a black background in what appears to be seven-point font [This is seven-point font].  When the "brightness" level is turned down on a smartphone to conserve battery life, as is customary for smartphone users, the grey font of the Notice is not visible.  Additionally, the Notice only appears on the screen where consumers are prompted to enter their credit card information and, thus, the Notice (even if visible and it's not) is displayed for only the few seconds required to punch in a credit card number.  For Plaintiff Schreiber and other Android-operated smartphone users, the amount of time the Notice was available (but not visible) was even shorter because a numerical keyboard pops up and obscures the lower portion of the screen, including the Notice, as soon as the consumer begins to enter a credit card number. Plaintiffs

did not see and ignore the Notice. To the contrary, as a result of the Uber App's flawed design and the inconspicuousness of the Notice, Plaintiffs Mena, Schreiber and Mejia could not *see* the Notice.  Mena, Schreiber and Mejia did not agree to arbitrate their claims.

Uber's contentions regarding Plaintiff Coolidge are frivolous and implicate Rule 11. Uber *concedes* that it did not provide the Notice to Coolidge when he obtained his Uber account.  Instead, Uber contends that it sent an email to Coolidge seven-and-a-half months later, on Oct. 29, 2014, which requested that Coolidge click on an "I Accept" button to affirmatively accept the TOS before continuing to take UberX rides.  However, Coolidge did not open the Oct. 29, 2014 email, did not click on the "I Accept" button, but nevertheless was able to continue taking UberX rides.  Uber's Jeremy Lermitte declares that he "determined that on several occasions Mr. Coolidge received *and opened emails* . . . delivered to the same address to which the Oct. 29, 2014 email was sent." Declaration of Jeremy Lermitte, ¶ 4 (emphasis added).  On that basis, Plaintiffs suspect that Uber knows that Coolidge neither opened the Oct. 29, 2014 email nor clicked on the "I Accept" button, but is advancing this baseless argument nevertheless in violation of Rule 11.  Coolidge did not agree to arbitrate.

Third, and in the alternative, Uber's arbitration provision is invalid because it is procedurally and substantively unconscionable.

The Motion should be denied.

## II.   STATEMENT OF FACTS

### A.   Uber's Registration Process For Smartphones

Each plaintiff obtained his Uber account using the Uber App on a smartphone. Declaration of Julian Mena ("Mena Decl."), ¶ 2; Declaration of Todd Schreiber ("Schreiber Decl."), ¶ 2; Declaration of Ernesto Mejia ("Mejia Decl."), ¶ 2; Declaration of Nate Coolidge ("Coolidge Decl."), ¶ 2.

By its Motion, Uber describes its registration process and states that, for all smartphones, Uber provides consumers with a "Link Payment" screen during the registration process that contains Notice. Uber contends the words "Terms of Service & Privacy Policy" are contained in a "rectangular box," indicating it "is a clickable button."

Uber has neglected to advise the Court of several salient facts.  <u>First</u>, Uber provided the Court with screenshots of the registration process for smartphones that are 150% to 200% larger than the actual size of the smartphone screens used by Plaintiffs.  The size of the screenshots of the iPhone 4 attached to the Declaration of Paul Holden ("Holden Decl.") is 7.1 inches.[1] The size of an iPhone 4 screen is 3.5 inches.[2] Likewise, the size of the screenshots of the Samsung Galaxy S4 contained attached to the Declaration of J.J. Ford  ("Ford Decl.") are 8 inches. The size of Samsung Galaxy S4 is 5 inches.[3]  As the conspicuousness of the Notice that Uber displayed to Plaintiffs is relevant here, screen size also is relevant.

Third, Uber has neglected to advise the Court that the words of the Notice—"By creating an Uber account, you agree to the"—appear in small, dark gray font against a black background:   Holden Decl., Ex. A at 4; Ford Decl., Ex. B at 4.  On an iPhone 4 screen, Uber's notice appears to be displayed in 7-point font: "By creating an Uber account, you agree to the."  Additionally, Uber's use of dark grey text on a black background decreases "readability."[4] "[A]proximately 50% of the population find it harder to read white [or grey] text on black than black text on white."[5]

Fourth, Uber also has neglected to account for the fact that smartphone users, including Plaintiffs, turn down the "brightness" levels on their smartphones to improve battery life.[6] Consumers repeatedly are advised to lower the brightness level on their smartphones to extend

---

[1] Screen size is described by the length of its diagonal: the distance between opposite corners.

[2] *See* https://support.apple.com/kb/SP587?locale=en_US (last visited May 13, 2015).

[3] *See* http://www.samsung.com/latin_en/consumer/mobile-devices/smartphones/galaxy-s/GT-I9500ZKLTPA (last visited May 13, 2015).

[4] The Dos and Don'ts of Dark Web Design, available at http://www.webdesignerdepot.com/2009/08/the-dos-and-donts-of-dark-web-design/ (last visited May 13, 2015).

[5] Why Light Text on a Black Background is a Bad Idea, available at http://blog.tatham.oddie.com.au/2008/10/13/why-light-text-on-dark-background-is-a-bad-idea ("People with astigmatism (approximately 50% of the population) find it harder to read white text on black than black text on white. Part of this has to do with light levels: with a bright display (white background) the iris closes a bit more, decreasing the effect of the "deformed" lens; with a dark display (black background) the iris opens to receive more light and the deformation of the lens creates a much fuzzier focus at the eye.") (last visited May 13, 2015).

[6] "Battery life" is the amount of time a device runs before it needs to be recharged.

1   battery life.  Custis Decl., Ex. A (Apple advises Iphone users to "Dim the screen or turn on

2   Auto-Brightness to extend battery life."); *id*., Ex. B ("Samsung advises Galaxy users that "You

3   can lower the screen brightness level to conserve battery power."); *id*., Ex. C ("It's much better

4   to manually set a super low brightness level that is still comfortable, and then just bump it up

5   when necessary. This is one of the main ways to improve your battery life as the screen is one

6   of the biggest battery suckers."); *id*., Ex. D ("Turn down the brightness").

7        **Plaintiff Julian Mena**.  Mena created an Uber account on Oct. 13, 2013 using the

8   Uber App on an iPhone 4. Mena Decl., ¶ 2.  Mena entered his personal information but did not

9   see any notice advising him that creation of an account would bind him to Uber's TOS or an

10  arbitration provision.  *Id*. ¶¶ 4-5. Mena always turns down the brightness level on his iPhone to

11  preserve battery life.  *Id*. ¶ 10.  When the brightness level is turned down, Mena was unable to

12  see the words: "By creating an Uber account, you agree to."  *Id*.



