TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
KEITH CUSTIS, SBN 218818
kcustis@ahdootwolfson.com,
THEODORE W. MAYA, SBN 223242
tmaya@ahdootwolfson.com
AHDOOT & WOLFSON, P.C.
1016 Palm Avenue
West Hollywood, California 90069
Telephone: 310-474-9111
Facsimile: 310-474-8585

NICK SUCIU III (pro hac vice application forthcoming)
nicksuciu@bmslawyers.com
BARBAT, MANSOUR & SUCIU PLLC
434 West Alexandrine #101
Detroit, Michigan 48201
Telephone: (313) 303-3472

Counsel for Plaintiffs
JULIAN MENA, TODD SCHREIBER,
NATE COOLIDGE and ERNESTO MEJIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JULIAN MENA, TODD SCHREIBER, NATE COOLIDGE and ERNESTO MEJIA individually and on behalf of all others similarly situated,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC., a Delaware Corporation,

Defendants.

Case No. 3:15-cv-00064-JST

**PLAINTIFFS' SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION**

Date: July 2, 2015
Time: 2:00 p.m.
Judge: Hon. Jon S. Tigar
Courtroom: San Francisco Courthouse
Courtroom 9, 19th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

Action Filed: January 6, 2015
Trial Date: TBD

Pursuant to the Court's June 3, 2015 Order (ECF No. 43), Plaintiffs respectfully submit this Surreply to respond to new evidence and arguments contained in Uber's Reply.[1]

## I. INTRODUCTION

By its Reply, Uber submitted new evidence and arguments in support of the Motion.

With respect to Uber's contention that the parties delegated the issue of arbitrability to the arbitrator, Uber cites *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-04062-LHK, 2015 WL 1886882 (N.D. Cal. Apr. 24, 2015) for the first time on Reply. Uber mischaracterizes *Nitsch* by suggesting that it undercuts the reasoning of *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014). It does not. Because the issue of whether the parties delegated arbitrability to the arbitrator was not contested in *Nitsch*, *Nitsch* is inapposite.

With respect to the issue of contract formation, Uber argues for the first time on Reply that "courts routinely enforce agreements where the user is notified at the critical moment just before completing the registration process that such completion constitutes consent, as was the case here." In support of this contention, Uber submits the Declaration of A. Matthew Ashley to introduce the "screenshots" of purported agreements that were formed on the Internet in five decisions. Uber then argues that its registration process is "nearly identical" to those at issue in those decisions. Uber mischaracterizes the Internet agreements at issue in these decisions and the decisions themselves, each of which differs from the instant action in meaningful ways. The issue is not whether the user is notified at a "critical moment," but whether the user is clearly and conspicuously provided with inquiry notice. Uber failed in that regard.

With respect to Plaintiff Nate Coolidge, Uber argues for the first time on Reply that Uber's Motion itself constitutes sufficient notice to Coolidge of Uber's TOS, including its arbitration provision, and that Coolidge is bound to arbitrate because he requested and completed three Uber rides after its Motion was filed. In support of this contention, Uber submits the Declaration of William Glad to introduce evidence of the number of Uber rides

[1] All terms are used herein as defined in the Opposition.

that Coolidge took after May 4, 2015, when Uber filed the Motion. Uber fails to support its argument that the filing of a motion to compel arbitration constitutes notice of an arbitration provision with any relevant authority. No such authority exists.

None of these new contentions has merit. The Motion should be denied.

## II. ARGUMENT

### A. **<u>This Court—And Not An Arbitrator—Determines Questions Of Arbitrability: *Nitsch* Does Not Undermine *Tompkins*</u>**

For the first time on Reply, Uber attempts to cast aspersions on Judge Koh's decision in *Tompkins v. 23andMe, Inc.*, No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014), by grossly mischaracterizing Judge Koh's recent decision in *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-04062-LHK, 2015 WL 1886882, at *9 (N.D. Cal. Apr. 24, 2015) (Koh, J.). Specifically, Uber contends that Judge Koh "recently acknowledged that incorporation of the AAA rules can evince an intention to delegate even when one of the parties is unsophisticated." Reply at 3:9-10 (citing *Nitsch*, 2015 WL 1886882, at *9). Uber's contention is baseless. Unlike the plaintiffs in *Tompkins* and Plaintiffs here, the plaintiff in *Nitsch* did *not* contest the defendant's position that the incorporation of AAA rules constituted clear and unmistakable evidence of the parties' intent to delegate arbitrability to the arbitrator. *See* 2015 WL 1886882, at *9. Thus, Judge Koh had no opportunity to rule on the issue in *Nitsch*. *Nitsch* does not undermine *Tompkins* and has no application here.