       100% Brightness                 Dimmed Brightness

23  Id.[7] Mena did not see and ignore the Notice. Mena Decl., ¶ 11. Mena simply did not see the

24  Notice. *Id*. Mena also did not see any reference to arbitration and had no understanding that

25  Uber was asking him to waive his right to file a lawsuit against Uber.  *Id*., ¶ 5

26      **Plaintiff Todd Schreiber**. Schreiber created an Uber account in May 2014 using the

27  Uber App on a Samsung Galaxy S4. Schreiber Decl., ¶ 2. Schreiber entered his personal

28
_____
[7] The iPhone 4 screen depicted here reflects the actual size of an iPhone 4 screen.

1    information but did not see any notice that his creation of an account would bind him to Uber's

2    TOS or an arbitration provision. *Id*. ¶¶ 4-5. Schreiber always turns down the brightness level

3    on his smartphone to preserve battery life. *Id*. ¶ 10. When the brightness level is turned down,

4    Schreiber was unable to see the Notice. *Id*. In addition, as reflected by the last screenshot of

5    Exhibit B to the Declaration of J.J. Ford, an electronic keyboard containing numbers totally

6    obscures the lower portion of the screen as the numbers are inputted and completely blocks

7    from view the bottom half of the screen, including the Notice. Ford Decl., Ex. B; *see also*

8    Schreiber Decl., ¶ 11.



22    Ford Decl., Ex. B; *see also* Schreiber Decl., ¶ 11.[8] Thus, even if the Notice was visible on the

23    screen (and it was not), *see id*., ¶ 10, the Notice was obscured as soon as Schreiber touched the

24    screen to begin entering his credit card information—which is the purpose of "Link Payment"

25    screen. Schreiber did not see and ignore the Notice. *Id*., ¶ 12. Schreiber could not see the

26    Notice. *Id*. Schreiber also did not see any reference to arbitration and had no understanding

27    that Uber was asking him to waive his right to file a lawsuit against Uber. *Id*., ¶ 5.

28

---

[8] The Samsung Galaxy S4 screen depicted here reflects the actual size of its screen.

**Plaintiff Ernesto Mejia**. Mejia created an Uber account on Oct. 13, 2013 using the Uber App on an Iphone 5. Mejia Decl., ¶ 2. Mejia entered his personal information but did not see any notice that his creation of an account would bind him to Uber's TOS or an arbitration provision. *Id*. ¶¶ 4-5. Mejia always turns down the brightness level on his Iphone to preserve battery life. *Id*. ¶ 10. When the brightness level is turned down, Mejia was unable to see the words: "By creating an Uber account, you agree to." *Id*. Mejia also did not see any reference to arbitration and had no understanding that Uber was asking him to waive his right to file a lawsuit against Uber. *Id*. ¶ 5.

**Plaintiff Nate Coolidge**. Coolidge registered for an Uber account on February 15, 2014, using "Google Wallet" on an Android operated smartphone. Coolidge Decl., ¶ 2. During the registration process, Uber did not provide Coolidge with the Notice. *See* Ford Decl., ¶ 4(b) & Ex. A. Nor was Coolidge provided with a hyperlink to Uber's TOS. *Id*. Uber contends that it sent Coolidge an email on Oct. 29, 2014 with the subject line "Agree to Terms & Conditions" that contained a hyperlink to its TOS. Mot. at 8. This email is a classic clickwrap agreement.[9] It states "We noticed that you haven't yet agreed to the most recent version of our Terms & Conditions and Privacy Policy. Please review them to keep riding." Mot. at 8. Below that statement was a box containing the words "I Accept" followed by the phrase "Click Above to Keep Riding." *Id*. Coolidge did not open or review the Oct. 29, 2014 email; and he not accept Uber's offer by clicking on the box containing the words "I Accept." Coolidge Decl., ¶ 6-7. Nevertheless, Coolidge was able to continue to take UberX rides after Oct. 29, 2014. *Id*. Coolidge also did not see any reference to arbitration and had no understanding that Uber was asking him to waive his right to file a lawsuit against Uber. *Id*. ¶ 5.

**B.    Uber's Terms of Service and Arbitration Provision**

Uber's TOS in effect when each of the Plaintiffs obtained their Uber account consists of 5,424 words and 85 paragraphs (including headers; according to Microsoft Word's "word count" tool); the Dispute Resolution section begins at Paragraph 75. *See* Cianfrani Decl. Ex.

---

[9] A clickwrap agreement "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the . . . agreement by clicking on an icon." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002).

A at 8.  Uber's arbitration provision states "You and Company agree that any dispute, claim or controversy  . . . will be settled by binding arbitration." *Id*.  It also expressly excludes "the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights." *Id*.

As relevant here, Uber's arbitration provision also states that "The arbitration will be administered by the [AAA] in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the 'AAA Rules') then in effect, except as modified by this 'Dispute Resolution' section." *Id*.  Neither of these AAA rules is attached to the arbitration provision, and nowhere does the TOS describe when it is "appropriate" to apply the Supplementary Procedures for Consumer Related Disputes.  The TOS indicates that the AAA Rules are available at http://www.adr.org/arb_med, but that link directs the consumer to a general page for the AAA that does not provide any links to either the AAA Commercial or Consumer Rules.  Custis Decl., Ex. E.

Uber maintains the unilateral right to modify the TOS and the arbitration provision *without* providing any notice to consumers. Cianfrani Decl. Ex. B at 1-2.  Uber's unilateral amendments purportedly take effect "upon Uber's posting of such updated Terms at this location or the amended policies or supplemental terms on the applicable Service(s)." *Id*., Ex. B at 1-2.  According to Uber, a consumer's "continued access or use of the Services after such posting constitutes [the consumer's] consent to be bound by the Terms, as amended." *Id*.

## III.   ARGUMENT

### A.   This Court—And Not An Arbitrator—Determines Questions Of Arbitrability

Uber's contention that the reference to the AAA Commercial Rules in the arbitration provision divests the Court of jurisdiction to determine arbitrability lacks merit. *See* Mot. at 12-14.  As this Court recognized in *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, "whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." 962 F. Supp. 2d 1172, 1186 (N.D. Cal. 2013) (Tigar, J.) (citing *In re Van Dusen*,

1    654 F.3d 838, 843 (9th Cir. 2011).