### B. **<u>The Decisions For Which Uber Has Submitted "Screenshots" Do Not Support Uber's Contention That Notice Is Sufficient When Provided On The Third Screen Of The Uber Registration Process</u>**

For the first time on Reply, Uber argues that "courts routinely enforce agreements where the user is notified at the critical moment just before completing the registration process that such completion constitutes consent, as was the case here." Reply at 4:16-18. Citing to the Ashley Decl. that was submitted on Reply, Uber argues that, "[a]s the screenshots from these cases reveal, the registration process in each of these cases was nearly identical to Uber's." Reply at 5:1-2. Uber grossly mischaracterizes its own registration process, and each of the decisions it cites. Far from showing that the registration process is nearly identical to

Uber's, the screenshots demonstrate that the opposite is true: Uber failed to provide inquiry notice of its TOS and the arbitration provision.

Preliminarily, Uber contends that Plaintiffs mischaracterize the Uber App registration process by describing it as a "browsewrap" agreement. Plaintiffs will concede that Uber's registration process is not a "true" browsewrap agreement, but is rather what the Eastern District of New York recently described as a "sign-in wrap" agreement. *Berkson v. Gogo LLC*, Case 1:14-cv-01199-JBW-LB, 2015 U.S. Dist. LEXIS 46899, *74 (E.D.N.Y. Apr. 8, 2015).[2] "These internet consumer contracts do not require the user to click on a box showing acceptance of the 'terms of use' in order to continue. Rather, the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." *Id*. The principles articulated by the Ninth Circuit in *Nguyen v. Barnes & Noble, Inc.* regarding mutual assent and the necessity of inquiry notice apply with equal force to browsewrap and sign-in wrap agreements. 763 F.3d 1171 (9th Cir. 2014); *see also Berkson*, 2015 U.S. Dist. LEXIS 46899, *80-88 (setting forth necessary factors for a valid sign-in wrap agreement).

To review, Uber's registration process consists of three screens. The first screen is entitled "Create an Account." Holden Decl., Exs. A & B; Memon Decl., Ex. A. The first screen requests that the consumer enter personal information and a password. The first screen does *not* contain any notice that creating an account constitutes acceptance of Uber's TOS. Nor are the TOS available on the first screen.

The second screen is entitled "Create Profile." Holden Decl., Exs. A & B; Memon Decl., Ex. A. The second screen requests that the consumer enter her name and add a photograph. The second screen does not contain any notice that creating an account—or creating a "Profile"—constitutes acceptance of Uber's TOS. Again, the TOS are not available on the second screen.

---

[2] "Browsewraps can take various forms but basically the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009).

The third screen is entitled "Link Payment." Holden Decl., Exs. A & B; Memon Decl., Ex. A. As detailed in the Opposition, the third screen does not contain sufficient or adequate notice that continuing beyond that screen constitutes acceptance of Uber's TOS because the words "By creating an account, you agree to" are not clearly and conspicuously visible to Plaintiffs or an average consumer. *See* Opp. at 13:25-18:18. Additionally, nothing on the third screen advises the consumer that this is the final screen of the registration process. Thus, a consumer may enter her credit card information without having any understanding that doing so completes the registration process.

Each of the five decisions for which Uber submitted screen shots differs from the instant action in meaningful ways.

First, Uber's reliance on *Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829 (S.D.N.Y. 2012), and Exhibit D to the Ashley Decl., is misplaced. In *Fteja*, the plaintiff claimed emotional distress and reputational damage when defendant Facebook disabled his Facebook account. *Id*. at 831. Relying on the forum selection clause in its "terms of service," Facebook moved to transfer the case to the Northern District of California. *Id*. at 831-34. Plaintiff countered that he had not accepted the terms. *Id*. at 834.