2          There is no "clear and unmistakable" evidence here. On the contrary, Uber's arbitration

3    provision is entirely silent on the issue of whether the Court or the arbitrator should determine

4    questions of arbitrability.  Indeed, while Uber identifies Rule 7(a) of the AAA Commercial

5    Rules in its moving papers, the arbitration provision itself does not identify Rule 7(a).[10]

6          Courts in this district have held that a reference to the AAA rules in an arbitration

7    provision does *not* constitute "clear and unmistakable" evidence of an agreement to delegate

8    the question of arbitrability to an arbitrator where, as here, one party is a consumer. *23andme,*

9    *Inc.*, 2014 WL 2903752, at *11 (Koh, J.) (the "incorporation of the AAA rules does not

10   necessarily amount to 'clear and unmistakable' evidence of delegation, particularly when the

11   party asked to accept the agreement is a consumer"); *see also Moody v. Metal Supermarket*

12   *Franchising Am. Inc.*, No. C 13-5098 PJH, 2014 WL 988811, *3 (N.D. Cal. Mar. 10, 2014)

13   (Hamilton, J.) (finding "that the Agreements' general reference to the 'then current

14   commercial arbitration rules of the AAA' is not the type of 'clear and unmistakable'

15   delegation required by [*Momot v*. *Mastro,* 652 F.3d 982, 987 (9th Cir. 2011)]*,* and thus

16   find[ing] that the threshold question of arbitrability remains with the court.").[11]

17         Importantly, the Ninth Circuit has "express[ed] no view as to the effect of

18   incorporating arbitration rules into consumer contracts." *Oracle America, Inc. v. Myriad*

19   *Group A.G.*, 724 F.3d 1069, 1075 n.2 (9th Cir. 2013).  In *Oracle*, the Ninth Circuit held that

20   the incorporation of the United Nations Commission on International Trade law arbitration

21   rules into an arbitration provision delegated the jurisdictional question to the arbitrator. *Id.* at

22

---

23   [10] Rule 7(a) of the AAA Rules provides: "The arbitrator shall have the power to rule on his or
     her own jurisdiction, including any objections with respect to the existence, scope, or validity
24   of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA
     COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES at R-7(a)
25   (https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103) (effective Oct. 1,
     2013; last accessed May 13, 2015).

26   [11] While the better reasoned authorities conclude that a reference to the AAA rules in
     consumer contracts does *not* constitute "clear and unmistakable" evidence of an agreement to
27   delegate the question of arbitrability to an arbitrator, other courts have reached the opposite
     conclusion. *See, e.g., Bernal v. Sw. & Pac. Specialty Fin., Inc.*, No. 12–CV–05797–SBA, 2014
28   WL 1868787, at *4 (N.D. Cal. May 7, 2014) (finding delegation in online loan agreement).

1073-75. However, *Oracle* expressly limited its holding: "We hold that as long as an arbitration agreement is between *sophisticated parties* to commercial contracts, those parties shall be expected to understand that incorporation of the [arbitration] rules delegates questions of arbitrability to the arbitrator." *Id*. at 1075 (emphasis added). Thus, the Ninth Circuit declined to hold that incorporation of arbitration rules shows "clear and unmistakable evidence" of an agreement to delegate arbitrability when consumers are involved.

Good reason exists not to extend this doctrine from commercial contracts between sophisticated parties to browsewrap agreements crafted for consumers on a smartphone application.[12]   *See 23andMe, Inc.*, 2014 WL 2903752, at *11.  The Supreme Court has held that by default, courts should decide arbitrability because the question of "who (primarily) should decide arbitrability" is "rather arcane," and "[a] party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995); *see also Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 782 (2012) ("the default expectancy is that the court would decide the matter"). The "clear and unmistakable" test thus established a "heightened standard" to evince delegation. *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, n.1 (2010).

Applying that heightened standard here, there is no clear and unmistakable evidence that Plaintiffs intended to delegate the issue of arbitrability to the arbitrator.  As detailed below, Uber did not provide actual or constructive notice of the TOS to Plaintiffs. The arbitration provision contains no express delegation language, and its mention of "the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes" creates multiple ambiguities about which rules ultimately apply. Assuming a consumer even reviews the arbitration language (and none of the Plaintiffs knew the arbitration provision existed until after Uber filed its Motion), this language forces a consumer to comprehend the import of the AAA Rules; locate those rules independently; determine that the AAA's Commercial Rules apply by operation of Rule R–1(a); and then specifically

---

[12] *See infra* at 12 (defining and discussing browsewrap agreements).

identify Rule R–7(a) to learn of the delegation provision. Moreover, although Plaintiffs here did *not* agree to arbitrate, none would have understood a reference to the AAA rules to mean that he was giving an arbitrator the exclusive right to decide if the arbitration provision is legally valid. Mena Decl., ¶ 12; Schreiber Decl., ¶ 13; Mejia Decl., ¶ 11; Coolidge Decl., ¶ 8.

In *Uptown Drug Co., Inc.*, under similar circumstances, this Court held that "the question of arbitrability in this case is for judicial determination":

> Defendants argue that the parties delegated the question of arbitrability to the arbitrator by expressly incorporating the rules of the American Arbitration Association in the arbitration clause. Mot. at 10. Because the Ninth Circuit has not addressed in a published opinion the question of whether such incorporation is sufficient to submit the question of arbitrability to the arbitrator, and because there is disagreement among the lower courts on this issue, the Court concludes that the question of arbitrability in this case is for judicial determination.

962 F. Supp. 2d at 1186 n.15. Here, the Ninth Circuit has not addressed in a published opinion whether the incorporation of the AAA Rules is sufficient to submit the question of arbitrability to the arbitrator in a case involving consumers, and there is disagreement among the lower courts on this issue. This is a consumer case. As in *Uptown Drug Co., Inc.*, this Court should conclude that the question of arbitrability here is for judicial determination.

**B.     Plaintiffs Did Not Agree To Arbitrate Their Claims**

**1.     Arbitration May Be Compelled Only When A Valid Agreement To Arbitrate Exists**

As the Supreme Court has made clear, the existence of an agreement to arbitrate is the essential condition that must be satisfied *before* the rest of the FAA comes into play. *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011) ("The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'"); *see also AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (internal quotation marks omitted).