As illustrated by Exhibit D to the Ashley Decl., the Facebook user was first asked to fill out several fields containing personal and contact information. The user was then asked to click a button that reads "Sign Up." After clicking this initial "Sign Up" button, the user proceeds to a page entitled "Security Check" that requires a user to reenter a series of letters and numbers displayed on the page. Below the box where the putative user enters that letter-number combination, the page displays a second "Sign Up" button similar to the button the putative user clicked on the initial page. The following sentence appears immediately below that button: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." The phrase "Terms of Service" is underlined, which the *Fteja* court concluded was "an indication that the phrase is a hyperlink, a phrase that is usually highlighted or underlined and sends users who click on it directly to a new location—usually an internet address or a program of some sort." 841 F. Supp. 2d at 834-835.

Contrary to Uber's contentions, numerous differences exist between the sign-in wrap agreement in *Fteja* and Uber's registration process: (1) Uber does not provide a consumer with a button that reads "Create Account" or "Sign Up"; (2) Uber does not require a consumer to click on a button that reads "Create Account" or "Sign Up"; (3) Uber does not notify a consumer that entering credit card information on the third screen is the functional equivalent of creating an account; (4) Uber does not notify consumers that entering credit card information constitutes consent to Uber's TOS and its arbitration provision; (5) Uber does not notify a consumer that the third "Link Payment" screen is the final screen of the Uber App registration process; and (6) while the notification in *Fteja* appears in black font against a white background, Uber's notification appears in dark grey font against a black background.

Contrary to Uber's suggestion that the *Fteja* court based its decision on the fact that the *Fteja* plaintiff was notified "at the critical moment just before completing the registration process that such completion constitutes consent," the *Fteja* court reasoned that "[i]t is not too much to expect that an internet user whose social networking was so prolific that losing Facebook access allegedly caused him mental anguish would understand that the hyperlinked phrase 'Terms of Use' is really a sign that says 'Click Here for Terms of Use.'" 841 F. Supp. 2d at 839. The *Fteja* court further reasoned that "at least *for those to whom the internet is an indispensable part of daily life, clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket*." *Id*.

The court in *Berkson* cogently criticized the *Fteja* court's reasoning:

> The phrase "for those to whom the internet is an indispensable part of daily life" in *Fteja* is curious. It presupposes intensive and extensive use of the internet, an assumption not easily justifiable when the user is buying only one or a few items through this system. What of those less devoted to computers? Should a survey be taken on how they view some of these directions? Judges and law clerks tend to be sophisticated about navigating the internet and website. Are they attributing their superior knowledge to that of "read-less and run" types? A "hyperlink," which is activated by clicking on an underlined word or term, with its serious legal ramifications, may not be fully understood by many consumers.

*Berkson*, 2015 U.S. Dist. LEXIS 46899, *77-78. Here, Uber has provided no evidence of either Plaintiffs' or a reasonable consumer's familiarity with smartphone applications and the varieties of agreements potentially formed through use of a smartphone application. In the absence of any evidence that Plaintiffs and/or reasonable consumers are familiar with the forms of agreements used by smartphone application developers, such familiarity cannot be assumed. *Berkson*, 2015 U.S. Dist. LEXIS 46899, *6-8 ("It is concluded that the average internet user would not have been informed, in the circumstances present in this case, that he was binding himself to a sign-in-wrap. . . It was open to defendants to show special circumstances indicating that the plaintiffs were aware, or should have been aware, of such clauses because of their special knowledge, but they have not done so.").

Second, Uber's reliance on *Nicosia v. Amazon.com, Inc*., and Exhibit A to the Ashley Decl., is misplaced because the consumer in *Nicosia* "signed up" to the website with a clickwrap agreement, and was presented with hyperlinks to the "terms of use" on subsequent visits. No. 14-CV-4513, 2015 U.S. Dist. LEXIS 13560 (E.D.N.Y. Feb. 4, 2015) (plaintiff assented to agreement "[g]iven (1) the conspicuous placement of the hyperlink to the current [c]onditions of [u]se on the checkout page, (2) the express warning at checkout that his purchases were subject to the terms of the current [c]onditions of [u]se, and (3) the fact that he expressly agreed, when signing-up for an Amazon.com account, to be bound by the terms of the [c]onditions of [u]se (including a provision notifying him that the conditions are subject to change)"), appeal filed, No. 15-CV-0423 (2d Cir. Feb. 13, 2015).

Here, by contrast, (1) Uber's supposed notice was not "conspicuous"; (2) Plaintiffs did not—and do not—receive an express warning each time they use UberX services that each ride is subject to Uber's TOS; and (3) none of the Plaintiffs "signed up" to Uber using a clickwrap agreement before commencing the registration process. In addition, Amazon's notice is displayed in dark font against a white background, while Uber's is displayed in dark gray font against a black background.