The Ninth Circuit has instructed that "whether a valid agreement to arbitrate exists" is the first question the Court should ask when deciding a motion to compel arbitration brought under the FAA. *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013). In

making this threshold inquiry, there is no thumb on the scale in fa*vor of finding an arbitration agreement to exist.* The *"liberal federal policy regarding* the scope of arbitrable issues is inapposite"* when the question is "whether a particular party is bound by the arbitration agreement." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006).

Because arbitration is a matter of contract between the parties, a judicial mandate to arbitrate must be predicated upon the parties' consent. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) (finding that, before a party can be ordered to arbitrate, there should be an "express, unequivocal agreement to that effect.") (citation omitted). The Court should compel arbitration only when there are no disputed issues of material fact as to the existence of a binding agreement. *Id.* at 1140–41. Where, as here, the party opposed to arbitration contends that no binding agreement to arbitrate exists, the district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise. *Id.* at 1141.

Uber bears the burden of showing that a valid and enforceable agreement to arbitrate exists and that its terms bind Plaintiffs. *Sanford v. MemberWorks, Inc.*, 483 F.3d 956 (9th Cir. 2007). Uber has not met that burden.

### 2. No Valid Agreement To Arbitrate Was Formed

Mutual assent is required to form a contract and can be demonstrated either by words or by actions.[13] *See Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999). Because "the outward manifestation or expression of assent is the controlling factor," an offeree, "*knowing that an offer has been made to him* but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992–93 (1972) (internal citations omitted and emphasis added). However, and importantly, contracts *cannot* be formed on the basis of stealth drafting or stealth smartphone application design. As the *Windsor Mills* court made

---

[13] The California choice-of-law provision in the TOS is invalid and unenforceable because Plaintiffs never agreed to any term of the TOS. *See, e.g., Trans–Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008). However, the substantive contractual laws of California, Illinois and Massachusetts are substantively similar with respect to the issue of contract formation. Plaintiffs, thus, analyze contract formation under California law.

clear,

> [W]hen the offeree does not know that a proposal has been made to him this objective standard does not apply. Hence, an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.

*Id.* Thus, the Court must determine "whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." *Knutson v. Sirius XM Radio, Inc.,* 771 F.3d 559, 565 (9th Cir. 2014) (citing *Meyer v. Benko,* 55 Cal. App. 3d 937, 942–43 (Cal. Ct. App. 1976)). Arbitration agreements are no exception, and the "principle of knowing consent applies with particular force to provisions for arbitration." *Windsor Mills,* 25 Cal. App. 3d at 992.

While the Internet has changed the factual circumstances in which courts must apply these principles, the requirement of "'mutual manifestation of assent, whether by written or spoken word or by conduct, [remains] the touchstone of contract.'" *Nguyen v. Barnes & Noble, Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Specht,* 306 F.3d at 29). Like any other agreement, the touchstone of an agreement formed on the Internet—or through a smartphone application—is a mutual manifestation of assent, which may be conveyed verbally, in writing or by conduct. *Id.* "Contracts formed on the Internet come primarily in two flavors: [1] 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and [2] 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Id.* at 1175–76.

Here, because Uber's TOS did not require consumers to affirmatively assent before they were purportedly bound to the arbitration provision, the TOS is a browsewrap agreement. As this Court recently observed, "Courts are typically reluctant to apply browsewrap agreements against consumers who were not provided with sufficient notice that their use of a website [or a smartphone application] would be construed as a manifestation of assent to the agreement's terms." *See Rodman v. Safeway Inc.,* No. 11-CV-03003-JST, 2015 WL 604985, at

1     *10 (N.D. Cal. Feb. 12, 2015) (Tigar, J.) (citing *Nguyen,* 763 F.3d at 1177, 1178 n. 2).

2          As a result, "[m]ost courts upholding the enforceability of browsewrap agreements

3 have done so in circumstances where notice to the [consumer] was firmly established in the

4 factual record." *Be In, Inc. v. Google Inc.,* No. 12–cv–03373–LHK, 2013 WL 5568706, at *7

5 (N.D. Cal. Oct. 9, 2013) (citing cases); *see also Nguyen,* 763 F.3d at 1176; *Specht,* 306 F.3d at

6 31–32, 35 ("Reasonably conspicuous notice of the existence of contract terms and

7 unambiguous manifestation of assent to those terms by consumers are essential if electronic

8 bargaining is to have integrity and credibility."); *Berkson v. Gogo LLC*, Case 1:14-cv-01199-

9 JBW-LB, 2015 WL 1600755 (April 9, 2015) ("For an internet browsewrap contract to be

10 binding, consumers must have reasonable notice of a company's 'terms of use' and exhibit

11 'unambiguous assent' to those terms."); Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459,

12 477 (2006) ("Courts may be willing to overlook the utter absence of assent only when there

13 are reasons to believe that the [smartphone application user] is aware of the [smartphone

14 application owner's] terms.").

15          As this Court recently noted, "The Ninth Circuit has taken a skeptical view of contracts

16 in which online retailers have sought to alter the offer and acceptance structure by contending

17 that assent can be inferred by a customer's continued use of a service even in the absence of

18 notice of the terms in question." *Rodman*, 2015 WL 604985, at *10. "An examination of the

19 cases that have considered browsewraps in the last five years demonstrates that the courts have

20 been willing to enforce terms of use against corporations, but *have not been willing to do so*

21 *against individuals*." Lemley, 91 Minn. L. Rev. at 472 (emphasis added).