Third, Uber's reliance on *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014), and Exhibit B to the Ashley Decl., is also unavailing. In

*Starke*, the registration process consisted of only one screen, and not three. In addition, the hyperlinked "terms and conditions" were located next to the only button that read "Shop Now," which allowed the user to continue use of the website. The notice to the consumer appears in black font against a light grey background, is situated beneath the button, and provides that "By joining Gilt through email or Facebook sign-up, you agree to the Terms of Membership for all Gilt Groupe sites"

Contrary to Uber's contention, numerous differences exists between the sign-in wrap agreement in *Starke* and Uber's registration process: (1) Uber does not provide a consumer with a button that reads "Create Account" or "Sign Up"; (2) Uber does not require a consumer to click on a button that reads "Create Account" or "Sign Up"; (3) Uber does not notify a consumer that entering credit card information on the third screen is the functional equivalent of creating an account; (4) Uber does not notify a consumer that the third "Link Payment" screen is the final screen of the Uber App registration process; and (5) while the notification in *Starke* appears in black font against a light grey background, Uber's notification appears in dark grey font against a black background. *Compare* Ashley Decl. Ex. B *with* Holden Decl., Ex. A.

Fourth, Uber's reliance on the *Crawford v. Beachbody, LLC*, No. 14-CV-1583, WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014), and Exhibit C to the Ashley Decl., is similarly misplaced. In *Crawford*, as in *Starke*, the hyperlinked "terms and conditions" were located next to the only button that allowed the user to continue use of the website. *See, e.g., Crawford*, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014). Unlike the Uber App registration process, the notice provided in *Crawford* ("By clicking Place Order, you are agreeing [to the ] . . . Terms and Conditions." ) clearly and conspicuously communicated to the consumer that pushing the large red button that read "PLACE ORDER" constituted consent.

By clicking *Place Order* below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions, and Team Beachbody Terms and Conditions.

In contrast, the notice provided by the Uber App registration process, even if visible (and it was not visible to Plaintiffs), does not advise consumers that linking their payment, or

entering their credit card number, and proceeding to the next screen, constitutes acceptance of Uber's TOS. Nor is there any obvious button on the third screen of the Uber App registration process. In addition, the notice in *Crawford* appears in black font against a white background and not, as is true with Uber's, in dark grey font against a black background.

Finally, Uber's reliance on *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011), and Exhibit E to the Ashley Decl., is similarly unavailing. Like the sign-in wrap agreement at issue in *Fteja*, the sign-in wrap agreement at issue in *Swift* contained a conspicuous button that read "Allow," which appeared immediately above a statement indicating that clicking the "Allow" button constituted agreement with Facebook's "Terms of Service."

Contrary to Uber's contentions, numerous differences exists between the sign-in wrap agreement in *Swift* and Uber's registration process: (1) Uber does not provide a consumer with a button that reads "Create Account" or "Allow"; (2) Uber does not require a consumer to click on a button that reads "Create Account" or "Allow"; (3) Uber does not notify a consumer that entering credit card information on the third screen is the functional equivalent of creating an account; (4) Uber does not notify a consumer that the third "Link Payment" screen is the final screen of the Uber App registration process; and (5) while the notification in *Swift* appears in black and grey font against a white background, Uber's notification appears in dark grey font against a black background. *Compare* Ashley Decl. Ex. E *with* Holden Decl., Ex. A.

In sum, and contrary to Uber's contention, the fact that Uber's supposed notice appears on the third and final screen of the Uber App registration screen is meaningless. It cannot be taken for granted that either Plaintiff Schreiber, Mena or Mejia agreed to Uber's TOS by entering his credit card information on the final screen. Uber's supposed notice was not visible to Plaintffs and, even if it was, was insufficient to give adequate notice. *See Berkson*, 2015 U.S. Dist. LEXIS 46899, *84-88.

The design and content of the Uber App, including the three-screen registration process, did not make the "terms of use" readily and obviously available to Plaintiffs. The hyperlink to the "terms of use" was not in large font, all caps, or in bold. Nor was it accessible from multiple screens during the registration process. Nor was it visible given the grey font, the black background and the lowered brightness levels used by Plaintiffs and most consumers. By contrast, the "LINK PAYMENT" notice and space to enter credit card information is very user-friendly and obvious, appearing in all caps, in large, bright, white font, in a clearly delineated box at the top of the third "Link Payment" screen.