22               **a.**      **Plaintiffs Lacked Actual Knowledge Of The Arbitration Provision**

23          Plaintiffs lacked actual knowledge of the arbitration provision. Mena Decl., ¶ 5;

24 Schreiber Decl., ¶ 13; Mejia Decl., ¶ 11; Coolidge Decl., ¶ 8.

25               **b.**      **Uber Did Not Provide Inquiry Notice Of Its Arbitration Provision**

26          Where, as here, there is no evidence that the Plaintiffs had actual knowledge of the

27 TOS, the validity of the browsewrap agreement turns on whether the website puts a reasonably

28 prudent user on inquiry notice of the terms of the contract. *Nguyen*, 763 F.3d at 1177 (citation

omitted). Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the smartphone application. *See id.*

The recent trend in both federal district and appellate courts for browsewrap agreements is to require both (i) *conspicuous* hyperlinks or texts of agreements and (ii) an *explicit* text referencing terms of agreements or instructing users that they are assenting to agreements. The additional requirement of an explicit reference is to protect users who may "have no reason to suspect [that] they will be bound" by the terms hidden in hyperlink agreements. *Nguyen*, 763 F.3d at 1179. Thus, in *Nguyen*, the Ninth Circuit invalidated a browsewrap agreement, *i.e.*, a "Terms of Use" hyperlink placed directly below or a few inches away from the button which required users to click to proceed in a checkout process, because the website did not provide any notice to users or promote them to take any affirmative action to demonstrate their assent to the agreement. 763 F.3d at 1179.

Where the website contains an explicit textual notice on every page that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. *See, e.g.*, *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D. Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where *every page* on the website had a textual notice that read: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site"). However, and importantly, even where the text is explicit, courts will not enforce a browsewrap agreement where the design makes the notice difficult or impossible to read. *See Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background).[14]

---

[14] The cases relied on by Uber are inapposite because *none* involve browsewrap agreements displayed to consumers in a smartphone application. *See* Mot. at 17-18 (citing cases). Also, many of Uber's authorities are unavailing because they are clickwrap cases, not browsewrap cases. *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011); *Crawford v. Beachbody, LLC,* No. 14CV1583-GPC KSC, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12cv426, 2013 WL 5328324, *4 (E.D.N.Y. Sept 23, 2013). *Cairo, Inc., 2005* WL 756610, is inapposite because every page on the website there contained an explicit textual notice whereas, here, Uber displays its Notice on only one screen for the few seconds it take to enter a credit card number. *Nicosia v.*

In short, the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's—or, as here, the smartphone application's—general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement. Importantly, Plaintiffs have been unable to locate a single decision addressing the validity of a browsewrap agreement provided to a consumer on a smartphone application. The reason, perhaps, is that smartphone applications typically use clickwrap, or clickthrough, agreements that require a consumer's affirmative consent. While numerous decisions exists regarding the validity of browsewrap agreements on the Internet, the question presented here differs. Instead of viewing the browsewrap agreements on a desktop or laptop computer that range from 15-inches to 27-inches, Uber's browsewrap agreement was displayed to Plaintiffs on screens that range from 3.5 to 5 inches.

Here, Uber contends that Plaintiffs Mena, Schreiber and Mejia had inquiry notice of the arbitration provision because the Notice appears on the "Link Payment" screen on the Uber registration process. Uber is wrong, however. The Notice is not sufficiently conspicuous to place a prudent consumer on inquiry notice for numerous reasons.

The Dark Grey Text On A Black Background Makes the Notice Difficult Or Impossible to Read. Uber's "textual notice"—that portion of the Notice that reads "By creating an Uber account, you agree to the" (the "Textual Notice")—is displayed in gray text on black. Ford Decl., Ex B; Holden Decl., Ex. A. Uber's use of dark grey text on a black background decreases "readability."[15] "[A]pproximately 50% of the population find it harder to read white [or grey] text on black than black text on white."[16] Even where text is explicit, courts will not enforce a browsewrap agreement where the design makes the notice difficult or impossible to read. *See Pollstar,* 170 F. Supp. 2d at 981. The Textual Notice is difficult to discern even in Uber's screenshots, which are 150% to 200% larger than the actual size of the screen.

---

*Amazon.com, Inc.*, No. 14-CV4513, 2015 WL 500180, at *5 (E.D.N.Y. Feb. 4, 2015) is inapposite because the court found that the plaintiff had *previously*, "expressly agreed, when signing-up for an Amazon.com account, to be bound by the terms of the Conditions of Use."

[15] *See* supra n.4.

[16] *See* supra n.5.

PLAINTIFFS' OPPOSITION TO MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

Flawed Design For Low "Brightness" Levels. Smartphone users, including Plaintiffs, turn down the "brightness" levels on their smartphones to improve battery life. As each Plaintiff has declared, Uber's "Textual Notice" cannot be discerned when the brightness levels on their smartphone are lowered to extend battery life. Mena Decl., ¶ 10; Schreiber Decl., ¶ 10; Mejia Decl., ¶ 10; *see also Pollstar*, 170 F. Supp. 2d at 981.  In addition, the "rectangular box" that surrounds the words "Terms of Service & Privacy Policy" and purportedly indicates that it is a "a clickable button" also disappears when the brightness is dimmed.

Seven-Point Font. *Conservatorship of Link*, 158 Cal. App. 3d 138 (1984), should be dispositive here.  In *Link*, a member of a car racing pit crew, was injured while watching a car race from a nonpublic viewing area.  To get into that area, Link had to sign a release of liability, which was in 5.5-point type.  The court held that the release was unenforceable "because it is printed in five-and-one-half-point type and cannot be easily read by persons of ordinary vision." *Link,* 158 Cal. App. 3d at 139. Concerning the font, the court stated that "Typeface smaller than eight-point is an unsatisfactory reading medium*." Id.* at 141 (internal citations omitted).  The Court also noted that "Numerous provisions of the Civil Code regulate the typeface size of required contract provisions, generally requiring 8- to 10-point type, often in boldface, with headings required in up to 16-point boldface capital letters. As a matter of public policy, the typeface size of the crucial language in a release should be no smaller." *Id.* at 141-142 (fn. omitted).  Uber's Notice suffers from the same flaw as it clearly is displayed in "[t]ypeface smaller than eight-point." *Id.* at 141; *see also Pollstar*, 170 F. Supp. 2d at 981.

The Notice is Only Available on the Third Screen – The "Link Payment" Screen. The Notice does not appear on the first two screens of the Uber registration process: the "Create An Account" screen or the "Create a Profile" screen.  Thus, even assuming that a consumer is able to view the Notice (and none of the Plaintiffs noticed the Notice), a consumer would already have made a decision to register for an account before Uber displays the Notice to the consumer, advising him or her that account registration will bind the consumer to the TOS.  In addition, Uber's placement of the Notice on the "Link Payment" screen does not provide consumers with adequate notice because consumers are advised at the top of that screen that

the entire purpose for the "Link Payment" screen is to provide credit card information, and not to review Uber's TOS.