The importance of the "terms of use" was further obscured by the physical manifestation of assent, in this case entering one's credit card information. Once Plaintiffs entered their credit card number, the "terms of use" did not appear in a new screen or in a pop-up window on the same screen. Plaintiffs were not required to scroll through Uber's TOS and its boilerplate terms in order to click "accept" or "I agree." Plaintiffs did not click on any button, or take any affirmative action, to express their assent to Uber's TOS and arbitration provision. Plaintiff Schreiber, Mena and Mejia did not agree to arbitrate their claims.

**C. <u>Plaintiff Coolidge Did Not Agree To Arbitrate His Claims</u>**

By its Reply, for the first time, Uber contends that Plaintiff Coolidge's continued use of UberX transportation services after Uber filed the Motion on May 5, 2015, constitutes Coolidge's assent to Uber's TOS and arbitration provision. Reply at 10:2-11:22; *see also* Glad Decl. ¶ 3. This argument is baseless.

First, as a predicate to its new argument, Uber contends that "Coolidge cannot deny that he was aware of Uber's Terms when he filed his lawsuit, FAC ¶ 84, and he certainly cannot deny that he was aware of them after Uber filed this Motion." Reply at 10:4-7. To the contrary, Coolidge *has denied* that he is aware of Uber's TOS and its arbitration provision. *See generally* Declaration of Nate Coolidge ("Coolidge Decl.") (Dkt No. 37-3). Nothing in the FAC or the Coolidge Declaration reasonably may be construed as an admission that Coolidge was or is aware of Uber's TOS and arbitration provision. Coolidge was not provided with the TOS at the time he obtained his account, had no obligation to open and review any emails

received from Uber, did not open or review the October 29, 2014 email sent by Uber and has not reviewed Uber's TOS. Coolidge Decl. ¶¶ 2-7

Second, Coolidge's continued use of UberX services after Uber filed its Motion does not bind him to an arbitration provision that he has not reviewed and to which he has never provided his informed, affirmative consent. When Coolidge first registered for Uber, an implied contract between Uber and Coolidge was formed. The terms of that implied contract (1) do not include an agreement to arbitrate; (2) do not permit Uber to change the terms of that implied contract without notice or consideration; and (3) do not obligate Coolidge to review emails he received from Uber to determine whether Uber sought to change the terms of the implied contract. *See Douglas v. U.S. Dist. Court for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("Parties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side.").

Third, Uber's reliance on *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004), which was not cited in the Motion, is misplaced. In *Register, Inc.*, the party challenging the formation of the contract admitted that it was fully aware of the contract's terms each time it used the services. 356 F.3d at 402. In contrast, Coolidge declared that he did not review Uber's TOS or its arbitration provision and only learned that Uber contends he had agreed to arbitrate through this litigation. Coolidge Decl. ¶¶ 3-4. Uber has provided no evidence that Coolidge reviewed the TOS and arbitration agreement, and no such evidence exists. As the Ninth Circuit observed in *Douglas*, "[e]ven if [plaintiff's] continued use of [the] service could be considered assent, such assent can only be inferred after he received proper notice of the proposed changes. [Plaintiff] claims that no such notice was given." 495 F.3d at 1066. Coolidge similarly contends that Uber did not provide, and has not provided, notice.

In sum, Coolidge did not agree to arbitrate his claims.

## III. CONCLUSION

For the foregoing reasons and those contained in Plaintiffs' Opposition, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

DATED: June 9, 2015

Respectfully submitted,

**AHDOOT & WOLFSON, PC**

By: /s/ Keith Custis

Tina Wolfson
Robert Ahdoot
Keith Custis, Of Counsel
Theodore W. Maya
1016 Palm Avenue
West Hollywood, California 90069
Tel: 310-474-9111
Fax: 310-474-8585

Nick Suciu III (pro hac vice application forthcoming)
BARBAT, MANSOUR & SUCIU PLLC
434 West Alexandrine #101
Detroit, Michigan 48201
Tel: (313) 303-3472

Counsel for Plaintiffs
JULIAN MENA, TODD SCHREIBER, NATE COOLIDGE and ERNESTO MEJIA