Design Of The Link Payment Screen.  The overall design draws a consumer's attention to the large white, numerical keypad and the line—positioned at the top of the screen—where credit card numbers are entered, and away from the dark gray and black portions of the screen—which further decreases the likelihood that any consumer will notice the Notice.

For Iphone Users, The Notice Is Displayed For Only The Few Seconds It Takes To Enter A Credit Card Number. Plaintiffs using an iPhone view the "Link Payment" screen for only the few seconds required to enter a credit card number.  Thus, even assuming a consumer can view the Notice (and Plaintiffs could not), the Notice is only displayed for seconds. This stands in stark contract to *Cairo, Inc*. where a conspicuous textual notice appeared on every page of the website every time a user used the website. 2005 WL 756610, at *2, *4–5.

Placement And Design on Android Smartphones.  Uber's placement of the Notice at the bottom of the "Link Payment" screen suffers from the same flaws as the hyperlink in *Nguyen*, 763 F.3d at 1179.  *See* Ford Decl., Ex. B.  The Notice is placed at the far bottom of the screen while the consumer is directed to enter credit card information at the top of the screen.   In addition, the entire Notice—both the Textual Notice and the hyperlink to the TOS—appear in dark, gray font that is difficult to discern even on the screenshots attached to the Ford Declaration. *See* Ford Decl. Ex. B

For Android Phone Users, The Notice Is Displayed Only Until The User Touches The Screen And Activates The Numerical Keypad. On the Uber App for Android-operated smartphones, an electronic keyboard containing numbers totally obscures the lower portion of the screen as the numbers are inputted and completely blocks from view the bottom half of the screen, including Notice. Ford Decl., Ex. B at 5; *see also* Schreiber Decl., ¶ 11.  Thus, Uber's Notice, even if it was visible, is displayed for only the few seconds required for a consumer to begin to enter a credit card number. Again, this stands in stark contrast to *Cairo, Inc*. where the textual notice appeared on every page of the website. 2005 WL 756610, at *2, *4–5.

Consumers Cannot Realistically Review Uber's TOS.  Even if consumers attempted to

review the TOS (which Plaintiffs did not do here), they would find that it is impractical, if not impossible, to review the TOS on their smartphones because the TOS consists of 5,424 words and 85 paragraphs of legalese. Because meaningful review of legal terms and conditions is difficult on a smartphone, other companies like Apple offer to email copies of their terms and conditions to consumers. Custis Decl. Ex. F Uber does not provide that option, however. By way of example, the following screenshots are taken of Uber's TOS on an iPhone 4s.



The first screenshot is the first page of the TOS; the second and third screenshots, which may be viewed only after scrolling down to the bottom of the TOS, are the arbitration provision.

Uber failed to provide sufficient inquiry notice of its arbitration provision to Plaintiffs.

### c. Plaintiff Coolidge Did Not Agree To Arbitrate His Claims

Uber's tenuous arguments that Coolidge agreed to arbitrate his claims borders on the absurd and potentially violates Rule 11. *See* Fed. R. Civ. P. 11(b)(4). Uber concedes that it did *not* provide Coolidge with its Notice, its TOS or a hyperlink to its TOS at the time Coolidge obtained his account in February 2014, using Google Wallet. Mot. at 18; Ford Decl., ¶ 4(b). Instead, Uber misleadingly contends that it sent Coolidge an email on Oct. 29, 2014 "expressly informing him that his continued use of the Uber App was conditioned on the acceptance [of Uber's TOS], which were made available in this same email via a conspicuous hyperlink." Mot. at 18. Uber mischaracterizes its Oct. 29, 2014 email as a browsewrap agreement when it is plainly a clickwrap agreement. *Id.* at 19. The Oct. 29, 2014 email does not advise Coolidge

18

that he will be bound to the TOS if he continues to use UberX services.  Instead, the email expressly invites Coolidge ("Click Above to Keep Riding") to accept the TOS by affirmatively *clicking* on a box that said "I Accept."



Hey

We noticed that you haven't yet agreed to the most recent version of our Terms & Conditions and Privacy Policy. Please review and accept them to keep riding.

I Accept

Click Above to Keep Riding

Thanks,
The Uber Team

Lermitte Decl. ¶ 3, Ex. A.  Coolidge, however, did not open the Oct. 29, 2014 email and did not click on the box that said "I Accept." Coolidge Decl. ¶ 6. It strains credulity to think Uber would send a clickwrap agreement by email to a consumer, and lack the technical expertise to know that the consumer had both not opened the email and not clicked on the "I Accept" button. *See* Lermitte Decl., ¶ 4 (declaring that Uber determined that Coolidge opened several *other* emails).  Uber has proffered no evidence whatsoever that Coolidge *opened* the Oct. 29, 2014 email or *clicked* on its "I Accept" button.  Thus, the Oct. 29, 2014 email is an offer as to which Coolidge never expressed assent. Coolidge Decl. ¶ 6.

The authorities relied on by Uber are inapposite because they involve emails, containing changes in terms, sent to *existing* customers who already had agreed to a business's terms of service.[17] In *Rodman*, this Court suggested that Safeway could have alerted *existing* customers, who *already had agreed* to Safeway's Special Terms of Use, "that the Special Terms *they agreed to* at registration have been altered."  *Rodman, 2015* WL 604985, at *11 (emphasis added). The Court did not suggest that Safeway could bind new customers to Safeway's Special Terms of Use merely by sending a single, unsolicited email.  Uber cannot—and does not—contend that Coolidge had agreed to its TOS prior to Oct. 29, 2014.

Uber also mischaracterizes the facts by asserting that "[t]he notification at registration and the subsequent email constituted an offer, which Coolidge accepted when he continued to

---

[17] *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1259 (10th Cir. 2012) (browsewrap agreement sent by email to existing customer containing change-in-terms); *Dollar Phone Corp. v. Dun & Bradstreet Corp.*, 936 F. Supp. 2d 209, 215 n.6 (E.D.N.Y. 2013) (email sent to existing customer).

use the Uber App." Mot. at 19. When Coolidge obtained his Uber account, the Uber App only notified him that "[b]y continuing, you allow this app and Google *to use your information* in accordance with their respective terms of service and privacy policies." Ford Decl., Ex. A at p.2.   The subject line of the Oct. 29, 2014 email was "Agree to Terms & Conditions." Lermitte Decl., ¶ 3. Nothing about his initial registration or the Oct. 29, 2014 email constituted an "offer" that Coolidge could accept by taking an UberX ride. Nor was Coolidge contractually required to open and review all email from Uber. Many consumers receive numerous emails from businesses and make a deliberate decision not to open and review each and every email.  A consumer's decision not to review one of many emails received from a business is not the functional equivalent of a decision not to review a contract. Coolidge is "not bound by inconspicuous contractual provisions of which [he] was unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills*, 25 Cal. App. 3d at 993.

Uber also contends that Coolidge's use of UberX Transportation services, standing alone, binds him to its TOS because the TOS—which Coolidge has never accepted—provides that "Your access and use of the Services constitutes your agreement to be bound by these Terms . . ." Mot. at 19. This contention is meritless.   An implied contract may be formed in the absence of an express contract—but Uber cannot bind Coolidge to its TOS and its written arbitration provision without having provided actual or constructive knowledge of the TOS to Coolidge and/or obtained his affirmative consent to those express provisions.

Finally, Uber certainly possesses the technical wherewithal simply to have placed a hold on Coolidge's Uber account until he had provided affirmative consent to its TOS.  For example, Uber could have created a pop-up screen in the Uber App that popped up the next time he attempted to take an Uber ride and advised him that, before he could take another Uber ride, Uber required him to review and agree to the TOS.  Uber chose not to do so.  Coolidge did not agree to arbitrate his claims.

> **d.    Plaintiffs' Cause of Action for Breach of Implied Contract Does Not Bind Plaintiffs To The Arbitration Provision**

Uber's contention that Plaintiffs' cause of action for breach of implied contract binds

them to its arbitration provision is baseless.  Motion at 18:3-12; 20:12-20.[18] An implied-in-fact contract is a mutual agreement shown by the acts and conduct of the parties, rather than by their spoken or written words. *Varni Bros. Corp. v. Wine World, Inc.*, 35 Cal. App. 4th 880, 888, 41 Cal. Rptr. 2d 740 (1995); Cal. Civ. Code § 1621 ("[a]n implied contract is one, the existence and terms of which are manifested by conduct.").  Here, Plaintiffs do not rely on any portion of the TOS or arbitration provision. To the contrary, each Plaintiff alleges that he "did not see Uber's Terms and Conditions at the time that he obtained his account," *id*. ¶¶ 70, 79, 84, 89; and "was not aware of the Safe Rides Fee," *id*., ¶¶ 77, 82, 87, 93.

### e.     Uber Could Design An App To Provide Effective Notice

"[T]he onus must be on [Smartphone Application owners] to put users on notice of the terms to which they wish to bind consumers." *Nguyen*, 763 F.3d at 1179.  Uber plainly knows how to provide adequate notice to consumers of contractual terms. One of Uber's more controversial practices is to charge "surge pricing," where fees for transportation rise significantly during times of higher demand. In contrast to its inconspicuous Notice, Uber uses special pop-up screens and requires a consumer's affirmative consent before charging such prices.



---

[18] Uber's reliance on *Grant-Fletcher v. Collecto, Inc.*, 2014 U.S. Dist. LEXIS 64163, 18 (D. Md. May 9, 2014) is unavailing as the plaintiff there expressly relied in her complaint on the express, written contract that contained an arbitration agreement.  The court, thus, concluded that plaintiffs'  reliance on the contract containing arbitration agreement "undercuts any argument that the Arbitration Agreement was not available to her. *Id*.

Tellingly, and in stark contrast to its TOS, Uber uses black text against a white background in very large font for its surge-price notice, and also requires consumers to affirmatively agree to the amount of the surge pricing by requiring the consumer to type the surcharge into a separate field, ensuring that the consumer is expressly consenting to the fee.

Uber could have taken any number of steps to provide adequate notice to consumers, including the following: (1) requiring consumers to affirmatively click "I Agree"; (2) requiring consumers to click a checkbox indicating his/her assent to the Uber App's terms; (3) providing consumers with the ability to have a copy of the Terms of Service sent to their email address; (4) using dark font against a light or white background as it does for its surge pricing pop-up screens; (5) creating a pop-up screen that clearly notifies the consumer that he or she must agree with the Terms of Service before taking their first UberX ride. By way of comparison, Apple implements all of those measures when releasing a new version of its operating system to iPhone users. Custis Decl. Ex. F.

### f.       Plaintiffs Did Not Unambiguously Assent To Arbitration

"For an internet browsewrap contract to be binding, consumers must have reasonable notice of a company's 'terms of use' and exhibit 'unambiguous assent' to those terms." *Berkson*, 2015 WL 1600755.  Uber did not provide reasonable notice of its TOS and Plaintiffs clearly did not provide their "unambiguous assent" to the TOS.  Put simply, Uber has failed to satisfy its burden.  *See Windsor Mills*, 25 Cal. App. 3d at 993  (plaintiffs are not bound by "inconspicuous contractual provisions of which [they are] unaware, contained in a document whose contractual nature is not obvious."). The Motion should be denied.

## C.    <u>Alternatively, The Arbitration Provision Is Invalid Because It Is Unconscionable</u>

In the event the Court concludes that an arbitration agreement was formed, Plaintiffs contend, in the alternative, that the arbitration provision is invalid because it is unconscionable. "Under California law, a contract must be both procedurally and substantively unconscionable to be rendered invalid. California law utilizes a sliding scale to determine unconscionability." *Chavarria v. Ralphs Grocery Co.,* 733 F.3d 916, 922 (9th Cir. 2013) (citation omitted). "[T]he more substantively oppressive the contract term, the less evidence of

procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal. 4th 83, 114 (2000).  The same is true under Massachusetts law. *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015).  In Illinois, a finding of unconscionability "may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC*, 223 Ill.2d 1, 306 Ill.Dec. 157, 857 N.E.2d 250, 263 (Ill. 2006); *see also Crown Mortgage Co. v. Young,* 989 N.E.2d 621, 624 (Ill. Ct. App. 2013) ("Standing alone, this procedural unconscionability might be insufficient to invalidate [the] contract. However, it more than suffices once combined with an even stronger showing of substantive unconscionability.").

### 1.    The Arbitration Provision is Procedurally Unconscionable

The "[p]rocedural unconscionability analysis focuses on oppression or surprise." *Nagrampa v. MailCoups, Inc*., 469 F.3d 1257, 1280 (9th Cir. 2006*)* (citation and internal quotation marks omitted). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice," while "[s]urprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Id*. (citation omitted); *see also Kinkel*, 857 N.E.2d at 264 (considering all the circumstances surrounding the transaction including the manner the contract was entered into, whether each party had a reasonable opportunity to understand the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important).

Numerous indicia of procedural unconscionability exist here.  First, the arbitration provision is a contract of adhesion that Uber imposed on Plaintiffs without an opportunity for Plaintiffs to negotiate the terms. *Chavarria* 733 F.3d at 922–23 (citing with approval prior cases finding contracts of adhesion to involve some degree of procedural unconscionability as a matter of law); *Nagrampa*, 469 F.3d at 1284 (finding minimal procedural unconscionability because franchisor presented a contract to an unsophisticated first-time franchisee on a take-it-or-leave-it basis and franchisor had "overwhelming" bargaining power).

Second, Uber's unilateral right to modify the TOS transforms "an ordinary contract of adhesion into a contract that [gives Uber] the largely unfettered power to control the terms of its relationship with its [customers]." *Merkin v. Vonage Am. Inc.*, No. 2:13-CV-08026-CAS, 2014 WL 457942, at *7 (C.D. Cal. Feb. 3, 2014). Uber's unilateral right to modify the TOS constitutes oppression and surprise and, is thus, procedurally unconscionable. *Id.*; *Poublon v. Robinson Co.*, No. 2:12-CV-06654-CAS MA, 2015 WL 588515, at *5 (C.D. Cal. Jan. 12, 2015) ("[D]efendants have pointed to no contractual limitation on defendants' ability to unilaterally modify the Arbitration Procedures . . ., adding an additional element of surprise.").

Third, Uber's failure to provide the rules governing the arbitration is procedurally unconscionable because Plaintiffs and others are "forced to go to another source to find out the full import of what he or she is about to sign—and must go to that effort prior to signing." *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (2003); *Lou v. Ma Labs., Inc.*, No. C 12-05409 WHA, 2013 WL 2156316, at *3 (N.D. Cal. May 17, 2013) (collecting cases).

## 2. The Arbitration Provision is Substantively Unconscionable

Substantive unconscionability "is concerned with whether the contract is overly harsh or generates one-sided results." *Mohebbi v. Khazen*, No. 13-cv-03044 BLF, 2014 WL 6845477, at *6 (N.D. Cal. Dec. 4, 2014) (citation and internal quotations omitted). Numerous indicia of substantive unconscionability also exist here.

First, the arbitration provision is not mutual. In *Fitz v. NCR Corp.*, the California Court of Appeals found a one-sided arbitration clause substantively unconscionable because it exempted claims for intellectual property rights and noncompete agreements from arbitration, which were claims most likely to be brought by the employer. 118 Cal. App. 4th 702, 724 (2004). The arbitration provision here requires Plaintiffs to arbitrate the claims they are most likely to raise and did raise, but exempts the category of claims Uber is most likely to raise—those involving intellectual property rights. Cianfrani Decl., Ex. A.

Second, substantive unconscionability also arises when one party to an arbitration agreement can unilaterally alter that arbitration agreement. *Chavarria*, 733 F.3d at 926. In *Macias v. Excel Bldg. Servs. LLC*, the arbitration agreement reserved for the employer the

"right to modify, change or delete the terms . . . at any time without prior notice . . . provided such changes are in writing." 767 F. Supp. 2d 1002, 1010-11 (N.D. Cal. 2011). The Court held that this unilateral modification clause contributed to substantive unconscionability because it reserved "[a]bsolute [c]ontrol" of the agreement's terms to the employer. *Id*. Similarly, in *Ingle v. Circuit City Stores, Inc.*, the Ninth Circuit found the following substantively unconscionable: "[employer] may alter or terminate the Agreement and these Dispute Resolution Rules and Procedures on December 31st of any year upon giving 30 calendar days written notice to [employees]." 328 F.3d 1165, 1179 (9th Cir. 2003); *cf. Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 209 (5th Cir. 2012) (arbitration agreement illusory because of "the unfairness of a situation where two parties enter into an agreement that ostensibly binds them both, but where one party can escape its obligations under the agreement by modifying it."). Here, as in *Ingle* and *Macias*, the arbitration provision includes an unconscionable unilateral modification provision. Cianfrani Decl., Ex. A ("The Company reserves the right to modify the terms and conditions of this Agreement or its policies relating to the Service or Application at any time."); *see also id*. Ex. B ("Uber may amend the Terms related to the Services from time to time.").

The lack of mutuality is further underscored by the fact that Uber alone cannot waive any of its rights or the provisions of the TOS unless it does so in writing while Plaintiff and the putative class do not enjoy the same protection. Cianfrani Decl., Ex. A at 9 ("The failure of the Company to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by the Company in writing."); *see also id.*, Ex. B at 11 (substantially similar provision).

In sum, Uber's arbitration provision is both procedurally and substantively unconscionable. For that reason, the Court should conclude that it is neither valid nor enforceable under either California, Massachusetts or Illinois law.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

1   DATED:  May 13, 2015                Respectfully submitted,

2                                        **AHDOOT & WOLFSON, PC**

3                                        By:  /s/ Keith Custis

4
                                         Tina Wolfson
5                                        Robert Ahdoot
                                         Keith Custis, Of Counsel
6                                        Theodore W. Maya
                                         1016 Palm Avenue
7                                        West Hollywood, California 90069
                                         Tel: 310-474-9111
8                                        Fax: 310-474-8585
9                                        twolfson@ahdootwolfson.com
                                         rahdoot@ahdootwolfson.com
10                                       kcustis@ahdootwolfson.com
                                         tmaya@ahdootwolfson.com
11

12                                       Nick   Suciu   III   (pro   hac   vice   application
                                         forthcoming)
13                                       BARBAT, MANSOUR & SUCIU PLLC
                                         434 West Alexandrine #101
14                                       Detroit, Michigan 48201
                                         Tel: (313) 303-3472
15                                       Email: nicksuciu@bmslawyers.com

16
                                         Counsel for Plaintiffs
17                                         JULIAN MENA, TODD SCHREIBER,
                                           NATE COOLIDGE and ERNESTO MEJIA
18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO STAY PROCEEDINGS PENDING ARBITRATION