Exhibit A

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR PUBLICATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABDUL KADIR MOHAMED, *et al.*

      Plaintiff,

  v.

UBER TECHNOLOGIES, INC., *et al.*,

      Defendants.

_____/

RONALD GILLETTE, *et al.*

      Plaintiff,

  v.

UBER TECHNOLOGIES, *et al.*,

      Defendants.

_____/

No. C-14-5200 EMC

No. C-14-5241 EMC

**ORDER DENYING DEFENDANTS'
MOTIONS TO COMPEL
ARBITRATION; DENYING
DEFENDANT HIREASE'S JOINDER IN
MOTION TO COMPEL ARBITRATION**

(*Mohamed* **Docket Nos. 28 and 32**)

(*Gillette* **Docket No. 16**)

## I.   INTRODUCTION

      Plaintiff Ronald Gillette began driving for Uber in the San Francisco Bay Area in March

2013. *Gillette* Docket No. 7 at ¶ 12. Gillette's access to the Uber application was "abruptly

deactivated" in April 2014. *Id.* at ¶ 15. According to Gillette, an Uber representative told him he

was terminated because "'something had come up' on his consumer background report." *Id.*

      Gillette filed a lawsuit against Uber Technologies on November 26, 2014. *Gillette* Docket

No. 1. Gillette's operative complaint alleges putative class claims under the federal Fair Credit

Reporting Act (FCRA), individual claims under California's Investigative Consumer Report

United States District Court

For the Northern District of California

1   Agencies Act, and representative claims under California's Private Attorneys General Act (PAGA).

2   *See Gillette* Docket No. 7.  Generally speaking, Gillette's FCRA and Investigative Consumer Report

3   Agencies Act claims challenge Uber's practices with regards to the use of background checks in its

4   hiring and firing decisions.  Gillette's PAGA claims are largely unrelated, and allege that Uber has

5   violated a number of California Labor Code provisions, including failing to provide prompt payment

6   of wages to employees upon termination and resignation, failing to provide itemized wage

7   statements, failing to provide meal and rest breaks, and willfully misclassifying its drivers as

8   independent contractors, rather than employees.  *See Gillette* Docket No. 7 at ¶ 79.  Uber filed a

9   motion to compel all of Gillette's claims to individual arbitration pursuant to the terms of its 2013

10  contract with Gillette.  *Gillette* Docket No. 16.

11       Plaintiff Abdul Mohamed began driving for Uber's black car service in Boston in 2012, and

12  for uberX around October 2014.  *Mohamed* Docket No. 1 at ¶ 31.  According to Mohamed, his

13  access to the Uber application was terminated around October 28, 2014, at least in part as a "result

14  of information obtained [by defendants] through [a] Consumer Reporting Agency . . . ."  *See id.* at ¶

15  32.

16       On November 24, 2014, Mohamed filed suit against Uber Technologies, Rasier LLC, and

17  Hirease, LLC.[1]  *Mohamed* Docket No. 1.  Mohamed's complaint alleges that these defendants

18  violated numerous laws that "impose certain strictures on employers' use of consumer background

19  reports as a factor in their decisions to hire, promote, reassign, or terminate employees."  *See id.* at ¶

20  14.  Specifically, Mohamed alleges putative class claims under FCRA, the California Consumer

21  Credit Reporting Agencies Act (CCRAA), and the Massachusetts Consumer Reporting Act

22  (MCRA).  Uber and Rasier have moved to compel individual arbitration of Mohamed's claims under

23  the terms of its contracts with him.  *Mohamed* Docket No. 28.  Hirease filed a joinder in its co-

24  defendants' motion to compel arbitration, contending that Mohamed's putative class claim against it

---

26       [1]  Rasier is a wholly-owned subsidiary of Uber Technologies that contracts with uberX
    drivers.  *Mohamed* Docket No. 28 at 2.  Hirease is a independent company that, according to
    Mohamed, "contracts with Uber and Rasier to provide background screening services."  *Mohamed*
27  Docket No. 1 at ¶ 15.  Hirease is a non-signatory to the relevant arbitration agreements Uber and
    Rasier seek to enforce.  Except in certain circumstances where necessary for purposes of clarity, the
28  Court will refer to Uber Technologies and Rasier collectively as Uber.

1 should also be compelled to individual arbitration pursuant to Mohamed's contracts with Uber.

2 *Mohamed* Docket No. 32.

3       Having considered the parties' briefs, supplemental briefs, and lengthy oral arguments, the

4 Court denies both motions to compel arbitration, and thus denies Hirease's joinder. First, the Court

5 finds that both Gillette and Mohamed validly assented to be bound to the terms of the various

6 contracts at issue here. Next, the Court finds that the delegation clauses contained in those contracts

7 – which purport to reserve the adjudication of the validity and enforceability of the contracts'

8 arbitration provisions to an arbitrator – are unenforceable. The Court then concludes that the

9 arbitration provisions contained in both the 2013 and 2014 versions of Uber's contracts with its

10 drivers are both procedurally and substantively unconscionable, and therefore unenforceable as a

11 matter of California law. Hence, both Gillette and Mohamed may continue to litigate their actions in

12 this forum.

## II.    <u>BACKGROUND</u>

14 A.    <u>Gillette's and Mohamed's Relationships with Uber</u>

15       Ronald Gillette was hired in February 2013 by Abbey Lane Limousine, which provides

16 limousine and car services within the San Francisco Bay Area. *Gillette* Docket No. 7 at ¶ 11.

17 Abbey's owner opened an Uber account for Gillette shortly thereafter. *Gillette* Docket No. 22-3

18 (Gillette Decl.) at ¶ 3. Gillette did not have a personal email address or an Abbey-provided email

19 account at this time, and does not know what email address was submitted to Uber in association

20 with his Uber account, if any. *Id.* at ¶ 5. After his application was submitted to Uber, Gillette states

21 that he "met with an Uber representative at one of Uber's San Francisco office locations . . . passed a

22 short test given on a tablet device, and had my picture taken." *Id.* at ¶3. Gillette began driving an

23 Abbey vehicle on the UberBlack service shortly thereafter. *Id.* at ¶¶ 3-4.

24       Gillette, like other Uber drivers, used a smartphone to access the Uber application while

25 working as an Uber driver. Gillette Decl. at ¶ 4. The specific phones Gillette used were not his, and

26 they remained permanently in the Abbey vehicles that Gillette drove. *Id.* Gillette would log into the

27 Uber application as soon as he picked up a vehicle from Abbey. *Id.*

28

United States District Court<br>For the Northern District of California

3

**United States District Court**
For the Northern District of California

1    Around July 23, 2013, Uber notified its drivers via email that "it was planning on rolling out

2 a Software License and Online Services Agreement . . . and Driver Addendum within the next

3 couple of weeks." *Gillette* Docket No. 16-2 (Colman Decl. *Gillette*) at ¶ 9. Because Gillette did not

4 provide Uber with an email account, Gillette claims he did not receive any such notification.

5 Gillette Decl. at ¶ 5.

6    Once the relevant agreements were finalized, drivers saw the following message when they

7 attempted to log-on to the Uber application:



19 Colman Decl. *Gillette*, Ex. B. According to Uber, the words "Driver Addendum," "Software

20 License and Online Services Agreement," and "City Addendum" that appear in the picture above

21 were hyperlinks that "a driver could have clicked in order to review [the relevant agreements] prior

22 to hitting 'Yes, I agree.'" Colman Decl. *Gillette* at ¶ 10. If the driver hit the "Yes, I agree" button,

23 Uber contends that the driver would next see the following screen:

4

United States District Court
For the Northern District of California



Colman Decl. *Gillette*, Ex. C.

According to Uber's records, Gillette electronically accepted the 2013 Software License and Online Services Agreement (2013 Agreement) on July 29, 2013. Colman Decl. *Gillette* at ¶¶ 11-12. Gillette avers that he does "not recall accepting" the agreements on July 29. Gillette Decl. at ¶ 7. He does not dispute, however, that he continued to drive for UberBlack until April 2014, when Uber allegedly deactivated his account and terminated his employment "without notice or explanation." *Id.* at ¶ 6.

Abdul Mohamed lives and works in Boston. *Mohamed* Docket No. 1 at ¶ 7. He began driving as an UberBlack driver sometime in 2012. *Mohamed* Docket No. 28-2 (Colman Decl. *Mohamed*) at ¶ 8. It is undisputed that on July 31, 2013, Mohamed clicked to accept the 2013 Agreement following the same steps described above. *Id.* at ¶¶ 11, 13. Exactly one year later, Mohamed was prompted to electronically accept Uber's 2014 Software License and Online Services Agreement (2014 Agreement). *Id.* at ¶¶ 12-13. It is undisputed that the process for accepting the 2014 Agreement was the same as for the 2013 Agreement (*i.e.*, clicking "Yes, I agree" when prompted by the Uber application, and then once more confirming agreement on the next application screen), and that Mohamed pressed the relevant buttons. *Id.* at ¶ 12.

Around September 2014, Mohamed applied to drive as an uberX driver, but was told that he needed to get a new car for the position. *Mohamed* Docket No. 1 at ¶ 29. Mohamed subsequently

United States District Court

For the Northern District of California

1    purchased a new vehicle for approximately $25,000.  *Id.* at ¶ 30.  On October 3, 2014, Uber claims

2    that Mohamed accepted the 2014 Rasier Software Sublicense & Online Services Agreement (2014

3    Rasier Agreement) through the same process described above.  Colman Decl. *Mohamed* at ¶ 15.  He

4    thereafter drove for uberX in Boston.  *Mohamed* Docket No. 1. at ¶ 30.

5           On October 28, 2014, Mohamed received an email from "uberreports@hirease.com"

6    informing him that his "proposal to enter an independent contractor relationship" with Rasier could

7    not be "further consider[ed] . . . at this time."  *Mohamed* Docket No. 1 at ¶ 32.  The email went on to

8    state that "[t]he decision, in part, is the result of information obtained through the Consumer

9    Reporting Agency identified below."  *Id.*  Mohamed's access to the Uber application was turned off

10   around the same time he received the email.  *Id.* at ¶ 33.

11          It is undisputed that neither Plaintiff received a paper copy of any of the relevant contracts

12   with either Uber or Rasier.  *See, e.g.*, Gillette Decl. at ¶ 8.  Uber claims, however, that Plaintiffs

13   could have viewed or downloaded copies of the agreements from their "online driver portals."[2]

14   *Gillette* Docket No. 23-1 (Colman Reply Decl.) at ¶ 3.  Plaintiffs contend otherwise.  *Mohamed*

15   Docket No. 54 (Maya Supp. Decl.) at ¶¶ 3-5 (stating that plaintiffs counsel and a current Uber driver

16   searched the current version of the driver portal for the relevant agreements but could not find them).

17   Mohamed's counsel further contends that "Mr. Mohamed's ability to speak and understand English

18   is extremely limited, and an interpreter's assistance has been required to communicate with [him]."

19   *Mohamed* Docket No. 37-2 (Maya Decl.) at ¶ 6.  Counsel goes on to state an opinion that "based on

20

21

22

23   _____

24       [2]  The "driver portal" is a website that "stores information (particular to each driver)
     regarding the services provided by that driver through Uber's various platforms." *See Gillette*
     Docket No. 36 at ¶ 4.  The portal is not accessed through the Uber application. *See id.*  Rather, it is
25   accessed separately through any internet-enabled device. *Id.*  Uber did not provide any documentary
     evidence that would verify its declarant's statement that all drivers could view their relevant
26   contracts with Uber or Rasier through their driver portal during the time they were employed with
     Uber. *Id.*  Uber further admits that there was a "bug" in the driver portal that rendered some
27   contracts inaccessible to drivers through their driver portals. *Id.* at ¶ 5.  Based on the evidence
     presented, the Court makes a factual finding that the relevant contracts were not easily or obviously
28   available to drivers through their driver portals.

6

United States District Court

For the Northern District of California

1  conversations with Mr. Mohamed . . . if Mr. Mohamed had clicked on a link in the Uber app to open

2  one of the agreements . . . he would not have been able to understand the agreement."[3]  *Id.* at ¶ 7.

3  B.    The Applicable Contracts

4           There are three contracts that are directly relevant to the resolution of the pending motions to

5  compel arbitration; the 2013 Agreement, 2014 Agreement, and the 2014 Rasier Agreement.[4]  *See*

6  Colman Decl. *Mohamed*, Ex. D (2013 Agreement); Ex. F (2014 Agreement); and Ex. H (2014

7  Rasier Agreement).[5]  It is undisputed that Gillette could only be bound to the 2013 Agreement –

8  Gillette's relationship with Uber ended before either of the 2014 contracts were presented to drivers.

9  In contrast, Mohamed could be bound to the 2013 Agreement, the 2014 Agreement, and the 2014

10  Rasier Agreement.  However, because the 2014 contracts expressly provide that they "replace[] and

11  supersede[] all prior . . . agreements" between the parties regarding the same subject matter, the

12  Court determines that only the 2014 contracts could actually apply to Mohamed's claims.  *See* 2014

13  Agreement at § 13.3; 2014 Rasier Agreement at 17.

14           Each of the 2013 and 2014 contracts provide that they will be "governed by California law,

15  without regard to the choice or conflicts of law provisions of any jurisdiction."  *See, e.g.*, 2013

16  Agreement at § 14.1.  And each of the contracts also contains an arbitration provision.  While there

17  are significant differences between the 2013 Agreement's arbitration provision and the ones

18  contained in each of the 2014 contracts,[6] all of the arbitration provisions share a number of key

19  _____

20           [3]  According to counsel, Mohamed's native language is Somali.  *Id.*  Uber has objected to the
    form of this evidence as inadmissible hearsay and improper expert opinion.  Because the Court does
21  not rely on this evidence in forming the basis of any of its rulings, Uber's objection is overruled.

22           [4]  The Court refers to the 2014 Agreement and the 2014 Rasier Agreement collectively as the
    2014 contracts or 2014 agreements.
23

24           [5]  Uber attached copies of other contracts to its motions, such as the 2013 and 2014 Driver
    Addenda.  These contracts are not independently relevant to the pending motions, however, because
25  these agreements simply incorporate the arbitration provisions of Uber's other contracts by
    reference.  *See, e.g.*, Colman Decl. *Mohamed*, Ex. G (2014 Driver Addendum states that disputes
26  "will be settled by binding arbitration in accordance with the terms set forth in Section 14.3 of the
    [2014 Agreement]").  Because the Court finds that the arbitration provisions of the 2013 and 2014
27  contracts are unenforceable, the arbitration provisions of Uber's other contracts that incorporate the
    unenforceable arbitration provisions are similarly invalid.

28           [6]  The arbitration provisions in the 2014 contracts are largely identical.

7

United States District Court

For the Northern District of California

features.  First, each provision requires all disputes not expressly exempted from the scope of the arbitration provision to be resolved in "final and binding arbitration and not by way of court or jury trial."  *See, e.g.*, 2013 Agreement at § 14.3(i).  Second, each arbitration provision requires any arbitration to proceed on an individual basis only – drivers are not permitted to pursue class, collective, or representative claims (including PAGA claims) in arbitration.  *See, e.g.*, 2014 Agreement at § 14.3(i).  Third, each arbitration provision contains a delegation clause that provides that "disputes arising out of or relating to the interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision" shall be decided by the arbitrator.[7]  And fourth, each arbitration provision contains an opt-out clause that purports to allow drivers to avoid the arbitration clause altogether.  *See* 2013 Agreement at § 14.3(viii).

       1.    <u>The 2013 Agreement and the *O'Connor* Litigation</u>

      This Court previously considered the terms of the arbitration provision of the 2013 Agreement in a related lawsuit, *O'Connor v. Uber Techs., Inc.*, Case No. 13-3826 EMC.  Plaintiffs in *O'Connor* filed an emergency motion for a protective order to strike the arbitration provision contained in the 2013 Agreement.  *See O'Connor*, 2013 WL 6407583 (N.D. Cal. Dec. 6, 2013); *see also O'Connor*, 2014 WL 1760314 (N.D. Cal. May 2, 2014).  The general gist of plaintiffs' motion was that the 2013 Agreement's arbitration provision was unenforceable because drivers had been asked to assent to the 2013 Agreement – and most problematically, its class action waiver – *after* a number of putative class action lawsuits had already been filed against Uber on behalf of its drivers.  *O'Connor*, 2013 WL 6407583, at *2.

      The Court expressly declined to rule on the alleged unconscionability of the arbitration provision, as the issue was "not properly before the Court at [that] juncture."  *O'Connor*, 2013 WL 6407583, at *2.  The Court did observe, however, that the arbitration provision in the 2013 Agreement was inconspicuous, that the clause permitting drivers to opt-out of arbitration was itself

---

      [7]  As is discussed in more detail below, the 2013 Agreement provides an exception to the delegation clause whereby the Court, and not an arbitrator, is to determine the validity of the class action, collective, and representative action waivers.  *See* 2013 Agreement at § 14.5(c).

8

United States District Court

For the Northern District of California

"buried" in the contract, and that the opt-out procedures provided in the 2013 Agreement were "extremely onerous." *Id.* at *6. The Court therefore concluded that Uber's "promulgation of the [2013] Agreement and its arbitration provision [] runs a substantial risk of interfering with the rights of Uber drivers under Rule 23." *Id.* at *7. In order to minimize that risk, the Court chose to exercise its power under Federal Rule of Civil Procedure 23(d) to assert control over class communications in order to "protect the integrity of the class and the administration of justice." *O'Connor*, 2014 WL 1760314, at *3. Specifically, the Court required Uber to send corrective notices to its drivers (*i.e.*, putative class members) that were intended to insure that all drivers be "given clear notice of the arbitration provision" in the 2013 Agreement, and provide drivers with "reasonable means of opting out of the arbitration provision within 30 days of [receipt of] the notice." *O'Connor*, 2013 WL 6407583, at *7. The Court ordered the parties to meet and confer regarding the appropriate form of any corrective notices. *Id.* While the meet-and-confer process was ongoing, Plaintiff Gillette was terminated by Uber. *Gillette* Docket No. 7 at ¶ 15 (alleging Gillette was terminated in April 2014).

On May 9, 2014, Uber provided the Court with proposed corrective notices, as well as a revised version of the 2013 Agreement that included significantly more fulsome disclosures regarding the arbitration provisions. *O'Connor* Docket No. 100. The Court subsequently approved in part, and for Rule 23 purposes only, Uber's proposed language regarding opting-out of arbitration contained in both the corrective notices and the newly proposed Licensing Agreement. *O'Connor* Docket No. 106. The Court insisted on some changes, however, such as Uber allowing drivers to opt-out of arbitration by email, and bolding a subheading "Your Right to Opt Out of Arbitration" in the revised Licensing Agreement. *Id.* at 5. Uber submitted revised corrective notices along with revised versions of what would ultimately become the 2014 Agreement and 2014 Rasier Agreement for this Court's review, *O'Connor* Docket No. 109, and the Court approved them for Rule 23 purposes with a few additional changes on June 18, 2014. *O'Connor* Docket No. 111. Presumably, these corrective notices were subsequently issued to then-current Uber drivers like Mohamed. *Id.* ("Uber shall issue the documents as corrected."). The 2014 contracts were also subsequently issued to all Uber drivers beginning around June 21, 2014. *See* 2014 Agreement.

United States District Court
For the Northern District of California

### III.   DISCUSSION

Congress passed the American Arbitration Act, later renamed the Federal Arbitration Act[8] (FAA), in 1925.  *See* David Horton, *The Shadow Terms: Contract Procedure and Unilateral Amendments*, 57 UCLA L. Rev. 605, 613 (2010).  Section 2 of the FAA provides, in relevant part, that "[a] written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

For decades after its passage, "the FAA lurked in relative obscurity," and case law interpreting or applying its provisions was fairly scarce.  *See* Horton, *supra*, at 613-15.  In recent decades, however, the FAA has morphed into a "juggernaut," *id.* at 615, and cases discussing and construing the FAA abound.  *See generally* Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 Stan. L. Rev. 1631, 1631-42 (2005) (discussing the history of the FAA, and some of the U.S. Supreme Court's major decisions interpreting or applying it).  It should come as no surprise that as judicial attention has shifted more towards arbitration, the resulting principles of law this Court must apply to determine the validity of arbitration provisions have become increasingly complex.  Uber's pending motions to compel arbitration demonstrate just how complicated this area of law has become.

The Court's analysis of Uber's motions to compel arbitration will proceed as follows.  *First*, the Court determines whether either Plaintiff validly assented to the terms of the relevant contracts.  That is, was an agreement to arbitrate ever formed?  *Second*, if there is valid contractual assent, the Court determines whether it has the power to adjudicate the validity of Uber's arbitration provisions.  As the U.S. Supreme Court has made clear, parties may contractually agree to arbitrate gateway issues, such as the validity of an arbitration provision itself, as long as the parties' intent to so delegate arbitrability is "clear and unmistakable," and so long as the delegation clause itself is not "invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability."  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68, 70 n.1 (2010) (internal quotation marks and

---

[8]  Codified at 9 U.S.C. §§ 1-16.

**United States District Court**
For the Northern District of California

1    citations omitted). This Court must analyze whether either standard is met here. *Third*, if it has the

2    power to decide the question, the Court considers whether the arbitration provisions in any of the

3    relevant contracts are enforceable. This requires the Court to determine whether any of Uber's

4    arbitration provisions are procedurally unconscionable, substantively unconscionable, or both. It

5    also requires the Court to determine whether any substantively unconscionable or otherwise

6    unenforceable terms it identifies in Uber's contracts can be severed from the remainder of those

7    agreements.

8         Ultimately, as explained below, the Court concludes that while a binding agreement to

9    arbitrate was formed between the parties, Uber's arbitration provisions cannot be enforced against

10   Plaintiffs. Thus, the Court denies Uber's motions to compel arbitration.

11   A.    Plaintiffs Assented to be Bound to the Applicable Contracts

12        Plaintiffs argue that the arbitration provisions contained in the relevant contracts cannot be

13   enforced against them because they never assented to be bound by those contracts. Put differently,

14   Plaintiffs contend no agreement to arbitrate was ever formed as a matter of law. This argument is

15   rejected.

16        Plaintiffs initially contend that Uber failed to prove assent by a preponderance of the

17   evidence where it failed to produce signed versions of any contracts, or other "hard evidence"[9] that

18   the Plaintiffs received copies of the contracts and agreed to be bound. This contention is factually

19   incorrect. Uber presented evidence from its business records, including electronic receipts, that

20   indicate that both Gillette and Mohamed clicked the "Yes, I agree" buttons on the Uber application,

21   as depicted in the pictures above. *See* Colman Decl. *Mohamed* at ¶ 13-16; Colman Decl. *Gillette* at

22   ¶ 12. Moreover, it is undisputed that Uber requires drivers to indicate acceptance of the relevant

23   agreements *before* a driver can continue to use the Uber application, and it is similarly undisputed

24   that both Gillette and Mohamed did, in fact, drive for Uber. Thus, Uber has submitted sufficiently

25   probative evidence that Gillette and Mohamed took *some* affirmative step to indicate an assent to be

26

27   ─────────────

28        [9] Plaintiffs suggest such evidence could include, for instance, a personally addressed email
     to each Plaintiff that attached the relevant contracts.

11

**United States District Court**
For the Northern District of California

bound (*i.e.*, they clicked "Yes, I agree" on two separate application screens).[10] *See Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *7 (N.D. Cal. Jun. 25, 2014) (Koh, J.) (holding that an individual's access to a service or website that requires an indication of assent to contractual terms before access to the service or website will be granted was "sufficient evidence that the user clicked 'I Accept'") (citing *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007)).

The remaining question, then, is whether the specific manifestation of assent Uber can prove – that Plaintiffs clicked a "Yes, I agree" button that appeared near hyperlinks to the relevant contracts, and then clicked another "Yes, I agree" button on a subsequent application screen – was sufficient to form a legally binding contract under California law. *See Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049-50 (2001) (explaining that "[e]very contract requires mutual assent," and the "existence of mutual assent is determined by objective criteria" designed to measure whether "a reasonable person would, from the conduct of the parties, conclude that there was a mutual agreement"); *see also Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992 (1972) (explaining that California law is clear that "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious").

Judge Koh recently addressed very similar issues about contract formation in the internet era in a persuasive and comprehensive opinion. *See Tompkins*, 2014 WL 2903752, at *3-9. There, as here, plaintiffs "clicked a box or button that appeared near a hyperlink to the [contract] to indicate acceptance of the [contract]." *Id.* at *8. Judge Koh held that a valid and binding agreement had been formed.

The *Tompkins* court first distinguished between two types of contractual scenarios frequently encountered in the digital realm – "clickwrap" and "browsewrap" agreements. *Id.* at *5-6. "A clickwrap agreement 'presents the user with a message on his or her computer screen, requiring that

---

[10] That Gillette apparently does not specifically remember clicking the appropriate buttons is not dispositive where Gillette has submitted no proof that he would have been permitted to drive for Uber had he not clicked "Yes, I agree."

United States District Court
For the Northern District of California

the user manifest his or her assent to the terms of the license agreement by clicking on an icon.'" *Id.* at \*5 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002)). By contrast, the "defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement *or even knowing that such a webpage exists*." *Id.* at \*6 (citation omitted) (emphasis added). Judge Koh explained that courts tend to enforce clickwrap agreements, but not browsewrap agreements.[11] *Id.* at \*7; *see also Savetsky v. Pre-Paid Legal Servs., Inc.*, No. 14-cv-3514 SC, 2015 WL 604767, at \*3-4 (N.D. Cal. Feb. 12, 2015) (discussing in detail the enforceability of clickwrap and browsewrap agreements).

The *Tompkins* court next considered the situation, presented here, where the actual contract terms were not necessarily presented to the user at the time of formation, but a hyperlink to those terms was conspicuously presented nearby, and the user had to click a button indicating that they agreed to be bound by those hyperlinked terms. The court concluded that such situations "resemble clickwrap agreements, where an offeree receives an opportunity to review terms and conditions and must affirmatively indicate assent. The fact that the [contract was] hyperlinked and not presented on the same screen does not mean that customers lacked adequate notice" of the contract terms. *Id.* at \*8. Specifically, the court concluded that users had adequate notice of the contract terms "because courts have long upheld contracts where 'the consumer is prompted to examine terms of sale that are located somewhere else.'" *Id.* (quoting *Fteja v. Facebook*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012); *see also Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (enforcing arbitration clause where "Plaintiff was provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button"); Mark A. Lemley,

---

[11] Notably, the critical cases Plaintiffs rely on to argue that no contract was formed here are (or closely resemble) browsewrap cases, and thus not particularly apt or persuasive here. *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("[W]e must address whether Nguyen, by merely using Barnes & Noble's website, agreed to be bound by the Terms of Use, even though Nguyen was never prompted to assent to the Terms of Use and never in fact read them."); *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1259 (9th Cir. 2013) (expressing doubt that individual assented to terms hoisted upon him after his purchase of a "family safety report" was already completed, where the hyperlink to those terms was inconspicuous, and where button that user clicked to apparently assent to the terms simply said "Yes and Show My Report").

**United States District Court**
For the Northern District of California

*Terms of Use*, 91 Minn. L. Rev. 459, 459-60 (2006) (noting that courts regularly enforce clickwrap agreements, and collecting cases).

Here, it is beyond dispute that Mohamed and Gillette had the opportunity to review the relevant terms of the hyperlinked agreements, and the existence of the relevant contracts was made conspicuous in the first application screen which the drivers were required to click through in order to continue using the Uber application (*i.e.*, driving for Uber). Uber has similarly presented uncontroverted evidence that Mohamed and Gillette clicked "Yes, I Agree." *See* Colman Decl. *Mohamed* at ¶ 13-16; Colman Decl. *Gillette* at ¶ 12. Thus, Plaintiffs cannot successfully argue that a binding contract was not formed here. *See Tompkins*, 2014 WL 2903752, at *7-9. Whether or not the drivers actually clicked the links or otherwise read the terms of the contracts is irrelevant: Under California law "[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1049.

Plaintiffs' remaining arguments regarding contract formation are equally without merit. First, Mohamed appears to argue that he could not legally assent to the contract because he does not sufficiently understand English. Mohamed cites no case law in support of this contention, however, and what case law the Court has found does not support it. As the Seventh Circuit has held:

> [I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them. . . . [T]he fact that the rules were in German [does not] preclude enforcement of the contract. In fact, a blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound. Mere ignorance will not relieve a party of her obligations . . . . [A] party who agrees to terms in writing without understanding or investigating those terms does so at his own peril.

*Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992); *see also* Lauren E. Miller, Note, *Breaking the Language Barrier: The Failure of the Objective Theory to Promote Fairness in Language-Barrier Contracting*, 43 Ind. L. Rev. 175, 176 (2009) (arguing against the apparently universal common law rule that "treats non-English speakers the same as people who speak English – they have a duty to read the contract") (citations omitted). As a matter of contract formation, Mohamed is bound by his legal assent.

United States District Court

For the Northern District of California

Plaintiffs also argue that no contract was formed because it is very unlikely that anyone would actually click the hyperlinks presented in the Uber application to actually view Uber's contracts, and that any such review would be particularly difficult on the small screens of drivers' smartphones. This argument misses the mark. As noted above, for the purposes of contract *formation*[12] it is essentially irrelevant whether a party actually reads the contract or not, so long as the individual had a legitimate *opportunity* to review it. *Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1049 ("A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing."). Here, Plaintiffs had the opportunity to read the agreements on their phones, even if doing so would be somewhat onerous. Plaintiffs cite no authority that holds or suggests that mutual assent should not be found on these facts. Therefore the Court finds that valid and binding contracts were formed between the Plaintiffs and Uber/Rasier.

B.    The Delegation Clauses in the 2013 and 2014 Agreements are Not Clear and Unmistakable, and Thus are Unenforceable

All of the agreements at issue here contain arbitration provisions, and each provide that the "Arbitration Provision is intended to apply to the resolution of disputes that would otherwise be resolved in a court of law or before a forum other than arbitration." 2013 Agreement § 14.3(i); 2014 Agreement § 14.3(i); 2014 Rasier Agreement at 12. All of the arbitration provisions contain the following language in the very next paragraph:

> Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability, or validity of the Arbitration Provision or any portion of the Arbitration Provision.

2013 Agreement § 14.3(i); 2014 Agreement § 14.3(i); 2014 Rasier Agreement at 12. In the two 2014 agreements, the above-quoted language is then followed by this sentence: "All such matters shall be decided by an Arbitrator and not by a court or judge." 2014 Agreement § 14.3(i); 2014

_____

[12] While the fact that Uber drivers allegedly could only review the contracts on the small screens of their smartphones (and thus would have to scroll repeatedly to view the entire contract) is not relevant to contract formation, the Court finds that the argument has at least some relevance to this Court's procedural unconscionability analysis, as discussed below.

15

United States District Court

For the Northern District of California

1  Rasier Agreement at 12.  Put simply, the contracts contain delegation clauses that purport to delegate

2  threshold issues concerning the validity of the arbitration provisions to an arbitrator.

3       The first (and often final) step in determining the validity and enforceability of a delegation

4  clause is to decide whether the language of the delegation clause, read in context with other relevant

5  contract provisions, unambiguously calls for the arbitration of gateway issues such as arbitrability.

6  This is because the "default rule is that courts adjudicate arbitrability: 'Unless the parties clearly and

7  unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be

8  decided by the court, not the arbitrator.'" *Tompkins*, 2014 WL 2903752, at *11 (quoting *AT&T*

9  *Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).  Thus, "[c]ourts should not

10 assume that the parties agreed to arbitrate arbitrability unless there is *clear and unmistakable*

11 *evidence* that they did so."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)

12 (emphasis added) (internal quotation marks and modifications omitted) (citation omitted); *see also*

13 *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242 (2014) ("There are two prerequisites for a

14 delegation clause to be effective.  First, the language of the clause must be clear and unmistakable.

15 Second, the delegation must not be revocable under state contract defenses such as fraud, duress, or

16 unconscionability") (citations omitted).  The "clear and unmistakable" test reflects a "*heightened*

17 standard of proof" that reverses the typical presumption in favor of the arbitration of disputes.

18 *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 786 (2012) (emphasis in original); *see also*

19 *First Options of Chi.*, 514 U.S. at 945; *Rent-A-Center*, 561 U.S. at 69 n.1.

20       Plaintiffs do not appear to contend that the language of the delegation clauses *itself* is

21 ambiguous, and such an argument would be a tough sell.  Indeed, the Supreme Court recognized that

22 very similar language to that utilized in the delegation clauses here satisfies the "clear and

23 unmistakable" standard.  *See Rent-A-Center*, 561 U.S. at 68 (concluding that the parties' intent to

24 delegate arbitrability was clear and unmistakable where contract provided that "the Arbitrator shall

25 have exclusive authority to resolve any dispute relating to the enforceability of this Agreement

26 including, but not limited to any claim that all or any part of this Agreement is void or voidable")

27 (internal modifications omitted).  Rather, Plaintiffs argue that the delegation clauses are ambiguous

28 because they conflict with *other* language in the contracts.  Namely, all three contracts provide that:

United States District Court

For the Northern District of California

1    "any disputes, actions, claims or causes of action arising out of or in connection with this Agreement

2    or the Uber Service or Software shall be subject to the exclusive jurisdiction of the state and federal

3    courts located in the City and County of San Francisco, California."[13]  In the same paragraph, all

4    three contracts further provide that "[i]f any provision of this Agreement is held to be invalid or

5    unenforceable, such provision shall be struck and the remaining provisions shall be enforced to the

6    fullest extent under law."  *See* 2014 Agreement at § 14.1.  Indeed, in the 2013 Agreement, the

7    language regarding contract provisions being struck if held "invalid or unenforceable" appears in the

8    sentence immediately following the "exclusive jurisdiction" clause.  *See* 2013 Agreement at § 14.1.

9    Finally, the 2013 Agreement also provides that "[n]otwithstanding any other clause contained in this

10   Agreement," such as the delegation clause, "any claim that all or part of the Class Action Waiver,

11   Collective Action Waiver or Private Attorney General Waiver is invalid, unenforceable, [or] void or

12   voidable may be determined only by a court of competent jurisdiction and not by an arbitrator."

13   2013 Agreement at § 14.3(v)(c).

14         A number of California Court of Appeal decisions have analyzed situations similar to the one

15   presented here; an otherwise unambiguous and clear delegation clause is at least somewhat

16   contradicted by other provisions in the relevant contract.  *See Ajamian*, 203 Cal. App. 4th at 791-92.

17   As the *Ajamian* court convincingly explained, "[e]ven broad arbitration clauses that *expressly*

18   delegate the enforceability decision to arbitrators may not meet the clear and unmistakable test,

19   where other language in the agreement creates an uncertainty in that regard."  *Id.* at 792 (emphasis in

20   original) (citations omitted).  This is so because "[a]s a general matter, where one contractual

21   provision indicates that the enforceability of an arbitration provision is to be decided by the

22   arbitrator, but another provision indicates that the *court* might also find provisions in the contract

23   unenforceable, there is not clear and unmistakable delegation of authority to the arbitrator."  *Id.*

24   (emphasis in original) (citing *Parada v. Superior Court*, 176 Cal. App. 4th 1554, 1565-66 (2009)).

25

26         [13]  In the two Uber contracts, this language appears in the section 14.1, titled "Governing
     Law and Jurisdiction."  *See* 2013 Agreement at § 14.1; 2014 Agreement at § 14.1.  The arbitration
27   provision begins two sections later, in section 14.3.  In the Rasier contract, the relevant language
     appears on the final page of the contract, under the header "General."  2014 Rasier Agreement at 17.
28

United States District Court

For the Northern District of California

Applying the above-described "heightened standard," the Court of Appeal in *Baker v. Osborne Development Corp.* refused to enforce an express delegation clause that read "[a]ny disputes concerning the interpretation or enforceability of this arbitration agreement, including without limitation, its revocability or voidability for any cause . . . shall be decided by the arbitrator." 159 Cal. App. 4th 884, 888-89 (2008). Despite such seemingly clear and unmistakable language, the Court of Appeal concluded that the issue of delegation was ambiguous in light of a different clause in the arbitration provision that allowed for severance if "any provision of this arbitration agreement shall be determined by the arbitrator or *by any court* to be unenforceable." *Id.* at 891 (emphasis in original). The *Baker* court concluded that "in the absence of a clear, *consistent*, and unambiguous reservation of [arbitrability] to the arbitration, it is properly decided by the court." *Id.* (emphasis added) (citation omitted); *see also id.* at 893-94 ("[A]lthough one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the arbitrator, another provision indicated that the court might find a provision unenforceable. Thus, we conclude the arbitration agreement did not 'clearly and unmistakably' reserve to the arbitrator the issue of whether the arbitration agreement was enforceable."). This was so despite the fact that the claimed inconsistency was relatively minor (only four additional words that could well have been a typo or a simple drafting error), and there were no additional contractual terms or evidence to suggest any arguable inconsistency with the delegation clause. *See id.* at 893-94.

Another panel of the Court of Appeal reached a similar conclusion in *Hartley v. Superior Court*, 196 Cal. App. 4th 1249 (2011). There, the relevant contract expressly provided that "any and all disputes, claims or controversies arising out of or relating to any transaction between [the parties] . . . including the determination of the scope and applicability of this agreement to arbitrate . . . shall be submitted to final and binding arbitration . . . ." *Id.* at 1256 (emphasis omitted). A later provision of the contract, however, provided that "[n]othing contained in this Agreement shall in any way deprive a party of its right to obtain provisional, injunctive, or other equitable relief from a court of competent jurisdiction, pending dispute resolution and arbitration," and provided that any such request could only be brought in either a federal or state court "located in Orange County, California." *Id.* at 1257 (emphases omitted). The contract also contained a severability clause that

18

United States District Court

For the Northern District of California

provided that "[i]n the event that any provision of this Agreement shall be determined by a *trier of fact of competent jurisdiction* to be unenforceable in any jurisdiction," the "remainder of this Agreement shall remain binding." *Id.* (emphasis in original). The *Hartley* court concluded that the delegation clause was ambiguous because it was at least somewhat inconsistent with other contractual language providing that a court in Orange County could "decide all equitable issues" and language indicating that a "trier of fact of competent jurisdiction" might decide issues of severability. *Id.* at 1257-58. Hence, the Court of Appeal concluded that the "agreements do not meet the heightened standard that must be satisfied to vary from the general rule that the court decides the gateway issue of arbitrability." *Id.* at 1257-58.

Finally, the Court of Appeal in *Parada* held that an express delegation clause[14] was not sufficiently clear and unmistakable to be enforced where another provision of the contract intimated that a "trier of fact of competent jurisdiction" could determine that a portion of the agreement was unenforceable. 176 Cal. App. 4th 1554, 1566 (2009). The Court of Appeal reasoned that in order to meet the heightened "clear and unmistakable" standard, the severability clause needed to be drafted in complete consistency with the delegation clause, and should have provided that only an arbitrator could decide issues of severability. *Id.*

This Court finds that the reasoning of the California Court of Appeal in the above-described cases is persuasive, and equally applicable to the facts presented here. Indeed, the inconsistencies between the various clauses in Uber's contracts are arguably more serious than those discussed in either *Baker*, *Hartley*, or *Parada*. In fact, the inconsistencies in the 2013 Agreement are particularly obvious. Most notably, the delegation clause in the contracts provides that "*without limitation*[,] disputes arising out of or relating to interpretation or application of this Arbitration Provision" shall be decided by an arbitrator. 2013 Agreement at § 14.3(i) (emphasis added). But the 2013 Agreement's arbitration provision later stipulates that "only a court of competent jurisdiction and

---

[14] The relevant clause read: "The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between them or to the breach, termination, enforcement, interpretation or validity of this Agreement, including the determination of the scope or applicability of this agreement to arbitrate, shall be submitted to final and binding arbitration . . . ." *Parada*, 176 Cal. 4th at 1565 (emphasis omitted).

not [] an arbitrator" may determine the validity of the arbitration provision's class, collective and representative action waivers. *See id.* at § 14.3(v)(c). These two clauses in the 2013 Agreement are facially inconsistent with each other and thus, for this reason alone, the heightened "clear and unmistakable" test is not met with respect to the delegation clause contained in the 2013 Agreement. *See, e.g.*, *Baker*, 159 Cal. App. 4th at 893-94.

The same result obtains with respect to the 2014 contracts. Both of the 2014 agreements – and the 2013 Agreement as well – provide that the state or federal courts in San Francisco will have "*exclusive jurisdiction*" of "*any* disputes, actions, claims or causes of action arising out of or in connection with this Agreement . . . ." 2014 Agreement at § 14.1 (emphases added); *see also* 2014 Rasier Agreement at 17. This language is inconsistent and in considerable tension with the language of the delegation clauses, which provide that "without limitation" arbitrability will be decided by an arbitrator. *See* 2014 Agreement at § 14.3(i). Moreover, the language of the delegation clauses is also in some tension with a provision, appearing in the same paragraph as the "exclusive jurisdiction" proviso, that provides for severance if "any provision of this Agreement is held to be invalid or unenforceable." *See* 2014 Agreement at § 14.1. Especially given its placement in the very same paragraph[15] that provides that all disputes arising out of the Uber contracts will be settled *in court*, it is reasonable to assume that the typical Uber driver[16] might read this severability

---

[15] In the 2013 Agreement, the inference is even stronger because the severability clause appears in the very next sentence after the forum-selection language. *See* 2013 Agreement at § 14.1.

[16] The Court requested supplemental briefing on the issue of whether the "clear and unmistakable" test announced by the Supreme Court is informed by the relative sophistication of the parties. That is, would it matter if the intent to delegate threshold issues was "clear and unmistakable" to an attorney, judge, or otherwise legally sophisticated party (such as a large corporation) reviewing the contract, but not so clear to an unsophisticated party? The parties' submissions indicate that this is still largely a debated question. For instance, in *Oracle America, Inc. v. Myriad Group A.G.*, the Ninth Circuit expressly refused to answer whether a delegation clause that it found to be "clear and unmistakable" when incorporated into an arbitration agreement between two large and sophisticated corporations would be similarly clear and unmistakable in a consumer contract. 724 F.3d 1069, 1075 n.2; *see also Zenelaj v. Handybook Inc.*, -- F. Supp. 3d --, 2015 WL 971320, at *3-5 (N.D. Cal. 2015) (citing cases on both sides of the debate, and declining to decide for itself whether the proper test must take into account the relative sophistication of the parties). Other courts, however, have held that delegation language (or other contract language in an arbitration provision) that might otherwise be clear and unmistakable to sophisticated entities may not be so obvious to less sophisticated parties. *See Tompkins*, 2014 WL 2903752, at *11 (finding "good reason" not to hold to consumers to the same standard as sophisticated commercial entities vis-a-vis delegation clauses); *see also Lou v. Ma Labs., Inc.*, No. 12-cv-5409 WHA, 2013 WL

United States District Court

For the Northern District of California

1   language to provide further evidence that Uber intended any determination as to whether "any

2   provision of this Agreement is . . . invalid or unenforceable" to be made in court, and not arbitration.

3   *See* 2014 Agreement at § 14.1.  Thus, the delegation clause in the 2014 contracts is similarly not

4   "clear and unmistakable," and cannot be enforced.  *See First Options of Chi.*, 514 U.S. at 944-45.

5        Uber argues that any facial tension there might be between the above-described clauses is

6   artificial, and that the intent of the parties to delegate arbitrability to an arbitrator is ultimately clear

7   and unmistakable.  For instance, Uber argues that the language providing for "exclusive jurisdiction"

8   in San Francisco courts is merely a standard forum-selection clause that provides the appropriate

9   forum for disputes *should* those disputes not otherwise be found subject to arbitration.  This, Uber

10  argues, is obvious because the forum-selection language appears in an earlier provision of the

11  contract – not within the arbitration provision itself[17] – and "it is a well-settled cannon of contract

12  interpretation that when a general and particular provision are inconsistent, the particular and

13  specific provision is paramount to the general provision."  Reply Br. at 11 (internal quotation marks

14  and citation omitted).  Similarly, Uber argues that the language in the 2013 Agreement that allows a

15  court to decide the validity of class, collective, or representative action waivers, can be easily read in

16

17  2156316, at *3 (N.D. Cal. May 17, 2013) (finding that language in arbitration provision that might

18  be clear to a lawyer or judge was not necessarily clear to unsophisticated employees who were not
    attorneys).  To the extent this Court has to weigh in on the issue, the Court is persuaded by *Tompkins*
    and other cases that recognize that whether the language of a delegation clause is "clear and

19  unmistakable" should be viewed from the perspective of the particular parties to the specific contract
    at issue.  What might be clear to sophisticated counterparties is not necessarily clear to less

20  sophisticated employees or consumers.  Here, however, it makes little difference because the Court
    concludes that Uber's delegation clauses are not sufficiently clear and unmistakable to be enforced

21  even against a legally sophisticated entity.

22        [17]  Uber also argues that a key distinguishing factor between this case and cases like *Parada*,

23  *Baker*, and *Hartley* is that here the putatively conflicting language appears outside the arbitration
    provision, whereas in the Court of Appeal cases the putatively conflicting language appeared within

24  the arbitration provisions themselves.  First, Uber overlooks the fact that with respect to the 2013
    Agreement, there *is* tension within the arbitration provision itself.  Second, in two of the Court of
    Appeal cases cited by this Court, the putatively conflicting language was contained in other

25  provisions of the contract.  *See Hartley*, 196 Cal. App. 4th at 1257 (conflicting language appeared
    both within and without the arbitration provision); *Ajamian*, 203 Cal. App. 4th at 777 (potentially

26  conflicting language appeared in different section of contract from arbitration provision).  In any
    event, the Court does not believe that this distinction is legally relevant – the question of whether

27  delegation language is clear and unmistakable should be determined in context of the contractual
    language as a whole – not by artificially restricting the Court's review solely to the provisions of the

28  arbitration clause.

United States District Court
For the Northern District of California

harmony with the delegation clause, because the carve-out provision for court adjudication of the validity of the waivers starts with the language "[n]otwithstanding any other clause contained in this Agreement . . . ." 2013 Agreement at § 14.3(v)(c). These arguments, however, ignore the Supreme Court's heightened requirement that delegation language be "clear and unmistakable" to be enforceable. *First Options of Chi.*, 514 U.S. at 944.

Indeed, simply to state the premise of Uber's argument is to prove that it fails: At bottom, Uber argues that the language of the contract it drafted is "clear and unmistakable" because this Court can easily resolve any putative conflicts or ambiguities in its contract by resorting to standard rules of contract interpretation.[18] But a court should only turn to rules of construction where the contract language under consideration is at least somewhat ambiguous or open to two or more reasonable constructions. If, as the Supreme Court requires, the language of the delegation clauses here was truly "clear and unmistakable," there would be no need to resort to rules of construction whatsoever. *See, e.g.*, *Natural Res. Def. Council, Inc. v. Cnty. of L.A.*, 725 F.3d 1194, 1204-05 (9th Cir. 2013) (noting that a court should only turn to interpretative aids where a contract's language is not plain); *Klamath Water Users Protective Ass'n. v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (explaining that "[w]henever possible, the plain language of the contract should be considered first" and rules of construction applied only "if reasonable people could find its terms susceptible to more than one interpretation"); *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 501 (2005)[19] (explaining that a court first looks to the plain text of a contract, and turns to

---

[18] Notably, Uber argues that this Court should apply the principle of interpretation that the specific controls the general. Plaintiffs, however, argue persuasively that the Court would be obligated to apply a different cannon of contract interpretation – that "ambiguities in a form contract are resolved against the drafter." *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 56 Cal. App. 4th 1441, 1448 (citing Cal. Civ. Code § 1654; *Victoria v. Superior Court*, 40 Cal. 3d 734, 747 (1985)). Thus even if this Court accepted Uber's invitation to use tools of contract interpretation to determine the meaning of the delegation clauses, the Court would likely find that the delegation clauses here are not enforceable.

[19] At the hearing, counsel for Uber suggested that *Boghos* supports its argument that the delegation clauses here are enforceable. But *Boghos* is not on point because the question before the California Supreme Court there was *not* the enforceability of a delegation clause, and thus *Boghos* was not required to (and did not) apply the heightened "clear and unmistakable" standard. *See id.* at 502. In fact, *Boghos* applied the "presumption *favoring* arbitration" – a presumption that does not apply here. *Id.* (emphasis added). Uber's other cited case, *Hill v. Anheuser Busch InBev Worldwide, Inc.*, No. 14-cv-6289 PSG, 2014 U.S. Dist LEXIS 168947, at *11-13 (C.D. Cal. Nov.

interpretative aids only where the intent of the parties is at least somewhat ambiguous); *Ticor Title Ins. Co. v. Emp'r Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707-08 (1995) (same). As the California Court of Appeal correctly and persuasively explained, following the U.S. Supreme Court's decision in *First Options*, "it is not enough that ordinary rules of contract interpretation simply yield the result that arbitrators have power to decide their own jurisdiction. Rather, the result must be clear and unmistakable, because the law is solicitous of the parties actually *focusing* on the issue [of delegation]. Hence silence or ambiguity is not enough." *Ajamian*, 203 Cal. App. 4th at 789 (emphasis in original) (quoting *Gilbert St. Developers, LLC v. La Quinta Homes, LLC*, 174 Cal. App. 4th 1185, 1191-92 (2009)).[20] This Court concludes that if the "clear and unmistakable" test means anything, it means that the parties' intent to delegate threshold issues must be undeniably apparent from the text of the contract, and the text alone, without resort to subtle interpretive aids. Because that standard is not met here, the Court cannot enforce the delegation clauses.

C.    Even if the 2013 Agreement's Delegation Clause Was Clear and Unmistakable, it is
      Nevertheless Unconscionable and Therefore Unenforceable

      In the alternative, the Court finds that the delegation clauses in Uber's contracts are unenforceable because they are unconscionable. As noted above, if a delegation clause is "clear and unmistakable," the Court must still decline to enforce the clause if the delegation clause itself is unconscionable or otherwise unenforceable under the FAA. *See Rent-A-Center*, 561 U.S. at 71-74. Critically, the party must show that the delegation clause *specifically* is unenforceable under the FAA. *Id.* at 71-73 (requiring any unconscionability challenge to be "specific to the delegation

---

26, 2014), is on point, but not persuasive. There, the district court found that an express delegation provision was "clear and unmistakable" notwithstanding a broader contractual term that provided that "a court may determine that any provision of the [contract] is invalid or unenforceable." *Id.* at *11 (internal brackets omitted). Notably, the *Hill* court did not cite *First Options* or *Rent-A-Center*, nor did it mention or apply the proper "heightened standard" for finding a delegation clause "clear and unmistakable." Put simply, it appears the court in *Hill* applied the wrong legal standard and erred in enforcing the delegation clause before it.

      [20] The "clear and unmistakable" test is a matter of federal law. *See Tompkins*, 2014 WL 2903752, at *9. However, California courts have suggested that arbitrability should be analyzed similarly under California and federal law. *See id.* at *9 n.3; *Tiri*, 226 Cal. App. 4th at 239-40 (explaining that California test for delegation clauses is the same as under federal law).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  provision"). It is not sufficient to prove that the arbitration provision as a whole, or other parts of

2  the contract, are unenforceable. *Id.* at 71-74.

3       Gillette argues that the 2013 Agreement's delegation clause is unenforceable because it is

4  unconscionable. "[T]he core concern of unconscionability doctrine is the absence of meaningful

5  choice on the part of one of the parties together with contract terms which are unreasonably

6  favorable to the other party." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013)

7  (quotations and citations omitted). As the party opposing arbitration, Gillette "bears the burden of

8  proving any defense, such as unconscionability." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt.*

9  *Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012). Unconscionability requires a showing of both

10  procedural and substantive unconscionability, "balanced on a sliding scale." *Tompkins*, 2014 WL

11  2903752, at *13 (citation omitted); *see also Gentry v. Superior Court*, 42 Cal. 4th 443, 469 (2007)

12  (holding that "the more substantively oppressive the contract term, the less evidence of procedural

13  unconscionability is required to come to the conclusion that the term is unenforceable, and vice

14  versa"), *abrogated on different grounds by Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348

15  (2014).

16       1.   <u>Procedural Unconscionability</u>

17       As the California Supreme Court has explained, procedural unconscionability focuses on

18  "oppression" and "surprise." *Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83,

19  114 (2000). "'Oppression arises from an inequality of bargaining power which results in no real

20  negotiation and an absence of meaningful choice. Surprise involves the extent to which the

21  supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the

22  party seeking to enforce the disputed terms.'" *Tompkins*, 2014 WL 2903752, at *14 (quoting *Tiri*,

23  226 Cal. App. 4th at 245).

24       The oppression element is nearly always satisfied when the contract is one of adhesion.

25  *Armendariz*, 24 Cal. 4th at 113. An adhesion contract is a "standardized contract, which, imposed

26  and drafted by the party of superior bargaining strength, relegates the subscribing party *only the*

27  *opportunity to adhere to the contract or reject it*." *Id.* (emphasis added) (internal quotation marks

28  and citation omitted).

**United States District Court**
For the Northern District of California

Uber argues that the 2013 Agreement's arbitration clause – and specifically the delegation clause contained therein – does *not* take the form of an adhesion contract because the 2013 Agreement contained an opt-out provision that allowed drivers to avoid arbitration entirely, including the delegation clause, while still availing themselves of the other contract terms. *See Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002) (applying California law and concluding that "Ahmed was not presented with a contract of adhesion because he was given the opportunity to opt-out of the Circuit City arbitration program by mailing in a simple one-page form"). As this Court discusses below, however, *Ahmed* was abrogated by the California Supreme Court and is no longer good law. *See Gentry*, 42 Cal. 4th at 471-72 & n.10 (holding that *Ahmed*'s conclusion that the presence of an opt-out clause rendered a contract necessarily procedurally conscionable under California law was "not persuasive"). But even more fundamentally, while the 2013 Agreement *does* contain an opt-out clause, this Court has already determined for Rule 23 purposes that the opt-out clause is highly inconspicuous, and the "opt-out procedure is extremely onerous." *O'Connor*, 2013 WL 6407583, at *6. That is, the Court found the opt-out right in the 2013 Agreement to be largely illusory. As this Court previously explained:

> While the [2013] Licensing Agreement did afford Uber drivers thirty (30) days to opt out of the arbitration provision, the opt-out provision is buried in the agreement. It is part of the arbitration provision, which itself is part of the larger, overall Licensing Agreement. The opt-out clause itself is ensconced in the penultimate paragraph of a fourteen-page agreement presented to Uber drivers electronically in a mobile phone application interface. In sum, it is an inconspicuous clause in an inconspicuous provision of the Licensing Agreement to which drivers were required to assent in order to continue operating [for] Uber.

*Id.*

The Court sees no reason to depart from its earlier stated views now that it is considering unconscionability: Drivers' opt-out right under the 2013 Agreement was illusory because the opt-out provision was buried in the contract. The opt-out provision was printed on the second-to-last page of the 2013 Agreement, and was not in any way set off from the small and densely packed text surrounding it. 2013 Agreement § 14.3(viii). Furthermore, the fact that those drivers who actually discovered the opt-out clause (if any) could only opt-out by a writing either hand-delivered to

United States District Court

For the Northern District of California

1  Uber's office in San Francisco or delivered there by a "nationally recognized overnight delivery

2  service," renders the opt-out in the 2013 Agreement additionally meaningless.  2013 Agreement §

3  14.3(viii).

4         At oral argument, Uber contended that the opt-out right provided under the 2013 Agreement

5  was meaningful because at least some drivers successfully opted-out of the 2013 Agreement's

6  arbitration provision.  *See* Oral Arg. Tr. at 36:19-37:15.  Indeed, Uber argued that so long as just one

7  driver opted-out of the 2013 Agreement's arbitration provision, the opt-out right necessarily must

8  have been "real," and thus the arbitration provision (and importantly for this discussion, the

9  delegation clause) was not oppressive or otherwise procedurally unconscionable.  *Id.* at 37:7-15.

10  But critically, Uber presented no evidence to this Court that even a single driver opted-out of the

11  2013 Agreement's arbitration clause, and certainly not before this Court ordered conspicuous

12  corrective notices be sent to current and future drivers to alert them to their opt-out rights.  And even

13  if Uber had presented such evidence, this Court has significant doubts that the California Supreme

14  Court would vindicate an opt-out clause simply because a few signatories out of thousands were able

15  to (and did) successfully opt-out.  *See Gentry*, 42 Cal. 4th at 471-72 (finding that even the presence

16  of a conspicuous opt-out provision did not render an arbitration provision entirely without

17  procedural unconscionability or oppression); *see also Duran v. Discover Bank*, 2009 WL 1709569,

18  at *5 (Cal. Ct. App. 2009) (unpublished) (concluding that *Gentry* held generally that "even a

19  contract with an opt-out provision can be a contract of adhesion").

20         At bottom, the opt-out right in the 2013 Agreement was illusory, and thus there is no

21  evidence that drivers could *actually* reject the arbitration provision, and thereby avoid the delegation

22  clause.  Thus, the Court concludes that the delegation clause in the 2013 Agreement was

23  "oppressive" under California law in that it was "imposed and drafted by the party of superior

24  bargaining strength" and drivers could not meaningfully reject that term.  *Armendariz*, 24 Cal. 4th at

25  113.

26         The "surprise" element of procedural unconscionability is also met.  Like the opt-out clause

27  discussed above, the delegation clause in the 2013 Agreement is essentially "hidden in the prolix

28  printed form drafted by [Uber]."  *Tiri*, 226 Cal. App. 4th at 245.  The delegation clause appears on

26

**United States District Court**
For the Northern District of California

the eleventh page of a form agreement, without a separate header or any other indicator (*e.g.*, bold or

relatively larger typeface) that would call a reader's attention to the provision.  Put simply, Gillette

and other drivers would have no reason to know or suspect that arbitrability would be decided by an

arbitrator under the 2013 Agreement.  Thus, the delegation clause specifically is procedurally

unconscionable.

### 2.    Substantive Unconscionability

Substantive unconscionability arises when a provision is overly harsh, unduly oppressive, so

one-sided as to shock the conscience, or unfairly one-sided.  *See Tompkins*, 2014 WL 2903752, at

\*15; *Tiri*, 226 Cal. App. at 243; *see also id.* at 243 n.6 (recognizing that California Supreme Court is

currently considering the "appropriate standard for determining whether a contract or contract term

is substantively unconscionable").  Gillette contends the delegation clause in the 2013 Agreement is

substantively unconscionable because it requires arbitration costs and fees to be shared between

Uber and the driver, unless otherwise "required by law."  Opp. Br. at 14; 2013 Agreement §

14.3(vi).  Specifically, the relevant clause provides: "[I]n all cases where required by law, Uber will

pay the Arbitrator's and arbitration fees.  If under applicable law Uber is not required to pay all of

the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the Parties in

accordance with said applicable law, and any disputes in that regard will be resolved by the

Arbitrator."  2013 Agreement § 14.3(vi).

Under California law, any clause in an employment agreement that would impose

"substantial forum fees" on an employee in her attempt to vindicate her unwaivable statutory rights

is contrary to public policy and therefore substantively unconscionable.  *Armendariz*, 24 Cal. 4th at

110.  As the California Supreme Court made clear, "we conclude that when an employer imposes

mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process

cannot generally require the employee to bear any *type* of expense that the employee would not be

required to bear if he or she were free to bring the action in court."[21]  *Id.* at 110-11 (emphasis in

---

[21] As the Court previously explained, the 2013 Agreement's opt-out provision was illusory, and thus the arbitration provision – and specifically the delegation clause – foisted on the signatories to that contract was "mandatory" as that term is used in *Armendariz*.  Indeed, Uber admits that drivers could not drive for Uber unless they accepted the terms of the 2013 Agreement.  *See* Colman

original); *see also Sonic-Calabasas A*, 57 Cal. 4th at 1144 (reaffirming *Armendariz*'s prohibition on contractual terms that require an "equal division of costs between employer and employee" in arbitration, and further explaining persuasively that the *Armendariz* rule is not pre-empted by the FAA or *Concepcion*).[22]

Indeed, the United States Supreme Court has repeatedly suggested that a court may refuse to enforce a delegation clause, or otherwise refuse to compel statutory claims to arbitration, if the party resisting arbitration would be subject to an "unfair" fee-splitting arrangement or would otherwise be required to pay significant forum fees in arbitration. For instance, in *Green Tree Fin. Corp.-Alabama v. Randolph*, the Court recognized that "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." 531 U.S. 79, 90 (2000). Ultimately, however, the Court sidestepped the issue because Randolph "failed to support" her assertion that "arbitration costs are high" with probative evidence. *Id.* at 90 n.6.

In *Rent-A-Center*, the Court once again recognized that a sufficiently robust challenge to arbitration fee-splitting could invalidate an arbitration clause, and specifically a delegation clause. *See Rent-A-Center*, 561 U.S. at 74 (holding that litigant could have challenged substantive unconscionability of delegation clause by showing that he was subject to an "unfair[] . . . fee-splitting arrangement" but noting that the plaintiff "did not make any arguments specific to the delegation provision"). And in *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013), the Court expressly acknowledged that a provision in an arbitration agreement that provides for "administrative fees attached to arbitration that are so high as to make access to the forum impracticable" may well be unenforceable. *Id.* at 2310-11 (citing *Green Tree Fin.*, 531 U.S. at 90). Once again, however, because there was no evidence of such prohibitive fees before the Court, the Justices did not have occasion to flesh out the rule. *Id.* at 2311.

---

Decl. *Mohamed*, at ¶ 6.

[22] The Court notes that Uber does not argue that the *Armendariz* rule regarding arbitration fees is preempted by the FAA, and thus any such argument is waived.

Unlike the litigants in *Green Tree*, *Rent-A-Center*, and *Italian Colors*, Plaintiffs here *have* made a sufficient showing that they would be subject to hefty fees of a type they would not face in court if they are forced to arbitrate arbitrability pursuant to the delegation clause of the 2013 Agreement. Specifically, Plaintiffs presented fee schedules and invoices from JAMS[23] that show JAMS arbitrators charge substantial "retainer fees" at the outset of an arbitration. Maya Decl. Ex. A. (invoice for $5,000 "retainer fee" to be "applied to reading, research, preparation, etc."). A fee schedule for a JAMS arbitrator shows that litigants will further be charged a hearing fee of $7,000 per full day, and that "[o]ther professional time, including additional hearing time, pre and post hearing reading and research, and conference calls, will be billed at $700 per hour." *Id.* Put simply, if Gillette is forced to arbitrate even the gateway question of arbitrability at JAMS, he will have to pay a number of hefty fees of a type he would not pay in court, such as a fee for "reading and research" and "award preparation." *Id.* Importantly, the evidence also suggests Gillette would have to advance his *pro rata* portion of these fees just to get the arbitration started, and just to determine whether he needs to arbitrate his claims at all. *Id*; *see also* Maya Decl. Ex. C at Rule 26 (JAMS rule requiring each party "to pay its *pro rata* share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration"). Gillette has stated in a declaration that his sole source of income is Social Security ($775 per month), and that he therefore could not afford to pay the arbitration fees that would be required even to litigate the limited issue of arbitrability under the delegation clause. Gillete Decl. at ¶ 11. The Court finds that Gillette would be unable to access the arbitral forum to even litigate delegation issues if the fee-splitting clause is enforced. Thus, under *Armendariz* the delegation clause is substantively unconscionable. *See Armendariz*, 24 Cal. 4th at 110; *see also Italian Colors Rest.*, 133 S. Ct. at 2310-11.

Uber's numerous arguments to the contrary are not persuasive. First, Uber suggests that *Armendariz* does not apply here because the drivers are not its employees. But if putative employers

---

[23] While the 2013 Agreement does not require arbitration at JAMS, if the parties cannot mutually agree on a neutral, the contract provides that a JAMS arbitrator will be selected and JAMS arbitration rules will apply. 2013 Agreement § 14.3(iii). Uber presented no evidence that other potential arbitration providers charge fees of a different type, or in significantly lesser amounts, than those charged by JAMS.

29

United States District Court
For the Northern District of California

could avoid the rule of *Armendariz* simply by *claiming* that a laborer is not their employee, the rule of *Armendariz* would be effectively nullified. It remains to be seen whether drivers like Gillette are, or are not, Uber's employees under California law. In the meantime, the Court finds that the policy rationale undergirding *Armendariz* can only be vindicated if individuals who can colorably claim to be an entity's employees are not required to pay substantial arbitral forum fees simply to obtain a determination of that precise issue (or threshold questions necessary to reach that determination).[24] If the rule were otherwise, companies could impose substantial forum costs on adverse litigants with impunity merely by denying the existence of an employment relationship. Moreover, such a rule would also significantly chill drivers in the exercise of their rights under the relevant agreements. A driver reviewing the "Paying for the Arbitration" section of the contracts could easily conclude that she would be required to pay arbitral fees simply to begin arbitration – a conclusion which could seriously discourage the driver from attempting to vindicate his or her rights as a putative employee in any forum. The Court cannot sanction such a result. *See Iskanian*, 59 Cal. 4th at 382-83 (explaining public policy is frustrated where individuals cannot effectively litigate claims related to their unwaivable statutory rights).

Uber next argues that drivers are *not* responsible for paying arbitration fees under the 2013 Agreement because the contract expressly states that "in all cases where required by law, Uber will pay the Arbitrator's and arbitration fees," and Uber understands *Armendariz* to require that employers cover its employees' arbitration fees.[25] *See Armendariz*, 24 Cal. 4th at 113 (holding that where an arbitration agreement between an employer and employee does not specifically provide for the handling of arbitration costs, California courts should "interpret the arbitration agreement . . . as providing . . . that the employer must bear the arbitration forum costs"). As should be obvious from

---

[24] The Court notes that the drivers' claims to employment status are colorable here. Indeed, this Court has already determined that the drivers are Uber's *presumptive* employees as a matter of California law, and the burden is now on Uber to prove an independent contractor relationship. *See O'Connor v. Uber Techs., Inc.*, -- F. Supp. 3d --, 2015 WL 1069092, at *9 (N.D. Cal. 2015).

[25] It is not immediately apparent this is a correct reading of the case. Uber reads *Armendariz* to require employers to pay their employees' arbitration costs, but a more accurate reading is that *Armendariz* simply renders unenforceable employment contracts that purport to require employees to bear those costs.

the Court's discussion in the preceding paragraph, this argument is disingenuous. Uber adamantly

contends that the drivers are *not* its employees. That is what this litigation is all about. To argue

that the words "where required by law" impose an obligation on Uber to pay its drivers' arbitration

fees because *Armendariz* requires such fees to be paid on behalf of *employees* is tantamount to

doublespeak.[26] Uber's former counsel in the *O'Connor* matter admitted as much:

> The Court: Okay. In California, who pays [for arbitration]?

> Mr. Hendricks: Well, it would depend – in this context, given we're dealing with independent contractors, I believe absent a showing of employee status, each party would probably bear their own expenses.

*O'Connor* Hr. Tr. at 10:5-9, Nov. 14, 2013. This Court will not permit Uber to try to "'gain an

advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an

incompatible theory'" in this case. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)

(quoting 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4477, p. 782

(1981)).[27]

　　　　Finally, Uber seeks to walk back its contention that drivers, as its claimed independent

contractors, would be responsible for paying their respective share of arbitration fees by now

offering to pay any such fees. Reply Br. at 20 (claiming that since litigation commenced

"Defendants have offered to pay the arbitration fees" pursuant to *Armendariz*). This after-the-fact

concession cannot render the delegation clause conscionable. As the Supreme Court in *Armendariz*

explained, whether a party is now willing to excise an unconscionable clause in a contract "does not

change the fact that the arbitration agreement as written is unconscionable and contrary to public

policy. Such a willingness can be seen, at most, as an offer to modify the contract; an offer that was

never accepted. No existing rule of contract law permits a party to resuscitate a legally defective

contract merely by offering to change it." *Armendariz*, 24 Cal. 4th at 125 (internal quotation marks

---

[26] The JAMS fee schedule provided by Plaintiffs further states that "[f]or arbitrations arising out of *employer*-promulgated plans, the only fee that an *employee* may be required to pay is the $400 per party fee for a one-day case." Maya Decl., Ex. A (emphases added). But again, this carve out would only apply if Uber agreed that it was the drivers' employer, and they its employees.

[27] Even if Plaintiffs were not employees, requiring parties with insufficient resources to arbitrate arbitrability could well be problematic.

and citation omitted); *see also Sonic-Calabasas A*, 57 Cal. 4th at 1134 (explaining that under

California law, unconscionability is measured by "whether a contract provision was unconscionable

at the time it was made") (internal quotation marks and citation omitted).

Put simply, Gillette has adequately proved that the delegation clause in the 2013 Agreement

is substantively unconscionable because in order to arbitrate arbitrability, he would have to pay

hefty fees of a type he would not have to pay if he was permitted to challenge arbitrability in court.

Thus, the Court holds that the delegation clause in the 2013 Agreement cannot be enforced under the

FAA because it is both procedurally and substantively unconscionable as a matter of California law.

Hence, this Court, and not an arbitrator, has the power to consider whether the 2013 Agreement's

arbitration provision is enforceable.

D.     <u>Even if the 2014 Agreements' Delegation Clauses Were Clear and Unmistakable, They are</u>
          <u>Nevertheless Unconscionable and Therefore Unenforceable</u>

The Court similarly concludes that even if the delegation clauses in the 2014 contracts were

"clear and unmistakable" – and they are not – those delegation clauses are unenforceable because

they are unconscionable under California law.

The Court's analysis of the enforceability of the 2014 delegation clauses and the 2013

Agreement's delegation clause is similar in some respects. Indeed, because the 2014 contracts all

contain nearly identical[28] fee-splitting provisions to the one contained in 2013 Agreement, the

Court's substantive unconscionability analysis of the 2014 contracts is exactly the same as it is with

respect to the 2013 Agreement. Because the 2014 contracts impermissibly subject Uber drivers to

the risk of having to pay significant forum fees, and because drivers are required to advance their

share of such fees simply to start the arbitration, the delegation clauses in the 2014 agreements are

substantively unconscionable to a significant degree. *See* Section III.C.2, *supra*.

---

[28] The 2014 Agreement provides in relevant part: "If under applicable law Uber is not
required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally
between the Parties or as otherwise required by applicable law." *See* 2014 Agreement at § 14.3(vi).
This language is the same in the 2014 Rasier Agreement, except the word "Uber" has been replaced
with "the Company." *See* 2014 Rasier Agreement at 14.

United States District Court

For the Northern District of California

The Court's review of the "surprise" element of the procedural unconscionability test is also the same under both the 2013 and 2014 agreements. The delegation clause in the 2014 agreements is as hidden in Uber's "prolix form" as it is in the 2013 Agreement, and thus the surprise element is satisfied. Thus the only question remaining is whether the "oppression" element of California's procedural unconscionability test is met, such that the Court should conclude the delegation clauses in the 2014 contracts present at least some minimal amount of procedural unconscionability.

1. Oppression of the Delegation Clauses Under the 2014 Agreements

The Court's analysis of the "oppression" element of procedural unconscionability is materially different under the 2014 contracts. Unlike the 2013 Agreement, the 2014 contracts provide drivers a meaningful opportunity to opt-out of the arbitration provision, and, consequently, the delegation clause. The 2014 agreements contain opt-out notices on their very first pages, in boldface and all-caps type that is considerably larger than the surrounding text. *See* 2014 Agreement at 1; 2014 Rasier Agreement at 1;[29] *see also O'Connor v. Uber Techs., Inc.*, No. 13-cv-3826 EMC, 2014 WL 2215860, at *3 (N.D. Cal. May 29, 2014) (stating that "the Revised Licensing Agreement gives clear notice of the arbitration provision, in bold caps at the beginning of the Revised Licensing Agreement"). The arbitration clauses themselves, which appear towards the end of the contracts, also contain bolded opt-out notices in very large and capitalized type. Indeed, before the substance of the arbitration provisions is laid-out, the 2014 Agreement and 2014 Rasier Agreement contain additional notices that attempt to make clear the importance of the opt-out right. *See, e.g.*, 2014 Agreement § 14.3 ("WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION"). Finally, the opt-out provision itself is contained in its own subsection bearing the header "Your Right to Opt Out of Arbitration." *See id.* at § 14.3(viii). In contrast to surrounding contract terms, the contents of the opt-out subsection are presented entirely in boldface type, as required by this Court. *Id.* Put simply, it would be hard to draft a more

---

[29] The opt-out notice is conspicuous in the 2014 Agreement, but is admittedly less so in the Rasier Agreement. Nevertheless, the opt-out right is bolded in larger text on the first page of the Rasier Agreement. Put differently, the opt-out is conspicuous in the Rasier Agreement, and more conspicuous in the 2014 Agreement with Uber.

visually conspicuous opt-out clause even if the Court were to aid in the drafting process, which it actually did.

The actual opt-out procedures in the 2014 contracts are also significantly more reasonable than those provided in the 2013 Agreement. At the Court's request, drivers can opt-out of the arbitration provisions in the 2014 contracts via email by simply sending Uber a message containing their name and expressing "an intent to opt-out." *See* 2014 Agreement § 14.3(viii). Alternatively, drivers can opt-out by letter which can be delivered to Uber by regular mail, overnight delivery, or hand delivery. Put simply, the "Revised Arbitration Provision gives [drivers] a reasonable means of opting out." *O'Connor*, 2014 WL 2215860, at *3.

Uber argues that the existence of a meaningful right to opt-out of the 2014 arbitration clauses necessarily renders those clauses (and the delegation clause specifically) procedurally conscionable as a matter of law, citing Ninth Circuit decisions in *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198 (9th Cir. 2002), *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104 (9th Cir. 2002), and *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052 (9th Cir. 2013) (en banc).[30] It cannot be denied that each of the cited decisions stand for the precise proposition of law that Uber advocates. But it is also undeniable that each of those decisions failed to apply California law as announced by the California Supreme Court. *See Gentry*, 42 Cal. 4th at 466-73. It is beyond dispute that the unconscionability of the contracts at issue here is a matter of state law. And because "the highest state court is the final authority on state law," *Fid. Union Trust Co. v. Field*, 311 U.S. 169, 177 (1940), and further because "no federal court interpreting California law could change the California Supreme Court's [ruling on an issue]," this Court cannot follow the Ninth Circuit cases cited by Uber in the face of directly contradicting California Supreme Court authority. *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 546 (C.D. Cal. 2012); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (noting that the United States Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law"); *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 889 (9th Cir. 2010) (recognizing that

---

[30] Uber also cites *Johnmohammadi v. Bloomingdale's, Inc.*, for the proposition that a meaningful opt-out right in a contract renders the contract procedurally conscionable as a matter of California law. 755 F.3d 1072 (9th Cir. 2014). But *Johnmohammadi* does not discuss procedural unconscionability at all, and thus the case is not on point. *See id.*

34

1  federal courts "are bound by pronouncements of the California Supreme Court on applicable state

2  law").

3      In *Ahmed*, the plaintiff was hired to work as a sales counselor at Circuit City.  *Ahmed*, 283

4  F.3d at 1199.  One month after he was hired, Circuit City sent Ahmed a contract that called for the

5  "binding arbitration of legal disputes."  *Id.*  Along with the contract, Circuit City also provided

6  Ahmed with a "simple one-page" opt-out form.  *Id.*  If Ahmed had returned the opt-out form to

7  Circuit City within the allotted thirty day period, "he would have been allowed to keep his job and

8  not participate in the [arbitration] program."  *Id.*  Ahmed, however, did not return the opt-out form.

9  *Id.*  He later sought to sue Circuit City for violations of the California Fair Employment and Housing

10  Act, and Circuit City moved to compel arbitration pursuant to their agreement.  *Id.*  Ahmed opposed

11  the motion to compel, and argued that the arbitration clause was unconscionable as a matter of

12  California law.  *Id.*  The Ninth Circuit concluded, however, that because "Ahmed was given a

13  meaningful opportunity to opt out of the arbitration program," he could not "satisfy even the

14  procedural unconscionability prong" of California law.  *Id.* at 1199-1200.  Thus the panel affirmed

15  the district court's order compelling arbitration without even "reach[ing] his arguments that the

16  agreement is substantively unconscionable."  *Id.* at 1200.

17      The Ninth Circuit was presented with the same situation in *Najd*.  Najd was employed by

18  Circuit City, and received the same arbitration contract and opt-out form the Ninth Circuit discussed

19  in *Ahmed*.  *Najd*, 294 F.3d at 1106.  Like Ahmed, Najd "did not exercise his right to opt out."  *Id.*

20  He later sued Circuit City, and Circuit City moved to compel arbitration.  *Id.*  Again like Ahmed,

21  Najd resisted the motion by arguing that the agreement was unconscionable under California law.

22  *Id.* at 1108.  The panel rejected this contention, however, finding that it "is foreclosed by our recent

23  decision in [*Ahmed*]" which "dictates that the [contract] is not procedurally unconscionable."  *Id.*

24      Finally, an en banc panel of the Ninth Circuit recently followed *Ahmed*, and held that an

25  arbitration clause that allowed "students to reject arbitration within sixty days of signing the

26  [contract]" was simply not procedurally unconscionable as a matter of California law.  *Kilgore*, 718

27  F.3d at 1059.

28

**United States District Court**
For the Northern District of California

The problem with these cases is the California Supreme Court's 2007 decision in *Gentry*. *See Gentry*, 42 Cal. 4th at 466-73. There, the Supreme Court was faced with the exact same issue the Ninth Circuit analyzed in *Ahmed* and *Najd*: A Circuit City employee (Gentry) sued Circuit City in court despite the fact that Gentry had agreed to arbitrate such claims with Circuit City, and failed to exercise his right to opt-out of the arbitration provision. *Gentry*, 42 Cal. 4th at 451. The California Court of Appeal had previously held, consistent with *Ahmed* and *Najd*, that the contract was simply not procedurally unconscionable "because of the 30-day opt-out provision." *Id.* at 452. The Supreme Court reversed, finding that the exact same contract that formed the basis of the *Ahmed* and *Najd* decisions "has an element of procedural unconscionability notwithstanding the opt-out provision." *Id.* at 451; *see also id.* at 470 ("[T]he Court of Appeal erred in finding the present agreement free of procedural unconscionability."). In doing so, the Supreme Court also expressly rejected *Ahmed* and *Najd*.[31] *Id.* at 472 n.10 (discussing *Ahmed* and *Najd* and concluding that "[w]e find neither case persuasive").

The *Gentry* court began its discussion of procedural unconscionability by noting that "a conclusion that a contract contains no element of procedural unconscionability is tantamount to saying that, no matter how one-sided the contract terms, a court will not disturb the contract because of its confidence that the contract was negotiated or chosen freely, that the party subject to a seemingly one-sided term is presumed to have obtained some advantage from conceding the term or that, if one party negotiated poorly, it is not the court's place to rectify these kinds of errors or asymmetries." *Gentry*, 42 Cal. 4th at 470. "Accordingly, if we take the Court of Appeal in this case at its word that there was no element of procedural unconscionability in the arbitration agreement because of the 30-day opt-out provision, then the logical conclusion is that a court would have no basis under common law unconscionability analysis to scrutinize or overturn even the most unfair or exculpatory of contractual terms." *Id.* The Supreme Court concluded, however, that the Court of

---

[31] While *Kilgore* was decided after *Gentry*, the decision never cites *Gentry* or otherwise recognizes the rule of procedural unconscionability announced by the California Supreme Court therein. *See Kilgore*, 718 F.3d at 1059. Instead, it cites *Ahmed*, which is not good law, and was not good law at the time *Kilgore* was decided. *Id.* Thus *Kilgore* presents an inaccurate picture of California law and is equally inapposite here.

United States District Court

For the Northern District of California

1    Appeal was mistaken in so concluding because there were "several indications that Gentry's failure

2    to opt out of the arbitration agreement did not represent an authentic informed choice." *Id.*

3        First, the *Gentry* court noted that the "explanation of the benefits of arbitration" in the

4    contract was "markedly one-sided." *Gentry*, 42 Cal. 4th at 470.  Specifically, the opt-out clause

5    failed to "mention the . . . significant disadvantages that *this particular arbitration agreement* had

6    compared to litigation." *Id.* (emphasis in original).  For instance, the arbitration agreement provided

7    a one-year statute of limitations for recovering overtime wages, as opposed to the three-year

8    limitations period under California law, and similarly limited the availability of backpay to a one

9    year period. *Id.* at 470-71.  The arbitration agreement also contained a punitive damages limitation,

10   and provided that the parties will "generally be liable for their own attorney fees" despite the fact

11   that prevailing employees were typically entitled to an award of reasonable attorney fees and costs

12   under California statutory law. *Id.* at 471.  Put simply, the arbitration agreement contained a number

13   of substantively unconscionable or otherwise unfavorable terms from the point of view of the

14   employee.

15       The Supreme Court held that failure to bring these specific substantively unconscionable or

16   otherwise unfavorable features of the arbitration clause to Gentry's attention in connection with the

17   opt-out clause rendered the entire arbitration provision at least somewhat *procedurally*

18   unconscionable. *Id.*  By neglecting to mention "the many disadvantages to the employee that Circuit

19   City had inserted into the agreement . . . the employee would receive a highly distorted picture of the

20   arbitration Circuit City was offering." *Id.*  Thus despite the fact that an employee who had read the

21   arbitration provision "would have encountered the above [one-sided] provisions, only a legally

22   sophisticated party would have understood that these rules and procedures are considerably less

23   favorable to an employee than those operating in a judicial forum." *Id.*  Put simply, the Supreme

24   Court determined that the opt-out right was not sufficiently meaningful to render the contract

25   without *any* procedural unconscionability where the employee was not given sufficient information

26   about one-sided terms that might make that employee more likely to opt-out of arbitration.

27       The Supreme Court further reasoned that the opt-out right could not cure the agreement of *all*

28   procedural unconscionability because "it is not clear that someone in Gentry's position would have

United States District Court

For the Northern District of California

felt free to opt out." *Gentry*, 42 Cal. 4th at 471. According to the Court, the "materials provided to Gentry made unmistakably clear that Circuit City preferred that the employee participate in the arbitration program." *Id.* at 471-72. For instance, a handbook distributed with the opt-out form "touted the virtues of arbitration, including use of the all-capitalized subheading – WHY ARBITRATION IS RIGHT FOR YOU AND CIRCUIT CITY – that left no doubt about Circuit City's preference" for arbitration. *Id.* at 472. Moreover, the fact that the arbitration agreement "was structured so that arbitration was the default dispute resolution procedure from which the employee had to opt out underscored Circuit City's pro-arbitration stance." *Id.* This was important, the Supreme Court explained, because "[g]iven the inequality between employer and employee and the economic power that the former wields over the latter it is likely that Circuit City employees felt at least some pressure not to opt out of the arbitration agreement." *Id.* (citing *Armendariz*, 24 Cal. 4th at 115). Thus, the Court concluded that "[t]he lack of material information about the disadvantageous terms of the arbitration agreement, combined with the likelihood that employees felt at least some pressure not to opt out of the arbitration agreement, leads to the conclusion that the present agreement was, at the very least, not entirely free from procedural unconscionability." *Id.*

The holding of *Gentry* regarding procedural unconscionability applies to this Court's analysis of the 2014 agreements.[32] Specifically with respect to the delegation clause, the first portion of the *Gentry* test is met because the 2014 agreements utterly failed to notify drivers of a specific drawback presented by the delegation clause – namely, that drivers may be required to pay

---

[32] This Court recognizes that *Gentry* was abrogated in part by the California Supreme Court in *Iskanian*. *See Iskanian*, 59 Cal. 4th at 366 (holding that "[t]he *Gentry* rule runs afoul of" the FAA and is thus preempted). However, "*the* [singular] *Gentry* rule" that the California Supreme Court recognized was preempted in light of *Concepcion* is *not* the procedural unconscionability rule discussed in this Order. The lion's share of the *Gentry* opinion was devoted to a discussion of the validity of class action waivers in arbitration. The *Gentry* rule that the *Iskanian* court recognized has been abrogated is the Court's rule that invalidated class action waivers in arbitration proceedings where a court concluded "that a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees . . . [and] disallowance of the class action will likely lead to a less comprehensive enforcement of [labor laws]." *Gentry*, 42 Cal. 4th at 463. The *Gentry* court's procedural unconscionability discussion, however, was an additional holding that was not addressed (or even acknowledged) by the *Iskanian* court. Put simply, there is no reason to believe that the California Supreme Court has cast the separate procedural unconscionability holding of *Gentry* into doubt. Nor is there reason to suspect that *Gentry*'s procedural unconscionability rule would be preempted because the rule is not specific to arbitration agreements, but appears to apply generally to all California contracts that contain opt-out provisions.

considerable forum fees to arbitrate arbitrability, whereas they would not be required to pay such fees if they opted-out of arbitration (and thus the delegation clause).[33] *See* Section III.C.2, *supra*.

It is less clear, however, whether the second part of the *Gentry* test – which asks whether an employee would feel at least some pressure not to opt out of the arbitration agreement – similarly applies to Uber drivers like Mohamed. A number of factual distinctions could remove this case from *Gentry*'s ambit. For instance, there are no terms in the 2014 contracts analogous to the solicitous subheading "Why Arbitration is Right for You and Circuit City." *See Gentry*, 42 Cal. 4th at 472. Moreover, the 2014 agreements specifically provide that "You will not be subject to retaliation if You exercise Your right to assert claims or opt-out of coverage under this Arbitration Provision." 2014 Agreement at § 14.3(viii). But on the other side of the ledger, Uber drivers are likely subject to the same general economic pressures that concerned the Court in *Gentry*. Like any other lower-level laborer, Uber drivers likely have a fairly urgent need to obtain employment, and may feel pressure to appease their putative employer by assenting to contractual terms the laborer has reason to believe are important to the company. *See Gentry*, 42 Cal. 4th at 471 (explaining that it is "unrealistic to expect anyone other than higher echelon employees" to negotiate contractual terms in an employment agreement or otherwise push back against an employer by, for instance, hiring an attorney to review an employment agreement). As the California Supreme Court noted in *Armendariz*, in a discussion explicitly cited by the *Gentry* court, "in the case of preemployment arbitration contracts, the economic pressures exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." *Armendariz*, 24 Cal. 4th at 115. And, like the employee in *Gentry*, Uber drivers here could reasonably assume that Uber prefers arbitration because "arbitration was the default dispute resolution procedure from which the employee had to opt out." *Gentry*, 42 Cal. 4th at 472.

---

[33] As the Court discusses in more detail below, the 2014 agreements further failed to specifically discuss other substantively unfavorable terms of the arbitration provision in connection with the opt-out. The Court does not discuss these issues here, however, because under *Rent-A-Center* the Court must focus on the features of the delegation clause specifically when deciding the enforceability of a delegation clause, and not other substantively unconscionable terms in the contract. *See Rent-A-Center*, 561 U.S. at 72.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Ultimately, while acknowledging that it is an extremely close question, the Court concludes that the second element of the *Gentry* test is met. Consequently, the Court finds that despite the conspicuous opt-out provisions in the 2014 agreements, the Court cannot conclude that the 2014 delegation clauses are without procedural unconscionability altogether; Mohamed's ability to opt-out of the delegation clause was not sufficiently meaningful to eliminate *all* oppression from the contract. *See Gentry*, 42 Cal. 4th at 451 (concluding that arbitration agreement had "an element of procedural unconscionability notwithstanding the opt-out provision"); *see also Duran*, 2009 WL 1709569, at *5 (concluding that *Gentry* held generally that "even a contract with an opt-out provision can be a contract of adhesion"). And when combined with the substantial amount of "surprise" drivers would face given the highly inconspicuous nature of the delegation clauses specifically, the Court finds that the 2014 agreements' delegation clauses contain some procedural unconscionability.

      2.   <u>Conclusion</u>

In sum, the Court determines that the delegation clauses in the 2014 contracts are procedurally unconscionable. And because the delegation clauses would force drivers to pay exorbitant fees just to arbitrate arbitrability – fees which drivers would not need to pay to litigate arbitrability in Court – the Court finds the 2014 delegation clauses to be significantly substantively unconscionable; enforcing the delegation clauses could effectively deprive Mohamed of any forum for him to pursue his claims whatsoever. *See Armendariz*, 24 Cal. 4th at 114 (explaining that where a contract contains less procedural unconscionability, the court must find significantly more evidence of substantive unconscionability before holding a contract term unenforceable, and vice versa). Thus, the Court concludes that the delegation clauses in the 2014 agreements are unenforceable under California law.

E.    <u>The 2013 Agreement's Arbitration Provision is Unenforceable</u>

The Court determined above that the delegation clause in the 2013 Agreement is ineffective. Consequently, it falls to this Court to decide whether the arbitration provision in the 2013

United States District Court
For the Northern District of California

1    Agreement is enforceable under California law and the FAA.[34]  As previously noted, the FAA

2    requires courts to enforce arbitration provisions in written contracts such as the 2013 Agreement

3    "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. §

4    2.  The U.S. Supreme Court has interpreted the FAA's "saving clause" to permit "agreements to

5    arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or

6    unconscionability, but not by defenses that apply only to arbitration or that derive their meaning

7    from the fact that an agreement to arbitrate is at issue."  *Concepcion*, 131 S. Ct. at 1746 (internal

8    quotation marks and citations omitted).

9           Plaintiffs argue that the 2013 Agreement's arbitration provision is unenforceable in its

10   entirety because it is unconscionable under California law.  The Court agrees.

11           1.    Procedural Unconscionability

12           For largely the same reasons that this Court held the delegation clause in the 2013

13   Agreement was procedurally unconscionable, the entire 2013 arbitration provision is procedurally

14   unconscionable as well.  Under any standard, the 2013 Agreement's opt-out provision was illusory

15   because it was highly inconspicuous and incredibly onerous to comply with.  Hence, the Court

16   concludes that the arbitration provision in the 2013 Agreement was presented to drivers on a take-it-

17   or-leave it basis, and was adhesive and oppressive.  *See Armendariz*, 24 Cal. 4th at 113 (holding that

18   a standardized contract which is imposed and drafted by the party of superior bargaining strength

19   and that "relegates the subscribing party only the opportunity to adhere to the contract or reject it" is

20   necessarily oppressive); *see also* Section III.C.1, *supra*.

21           Similarly, there can be no real dispute that the arbitration provision itself was a "surprise" to

22   drivers like Gillette and Mohamed.  The arbitration clause in the 2013 Agreement first appears on

25       [34]  The Court notes that even if it were incorrect in holding the 2013 delegation clause is
26   unenforceable, the Court would still be required to evaluate the validity of the PAGA waiver in the
     2013 Agreement under the express terms of the contract.  *See* 2013 Agreement at § 14.3(v)(c)
27   ("Notwithstanding any other clause contained in this Agreement, any claim that all or part of the
     Class Action Waiver, Collective Action Waiver or Private Attorney General Waiver is invalid,
28   unenforceable, unconscionable, [or] void or voidable may be determined only by a court of
     competent jurisdiction and not by an arbitrator.").

United States District Court

For the Northern District of California

1   the eleventh page of the printed document.[35]  *See* 2013 Agreement at § 14.3.  Unlike the 2014

2   agreements, there is no warning anywhere earlier in the 2013 Agreement that the document contains

3   an arbitration clause.  Moreover, the arbitration clause itself is inconspicuous in the context of the

4   surrounding provisions.  The size of the text of the arbitration provision is invariably the same as the

5   surrounding text.  And with the exception of only one paragraph of the pages-long arbitration

6   provision, the text is not bolded or otherwise distinguished from the surrounding contractual terms.

7   Put simply, the 2013 arbitration provision as a whole is highly inconspicuous, surprising, and

8   oppressive.  It is procedurally unconscionable.

9          2.      Substantive Unconscionability

10         The 2013 Agreement's arbitration clause is also significantly unconscionable as a substantive

11  matter.  First, the 2013 Agreement's arbitration provision is substantively unconscionable and

12  unenforceable because it purports to waive Gillette's right to bring representative PAGA claims in

13  any forum. And because the 2013 Agreement expressly provides that the PAGA waiver is not

14  severable from the rest of the arbitration provision, the Court concludes that the entirety of the

15  arbitration agreement fails because the PAGA waiver fails.

16         Alternatively, the 2013 Agreement's arbitration clause fails because it is "permeated" with

17  other substantively unconscionable terms.  *Armendariz*, 24 Cal. 4th at 122 (citing Cal. Civ. Code §

18  1670.5(a)).  Specifically, the Court finds that in addition to the substantively unconscionable PAGA

19  waiver, the 2013 Agreement's arbitration clause contains a substantively unconscionable fee-shifting

20  clause (*see* Section III.C.2, *supra*), confidentiality provision, carve-out proviso that permits Uber to

21  litigate the claims most valuable to it in court (*i.e.*, intellectual property claims) while requiring its

22  drivers to arbitrate those claims (*i.e.,* employment claims) they are most likely to bring against Uber,

23  and a provision allowing Uber to unilaterally modify contract terms at any time.

24

25

26         [35]  Plaintiffs note that drivers were prompted to view the relevant contracts, and accept them,
    while using their smartphones or other mobile devices.  Given the relatively small screen sizes on
27  such devices, it is likely drivers would have had to scroll through the 2013 Agreement a number of
    times in order to come across the arbitration provision towards the end of contract. This further
28  supports a procedural unconscionability finding.

a.    The PAGA Waiver is Unconscionable

In a section misleadingly titled "How Arbitration Proceedings are Conducted," the 2013 Agreement provides that "You and Uber agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis." 2013 Agreement § 14.3(v). The provision goes on to explain that "[t]here will be no right or authority for any dispute to be brought, heard, or arbitrated as a private attorney general representative action ('Private Attorney General Waiver')." *Id.* at § 14.3(v)(c). Gillette's complaint pleads a number of representative PAGA claims against Uber. *Gillette* Docket No. 7 at ¶¶ 76-83.

i.    PAGA Lawsuits Generally

Under PAGA, "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations." *Arias v. Superior Court,* 46 Cal. 4th 969, 980 (2009). Any penalties recovered go largely to the state; "[o]f the civil penalties recovered, 75 percent goes to [California's] Labor and Workforce Development Agency, leaving the remaining 25 percent for the 'aggrieved employees.'" *Id.* at 980-81. Hence, the "government entity on whose behalf the plaintiff files suit is always the real party in interest in the suit." *Iskanian*, 59 Cal. 4th at 382. Because the state is the real party in interest, an allegedly aggrieved employee may only proceed with a PAGA claim after providing written notice to the Labor and Workforce Development Agency (LWDA), which notice permits the agency to decide whether to investigate or prosecute the alleged violation(s) itself. *See* Cal. Lab. Code § 2699.3(a). Thus, LWDA retains "primacy over private enforcement efforts," *Arias,* 46 Cal. 4th at 980, and will be bound by any final judgment entered against its deputized plaintiff. *Iskanian,* 59 Cal. 4th at 387 (observing that a "judgment in a PAGA action is binding on the government"). In this way, a "PAGA representative action is [] a type of *qui tam* action." *Id.* at 382.

Against this background, it is clear that a PAGA representative suit, like Gillette's, differs significantly from class actions and other suits in which a private plaintiff seeks relief on behalf of himself, fellow class members, or even the public. *See, e.g.*, *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 934-38 (9th Cir. 2013) (holding that the FAA preempts California's *Broughton-Cruz* rule, which prohibited mandatory arbitration of three particular types of claims if the plaintiff sought

a public injunction).  Unlike these other types of suit, a PAGA claim "functions as a substitute for an action brought *by the government itself*."  *Arias,* 46 Cal. 4th at 986 (emphasis added); *see also Baumann v. Chase Inv. Servs. Corp.,* 747 F.3d 1117, 1123 (9th Cir. 2014) (discussing the distinct *qui tam* nature of PAGA representative suits and concluding that "a PAGA suit is fundamentally different than a class action"), *cert. denied,* 135 S. Ct. 870 (2014).

ii.    PAGA Waivers Violate Public Policy

In light of the significant differences described above, and the fundamental role representative PAGA suits play to the vigorous enforcement of California's Labor Code,[36] the California Supreme Court recently held that "an agreement by employees to waive their right to bring a PAGA action serves to disable one of the primary mechanisms for enforcing the Labor Code. Because such an agreement has as its object indirectly to exempt the employer from responsibility for its own violation of law it is against public policy and may not be enforced."  *Iskanian*, 59 Cal. 4th 348 at 383.  Put simply, *Iskanian* prohibits the pre-dispute waiver of an employee's right to bring a representative PAGA action in *any* forum (either court or arbitration).  *See id.* at 359 ("[W]e conclude that an arbitration agreement requiring an employee as a condition of employment to give up the right to bring representative PAGA actions in any forum is contrary to public policy."); *see also Securitas Sec. Servs. USA v. Superior Court.*, 234 Cal. App. 4th 1109, 1122 (2015); *Hernandez v. DMSI Staffing, LLC*, -- F. Supp. 3d --, 2015 WL 458083, at *4-6 (N.D. Cal. 2015).

The California Supreme Court further determined that California's state-law rule outlawing pre-dispute PAGA representative action waivers was not preempted by the FAA because the real party in interest for any PAGA claim is the State of California, and the FAA's focus is "on private disputes."  *Iskanian*, 59 Cal. 4th at 385.  According to *Iskanian*, "a PAGA claim lies outside the FAA's coverage because it is not a dispute between an employer and an employee arising out of their contractual relationship.  It is a dispute between an employer and the state, which alleges directly or through its agents – either the Labor and Workplace Development Agency or aggrieved

---

[36] *See Iskanian*, 59 Cal. 4th at 378-79 (explaining that PAGA was passed to compensate for the lack of resources and prosecutions brought by government enforcement agencies against Labor Code violators).

United States District Court

For the Northern District of California

employees – that the employer has violated the Labor Code." *Id.* at 386-87. *Iskanian* also suggested there was no FAA preemption because principles of federalism counsel against finding preemption of state laws dealing with matters traditionally within a state's police powers unless Congress's intent to preempt such laws was "clear and manifest." *See id.* at 388-89. The *Iskanian* majority could discern no such purpose in the FAA. *Id.* at 388. The United States Supreme Court subsequently denied certiorari. *CLS Transp. L.A., LLC v. Iskanian*, 135 S. Ct. 1155 (2015).

### iii. The *Iskanian* Rule is Not Preempted by the FAA

The question of FAA preemption is a matter of federal law, and as this Court previously recognized, *Iskanian*'s holding on that point is not binding on this Court. *See Hernandez*, 2015 WL 458083, at *6. Nevertheless, this Court recently determined that *Iskanian*'s discussion of preemption is "persuasive" and held, as a matter of federal law, that *Iskanian*'s anti-waiver rule is not preempted by the FAA. *See id.* at *6-9; *see also Zenelaj*, 2015 WL 971320, at *7 (following *Hernandez* and finding FAA does not preempt the *Iskanian* rule as a matter of federal law). In doing so, the Court adopted both of the rationales advanced by *Iskanian* (*i.e.*, (1) the FAA only applies to "private disputes," and (2) the FAA expresses no clear and manifest intent to preempt laws, such as PAGA, that come within the broad authority of the state's police powers) and advanced an additional rationale: litigating PAGA claims in arbitration would not "undermine the fundamental attributes of arbitration" by imposing complicated or formal procedural requirements on arbitrators. *See Concepcion*, 131 S. Ct. at 1748-53 (concluding *Discover Bank* rule was preempted by FAA because any state law rule that would require arbitrators to apply rigorous, time consuming, and formal procedures "interferes with the fundamental attributes of arbitration").

Uber asks this Court to reconsider its preemption decision in *Hernandez*. In the absence of Ninth Circuit authority on point,[37] the Court declines to do so. First, the Court notes that Uber does not argue that either *Iskanian* or *Hernandez* were incorrect in concluding that the FAA only applies to "private disputes." Nor does Uber argue that either *Iskanian* or *Hernandez* incorrectly invoked federalism principles in concluding that the FAA does not preempt *Iskanian*'s anti-waiver rule.

---

[37] The issue is currently pending before the Ninth Circuit in the consolidated appeal of *Sakkab v. Luxottica Retail N. Am.*, lead Ninth Circuit Case No. 13-55184.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   Rather, Uber argues that this Court was mistaken in concluding that the litigation of PAGA claims in

2   arbitration would not "interfere" with the fundamental attributes of arbitration – namely the speedy

3   and informal resolution of disputes.  For instance, Uber argues that to "recover penalties, a PAGA

4   plaintiff must 'prove Labor Code violations with respect to each and every individual on whose

5   behalf Plaintiff seeks to recover civil penalties.'"  Reply Br. at 4 (quoting *Hibbs-Rines v. Seagate*

6   *Techs., LLC*, 2009 U.S. Dist LEXIS 19283, at *4 (N.D. Cal. 2009)).  Uber also argues that Gillette

7   would need to establish each predicate PAGA violation as to each aggrieved driver – here likely

8   numbering in the thousands – thereby rendering the proceedings significantly more complicated than

9   the typical arbitration.  *Id.*

10         As an initial matter, the grounds stated by *Iskanian* are persuasive and sufficient to carry the

11  conclusion here.  In any event, as to this Court's additional observation in *Hernandez*, the Court

12  finds that Uber has not sufficiently established that representative PAGA claims cannot be

13  adjudicated in arbitration in a speedy and informal manner.  The lone case Uber cites in support of

14  this argument, *Hibbs-Rines*, is not persuasive.  As another district court has properly recognized,

15  *Hibbs-Rines* "stands for the unremarkable proposition that Plaintiff is required to prove every Labor

16  Code violation in order to obtain a civil penalty therefore.  Exactly why Defendants believe this

17  requires live witness testimony rather than evidence presented in a representative fashion or via

18  documentary evidence, is unclear."  *Medlock v. Host Int'l, Inc.*, No. 12-cv-2024-JLT, 2013 WL

19  2278095, at *5 (E.D. Cal. May 22, 2013).  Indeed, a number of courts, including the *Medlock*

20  court,  have recognized that PAGA plaintiffs can often satisfy their burdens of proof without undue reliance

21  on individualized evidence.  *See id.*; *see also Plaisted v. Dress Barn, Inc.*, No. 12-cv-1679-ODW,

22  2012 WL 4356158, at *2 (C.D. Cal. Sept. 20, 2012) (recognizing that individualized or fact-

23  intensive evidence of damages is not required under PAGA, because PAGA only permits recovery

24  of "statutory penalties in fixed amounts per violation"); *Alcantar v. Hobart Serv.*, No. 11-cv-1600

25  PSG, 2013 WL 146323, at *3-4 (C.D. Cal. Jan. 14, 2013) (holding that there was little risk litigation

26  of representative PAGA claim would "require a series of highly individualized, fact intensive, mini

27  trials" because the burden would be on Defendants to prove that the Labor Code was not violated,

28  and such proof could be drawn easily from Defendant's own records).  Uber does not explain why

United States District Court

For the Northern District of California

1   Gillette cannot establish Uber's PAGA liability in an efficient manner, by, for instance, the use of

2   representative evidence or Uber's own records.[38]

3        Even more fundamentally, the Court is not persuaded that the *Iskanian* anti-waiver rule is

4   preempted under the FAA simply because adjudicating a representative PAGA claim in arbitration

5   could be complicated or time consuming *because of the merits*. Disputants engage in lengthy and

6   complicated arbitrations quite frequently. *See, e.g.*, *Bear, Stearns & Co. v. Buehler*, 432 F. Supp. 2d

7   1024, 1026-29 (C.D. Cal. 2000) (affirming arbitration award regarding Bear Stearns' negligence and

8   breach of fiduciary duty that required arbitrators to "sit[] through 81 hearings"); *Am. Nat'l Ins. Co.*

9   *v. Everest Reinsurance Co.*, 180 F. Supp. 2d 884, 885 (S.D. Tex. 2002) (confirming arbitration

10  award entered in complex commercial case where hearing lasted six days, and where parties

11  "submitted well over 200 pages of briefs, over 500 exhibits . . . expert reports and an audit report"

12  and copious deposition testimony to the arbitrators); *Hodge v. Columbia Univ. in City of New York*,

13  No. 05-cv-7622 (LAK), 2008 WL 2686684, at *6 (S.D.N.Y. July 2, 2008) (discussing arbitration of

14  discrimination claim that required seventeen hearings and the arbitrator's review of copious briefs

15  and evidence). What *Concepcion* forbids is not complicated or time-consuming arbitration on the

16  merits, but state rules that foist onerous *procedural* requirements on arbitrators, such as the due-

17  process procedures required by Rule 23. *See Concepcion*, 131 S. Ct. at 1751 (explaining *Discover*

18  *Bank* rule was preempted because it would "generate *procedural* morass" and impose "*procedural*

19  formality" on arbitrators) (emphases added). As Justice Liu persuasively explained in *Iskanian*,

20  states are permitted to craft "an unconscionability rule that considers whether arbitration is an

21  effective dispute resolution mechanism for wage claimants *without* regard to any advantage inherent

22  to a *procedural device* that interferes with fundamental attributes of arbitration." *Iskanian*, 59 Cal.

23  4th at 365 (emphases added). What *Concepcion* does not permit, however, is a state-law rule that

24  _____

25        [38] Plaintiff notes, for instance, that Uber's PAGA liability for failing to provide drivers with
    itemized wage statements will be essentially "automatic" if a jury concludes that drivers were

26  "employees" under California law, and thus entitled to such statements. There appears to be no
    dispute that Uber does not provide such statements to its drivers because Uber has taken the position

27  it is not required to do so because its drivers are not "employees." Thus, according to Plaintiffs, a
    determination that Uber drivers *are* employees will result in a proved PAGA violation without resort

28  to any individualized evidence whatsoever.

"considers whether individual arbitration is an effective dispute resolution mechanism for employees *by direct comparison* to the advantages of a *procedural* device (a class action) that interferes with fundamental attributes of arbitration." *Id.* at 356-66 (first emphasis in original) (second emphasis added).

As the Ninth Circuit recognized in *Bauman*, and as this Court noted in *Hernandez*, PAGA imposes no *procedural* requirements on arbitrators (or courts for that matter) beyond those that apply in an individual labor law case. *See Baumann,* 747 F.3d at 1122; *Hernandez*, 2015 WL 458083, at *6. For instance, PAGA contains "no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action." *Baumann,* 747 F.3d at 1122. Nor does a PAGA action require inquiry into the "named plaintiff's and class counsel's ability to fairly and adequately represent unnamed employees." *Id.* "While the need for sufficient procedures to bind class members in class arbitration was cause for concern in *Concepcion,* PAGA's preclusive effect differs from that of class action judgments," and thus no such procedures are required under PAGA. *Hernandez*, 2015 WL 458083, at *6. Put simply, the "due-process-related procedural requirements of formal class actions do not obtain in PAGA representative actions." *Id*; *see also Zenalaj*, 2015 WL 971320, at *7-8 (concluding that *Iskanian* is not preempted because litigating representative PAGA claims is "not analogous to class action waivers, and therefore not contemplated by *Concepcion*"). Thus, there is no reason to conclude that *Concepcion* would preempt *Iskanian*'s requirement that representative PAGA actions be allowed to proceed either in court or in arbitration. The *Iskanian* rule is not preempted by the FAA.

iv.     *Iskanian* Applies Here Because Drivers Had No Meaningful Opt-Out Right Under the 2013 Agreement

Alternatively, Uber argues that this case is materially distinguishable from *Iskanian* and *Hernandez* because in those cases the plaintiffs could not opt out of the PAGA waiver. *See Iskanian*, 59 Cal. 4th at 360 ("We conclude that where, as here, an employment agreement *compels* the waiver of representative claims under the PAGA, it is contrary to public policy and unenforceable as a matter of state law.") (emphasis added); *Hernandez*, 2015 WL 458083, at *4 (applying *Iskanian* to plaintiff who had no right to opt-out of PAGA waiver). According to Uber,

United States District Court
For the Northern District of California

the *Iskanian* rule only prohibits *mandatory* PAGA waivers. *See Iskanian*, 59 Cal. 4th at 383 (noting that it is contrary to public policy for an employment agreement to eliminate a worker's choice to bring a PAGA claim "altogether by *requiring* employees to waive the right to bring a PAGA action before any dispute arises"). But even assuming for the moment that Uber is correct that a PAGA waiver is enforceable under California law so long as the employee is given *any* opportunity to opt-out of that waiver – an assumption this Court rejects in its below discussion of the PAGA waiver in the 2014 agreements – Uber's argument is of no moment to the 2013 Agreement because, as discussed at length above, the opt-out in the 2013 Agreement is illusory. *See* Section III.C.1, *supra*. Thus, there is no basis for finding that the Uber drivers who are bound to PAGA waiver in the 2013 Agreement truly had the choice to maintain their representative PAGA rights.

v.     Conclusion

In sum, the PAGA waiver in the 2013 Agreement is substantively unconscionable and void as a matter of California law. Uber has not shown that the FAA preempts the *Iskanian* anti-waiver rule. Thus, the representative PAGA waiver is unenforceable.

3.     The PAGA Waiver is Not Severable

If a court finds as a matter of law that "'the contract or any clause of the contract [was] unconscionable at the time it was made[,] the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause so as to avoid any unconscionable result.'" *Armendariz*, 24 Cal. 4th at 121 (quoting Cal. Civ. Code § 1670.5(a)). The California Supreme Court has explained, however, that there are limits on a court's discretion to refuse to enforce the entirety of a contractual provision based on the existence of a substantively unconscionable clause.[39] As the Court noted, the law favors "severing or restricting illegal terms rather than voiding the entire contract" because severance "prevent[s] parties from gaining [an] undeserved benefit," and

---

[39] The U.S. Supreme Court has also held that "[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Rent-A-Center*, 561 U.S. at 70-71 (internal quotation marks and citation omitted). Thus, at most a court can invalidate the entirety of an arbitration provision if that specific provision is permeated with unconscionability. A Court may not, however, invalidate the entire contract based on unconscionable terms contained solely in an arbitration clause. *Id.*

United States District Court<br>For the Northern District of California

United States District Court

For the Northern District of California

"conserve[s] a contractual relationship if to do so would not be condoning an illegal scheme." *Id.* at 123 (citations omitted). Put simply, California law favors severance of unconscionable terms where "the interests of justice would be furthered by severance." *Id.* (internal modifications and quotation marks omitted) (citation omitted). Only where the agreement is "permeated by unconscionability" or where the "central purpose of the contract is tainted with illegality" should the court refuse to sever the offending terms. *Id.* (internal quotation marks omitted).

Where, however, a contract expressly states that an unconscionable provision is not to be severed from the remainder of the agreement, the Court must enforce the non-severability clause according to its terms. *See Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1098 (9th Cir. 2009) (recognizing that while "[i]n the usual case" the court must consider whether an unenforceable term "should be severed from the arbitration agreement as a whole," where the "arbitration agreement itself includes a provision prohibiting severance" the court must invalidate the entirety of the arbitration agreement "in accordance with [the] severability clause"); *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 986-87 (9th Cir. 2007) (holding an "entire arbitration clause is void and arbitration cannot be compelled" where contract contained unconscionable clause and "has a nonseverability clause"). This is because courts "must 'rigorously enforce' arbitration agreements according to their terms." *Italian Colors*, 133 S. Ct. at 2309 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Gillette argues that the PAGA waiver in the 2013 Agreement is not severable from the rest of the arbitration provision by the express terms of the arbitration clause. Thus, Gillette contends that all of the remaining clauses in the arbitration provision, such as the otherwise lawful class action waiver, must fail because the PAGA waiver failed. The Court agrees with Gillette.

The 2013 Agreement's PAGA waiver contains the following language: "The Private Attorney General Waiver *shall not be severable from this Arbitration Provision* in any case in which a civil court of competent jurisdiction finds the Private Attorney General Waiver is unenforceable. In such instances and where the claim is brought as a private attorney general, such private attorney general claim must be litigated in a civil court of competent jurisdiction." 2013 Agreement § 14.3(v)(c) (emphasis added).

50

**United States District Court**
For the Northern District of California

Uber argues that the above non-severability language is not as clear as it seems. For instance, Uber points to a different provision in the 2013 Agreement, which appears two sections before the arbitration provision, which provides that: "If any provision of the Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced to the fullest extent of the law." 2013 Agreement at § 14.1. The problem with this argument, however, is that this more general pro-severability language, which is not contained in the arbitration provision itself, is contradicted by the more specific non-severability language of the PAGA waiver. As Uber itself recognizes, "it is a well-settled canon of contract interpretation that when a general and particular provision are inconsistent, 'the particular and specific provision is paramount to the general provision." Reply Br. at 11 (quoting *Prouty v. Gores Tech. Group*, 121 Cal. App. 4th 1225, 1235 (2005) and citing Cal. Civ. Code § 3534)). While this argument was not well-taken in respect to construing the delegation clauses in Uber's contracts, because delegation language must pass the "clear and unmistakable" test, Uber's argument is entirely apt here where the "clear and unmistakable" test does not apply. Between the general severability language in section 14.1, and the specific non-severability language in section 14.3(v)(c), the non-severability clause "must govern." Reply Br. at 11.

Uber next points to non-severability language contained within the arbitration provision itself. In the subsection titled "Enforcement of This Agreement," the contract states that "[e]xcept as stated in subsection v above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable." 2013 Agreement § 14.3(ix). Uber's argument fails, however, because it ignores the critical language "except as stated in subsection v above." As Gillette points out, the non-severability language in the PAGA waiver is contained in *subsection (v)*. That is, the severability provision in subsection (ix) expressly carves out any contrary language in subsection (v). And the language of subsection (v) states that "The Private Attorney General Waiver *shall not be severable from this Arbitration Provision* in any case in which a civil court of competent jurisdiction finds the Private Attorney General Waiver is unenforceable. 2013 Agreement § 14.3(v)(c) (emphasis added). Thus, the non-severability clause in subsection (v) obviously controls over the severability clause in subsection (ix).

United States District Court

For the Northern District of California

1    Uber's final argument relies on the structure of subsection (v).  Uber notes that subsection

2  (v) contains three separate waivers, one each for class, collective and representative actions.  *See*

3  2013 Agreement § 14.3(v)(a)-(c).  For instance, the class action provision reads: "The Class Action

4  Waiver shall not be severable from this Arbitration provision in any case in which (1) the dispute is

5  filed as a class action and (2) a civil court of competent jurisdiction finds the Class Action Waiver is

6  unenforceable."  2013 Agreement § 14.3(v)(a).  According to Uber, "[t]here is no logical basis for

7  dividing the waivers into three distinct subsections other than that the parties specifically

8  contemplated the potential for different results as to the waivers."  Reply Br. at 7.  And Uber notes

9  that, like the PAGA and collective action waivers, the class waiver provides what should occur if the

10  waiver is invalidated – "the class action must be litigated in a civil court of competent jurisdiction."

11  2013 Agreement § 14.3(v)(a).  Thus, Uber argues that the waivers "set forth the result *with respect*

12  *to those claims* [(*i.e.*, class, collective, or representative)] in the event one or more waivers are found

13  unenforceable.  The benefit of setting forth three different waivers, and separately providing that

14  they are not severable, is clear, particularly here: the unenforceable waiver does not fall out of the

15  agreement entirely, but instead requires that the impacted claims proceed in court as the parties

16  intended, *not the arbitral forum*."  Reply Br. at 7 (emphases in original).

17    To the extent the Court understands Uber's argument, it is not persuasive: The plain

18  language of the contract requires invalidation of the entire arbitration provision because the PAGA

19  waiver expressly forbids severance.  2013 Agreement § 14.3(v)(c).  In any event, even if Uber's

20  structural argument offered a plausible construction of the Agreement (and the Court has

21  considerable doubts on that point) it must ultimately be rejected.  At best, Uber's argument suggests

22  there is some ambiguity in the otherwise crystal clear language of the contract that provides that the

23  PAGA waiver is not severable.  Because the 2013 Agreement is a standardized contract written by

24  Uber, however, to the extent the language is ambiguous any ambiguity must be "resolved against the

25  drafter."  *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798 (1998); *see also Slottow v. Am. Cas. Co.*

26  *of Reading, Pa.*, 10 F.3d 1355, 1361 (9th Cir. 1993) (recognizing California law rule that

27  "ambiguities in a written instrument are resolved against the drafter") (citation omitted).  Thus, the

28  Court would resolve the ambiguity against Uber, and find that the PAGA waiver is expressly non-

United States District Court

For the Northern District of California

1    severable from the remaining arbitration provisions.  Hence, the court strikes the entire arbitration

2    clause from the 2013 Agreement, consistent with the plain language of the contract.  *See Chalk*, 560

3    F.3d at 1098; *Shroyer*, 498 F.3d at 986-87.

4    F.    Alternatively, the Court Finds the Arbitration Provision of the 2013 Agreement is Permeated

5          With Unconscionability

6          Even if the PAGA waiver in the 2013 Agreement was severable, the Court finds that the

7    entire arbitration provision would fail in any event because the arbitration clause in the contract is

8    permeated with a number of additional substantively unconscionable terms.  *See Armendariz*, 24

9    Cal. 4th at 122 (citing Cal. Civ. Code § 1670.5(a)).  The Court discusses the various additional

10   substantively unconscionable terms below.

11         1.    Arbitration Fee and Cost Splitting

12         As discussed at length in Section III.C.2, *supra*, California law provides that any clause in an

13   employment agreement that would impose "substantial forum fees" on an employee in her attempt to

14   vindicate her unwaivable statutory rights is contrary to public policy and therefore substantively

15   unconscionable.  *Armendariz*, 24 Cal. 4th at 110.  "We conclude that when an employer imposes

16   mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process

17   cannot generally require the employee to bear any *type* of expense that the employee would not be

18   required to bear if he or she were free to bring the action in court."  *Id.* at 110-111 (emphasis in

19   original).

20         Here, the 2013 Agreement purports to require drivers to split the full cost of arbitration with

21   Uber.  *See* 2013 Agreement § 14.3(vi).  The Court has already made a finding that a number of these

22   significant costs are of a type that drivers would not be required to bear if they litigated their

23   statutory claims in court.  *See, e.g.*, Maya Decl. Ex. A.  Uber's in-litigation concession that it will

24   not seek to enforce the terms of the contract (*i.e.*, it will pay for its drivers' arbitration costs) is

25   irrelevant to determining substantive unconscionability.  Such a concession "does not change the

26   fact that the arbitration agreement as written is unconscionable and contrary to public policy.  Such a

27   willingness [to pay fees] can be seen, at most, as an offer to modify the contract; an offer that was

28   never accepted.  No existing rule of contract law permits a party to resuscitate a legally defective

contract merely by offering to change it." *Armendariz*, 24 Cal. 4th at 125 (internal quotation marks and citation omitted).

Because the 2013 Agreement, at the time it was drafted, purports to force Uber's presumptive employees to pay substantial arbitration costs of a type they would not be required to pay in court, this provision is substantively unconscionable. *See* Section III.C.2, *supra*.

### 2. Confidentiality Clause

Gillette next assails a confidentiality provision in the 2013 Agreement that provides "Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all the Parties." 2013 Agreement § 14.3(vii).

A panel of the Ninth Circuit has previously held that a broad confidentiality provision in an arbitration agreement is substantively unconscionable under California law.[40] *Ting v. AT&T*, 319 F.3d 1126, 1151-52 (9th Cir. 2003). As the panel explained, "[a]lthough facially neutral, confidentiality provisions usually favor companies over individuals." *Id.* at 1151 (citation omitted). This is because "if the company succeeds in imposing a gag order, plaintiffs are unable to mitigate the advantages inherent in [Uber] being a repeat player" in arbitration. *Id.* at 1152. Thus, by imposing arbitration confidentiality, the company places "itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, [Uber] accumulates a wealth of knowledge" on how to arbitrate the claims most effectively. *Id.* Moreover, the panel expressed concern that "the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination" against the company.

Uber responds by citing *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1079 (9th Cir. 2007) for the proposition that "confidentiality provisions in an arbitration agreement are [not] per se unconscionable under California law." While true, the *Davis* court qualified that statement in the same paragraph, noting that certain narrow arbitration confidentiality provisions, such as those

---

[40] Uber has not argued that the *Ting* rule is preempted by the FAA. Any such argument is waived.

54

United States District Court

For the Northern District of California

agreeing "to limit availability of sensitive employee information (*e.g.*, social security numbers or other person identifier information) or other issue-specific matter" might be acceptable. *Id.* As the panel explained, "[c]onfidentiality by itself is not substantively unconscionable." *Id.* What Uber does not mention, however, is that *Davis* then held that the particular confidentiality clause before it *was* substantively unconscionable under *Ting*, because, like the clause in Uber's 2013 Agreement, it precluded any disclosures about an arbitration whatsoever to non-parties. *Id.* at 1078.

Uber's only other case, *Velazquez v. Sears*, is unpersuasive. 2013 U.S. Dist. LEXIS 121400, at *13-15 (S.D. Cal. 2013). There, the district court found a confidentiality clause that was identical to Uber's in the 2013 Agreement was not substantively unconscionable. *See id.* The court reached this conclusion by purporting to follow the logic of a footnote from the Ninth Circuit's *en banc* decision in *Kilgore*. *Id.* Interestingly, that footnote specifically cites *Ting* and does not purport to overrule *Ting*'s interpretation of California law vis-a-vis the unconscionability of broad confidentiality clauses. *See Kilgore*, 718 F.3d at 1059 n.9. Indeed, the *en banc* court noted that where the number of putative class members is large (like it is here, and unlike in *Kilgore* itself), the concerns expressed in *Ting* about the repeat player effect are likely valid. *Id.* Then, and somewhat inexplicably, the court added the following dicta: "In any event, the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general. Plaintiffs are free to argue during arbitration that the confidentiality clause is not enforceable." *Id.* But this dicta, in a footnote, does not clearly overrule *Ting*. Moreover, this dicta appears to conflict with the United States Supreme Court's holding that a determination of arbitrability must be made by a court, and not an arbitrator, absent "clear and unmistakable" intent to delegate the adjudication of arbitrability to an arbitrator.[41] *See First Options of Chi.*, 514 U.S. at 945. Under *Ting* and *Davis*, the confidentiality clause is substantively unconscionable as a matter of California law.

---

[41] Neither the *Kilgore* majority nor dissent mention whether the contract in *Kilgore* contained a delegation clause. This Court has independently reviewed the arbitration provision at issue in *Kilgore*, which was appended to the dissenting opinion. *See id.* at 1065 (Pregerson, J. dissenting). It does not appear to have a delegation clause.

United States District Court

For the Northern District of California

3.     Intellectual Property Claim Carve Out

Gillette next attacks a provision in the 2013 Agreement that provides that "[o]ther than disputes regarding the Intellectual Property Rights of the parties, any disputes . . . may be subject to arbitration." 2013 Agreement § 14.2. This provision in the 2013 Agreement restricts intellectual property (IP) claims from the scope of the arbitration clause, while forcing nearly all other disputes, including employment disputes, into arbitration. *See id.*

Plaintiffs cite *Fitz v. NCR Corp.* for the proposition that a contract "may be unfairly one-sided if it compels arbitration of the claims more likely to be brought by the weaker party but exempts from arbitration the types of claims that are more likely to be brought by the stronger party."[42] 118 Cal. App. 4th 702, 724 (2004). *Fitz* is squarely on point, and its reasoning applies here.

In *Fitz*, the Court of Appeal expressly found that a provision that exempted IP claims from arbitration, to the exclusion of all other claims, was substantively unconscionable. *Fitz*, 118 Cal. App. 4th at 724. As the Court of Appeal explained, while employees "have filed actions against employers over . . . intellectual property claims, it is far more often the case that employers, not employees, will file such claims. Furthermore, the [list of arbitrable claims] only includes the types of complaints that are predominately, if not solely, of concern to employees." *Id.* at 725; *see also Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 176-79 (2002) (finding an IP claim carve out provision substantively unconscionable because the "agreement exempts from arbitration the claims Countrywide is most likely to bring against its employees"). The *Fitz* court concluded that the IP carve out "is unfairly one-sided because it compels arbitration of the claims more likely to be brought by Fitz, the weaker party, but exempts from arbitration the types of claims that are more likely to be brought by NCR, the stronger party." 118 Cal. Ap. 4th at 725.

Uber responds to Plaintiffs' unconscionability argument by citing just one case, *Tompkins*. 2014 WL 2903752. Uber's response in insufficient, however, because *Tompkins* is plainly distinguishable. There, Judge Koh held that an IP carve out provision was not substantively

---

[42] Uber does not argue that the *Fitz* rule, or later cases applying it, are preempted by the FAA. Any such argument is waived.

United States District Court
For the Northern District of California

1   unconscionable because consumers in that case were actually fairly likely to bring IP claims against

2   the defendant.  2014 WL 2903752, at *17.  This was because the defendant in *Tompkins* was in the

3   business of collecting DNA samples from its customers, and the contracts allowed "consumers to

4   retain certain intellectual property rights to their genetic and self-reported information.  Therefore,

5   consumers may avail themselves of the carve out for intellectual property disputes."  *Id.*  The

6   holding of *Tompkins* makes perfect sense in the specific factual situation before Judge Koh: Given

7   that lawsuits about the mishandling of a plaintiff's genetic information are at least somewhat

8   foreseeable and valuable, a mutual carve out permitting such claims to be litigated in court was not

9   harshly one-sided.

10        Uber suggests, without any evidentiary support, that like the plaintiffs in *Tompkins*, its

11  "transportation company partners" (*i.e.*, drivers) "could have an interest in protecting their

12  intellectual property rights and may very well benefit from the [IP] exemption."  Reply Br. at 19.

13  This speculation is not sufficient to bring the Plaintiffs within the reasoning of *Tompkins*.  Rather,

14  the opinions of the California Court of Appeal are persuasive – the IP carve out in the 2013

15  Agreement is substantively unconscionable because it is overly "one-sided."  *See Armendariz*, 24

16  Cal. 4th at 114.  Hence, the Court cannot enforce it.

17        4.    <u>Unilateral Modification Provision</u>

18        Plaintiffs finally argue that a provision in the 2013 Agreement – although not one within the

19  arbitration clause itself – that permits Uber to unilaterally modify the terms of the contract without

20  notice to drivers is substantively unconscionable.  *See* 2013 Agreement § 12.1 ("Uber reserves the

21  right to modify the terms and conditions of this Agreement . . . at any time.").  The Ninth Circuit has

22  previously held, in a decision applying California law, that a provision affording the drafting party

23  "the unilateral power to terminate or modify the contract is substantively unconscionable."  *Ingle v.*

24  *Circuit City Stores, Inc*., 328 F.3d 1165, 1179 (9th Cir. 2003); *see also Chavarria v. Ralphs Grocery*

25  *Co.*, 733 F.3d 916, 926 (9th Cir. 2013) (affirming the substantive unconscionability rule in *Ingle*).

26  Following *Ingle*, Judge Illston similarly ruled that a unilateral modification clause can be

27

28

substantively unconscionable under California law.[43]  *See Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1010-11 (N.D. Cal. 2011).

While Uber only fleetingly challenges Plaintiffs' assertion that the unilateral modification provision is *substantively* unconscionable,[44] Uber does cite a Northern District case that holds that a unilateral modification provision is not substantively unconscionable as a matter of California law. *See Slaughter v. Stewart Enters.*, No. 07-cv-1157 MHP, 2014 U.S. Dist. LEXIS 56732, at *30-31 (N.D. Cal. Aug. 3, 2007).  *Slaughter* concluded that the "modification provision does not render the arbitration agreement [substantively] unconscionable" because "the modification provision was limited by the duty to exercise the right of modification fairly and in good faith."  *See id.* at *31 (citing *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal. App. 4th 1199, 1214 (1998)).  Other California Court of Appeal panels have similarly held that unilateral modification clauses are not necessarily unconscionable because the implied duty of good faith and fair dealing prohibits the drafter from unilaterally modifying the contract in bad faith.  *See, e.g.*, *24 Hour Fitness*, 66 Cal. App. 4th at 1214 (finding modification clause did not render contract "illusory" because the power to modify "indisputably carries with it the duty to exercise that right fairly and in good faith"); *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 708 (2013) (finding the "implied covenant of good faith and fair dealing limits the employer's authority to unilaterally modify the arbitration agreement and saves that agreement from being illusory and thus unconscionable").  At least one other panel of the Court of Appeal, however, has reached the opposite conclusion.  *See Sparks v. Vista Del Mar Child & Family Servs.*, 207 Cal. App. 4th 1511, 1523 (2012) (holding that "[a]n agreement to arbitrate is illusory if, as here, the employer can unilaterally modify the [contract]").

In the absence of controlling authority on this issue from the California Supreme Court, this Court must "attempt to 'predict how the highest state court would decide the issue using

---

[43]  Once again, Uber has not argued that *Ingle* or *Macias* are preempted by the FAA, and any such argument is now waived.

[44]  Uber's citations and (limited) argument(s) regarding the unilateral modification provision appear in a section of its reply brief titled "The Arbitration Provisions Are Not *Procedurally* Unconscionable" and do not expressly mention substantive unconscionability except in a parenthetical quotation from the *Slaughter* case.  *See* Reply Br. at 15-16 (emphasis added).

United States District Court

For the Northern District of California

intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 745 F. Supp. 2d 1145, 1179 (C.D. Cal. 2010) (quoting *S.D. Myers, Inc. v. City & Cnty. of S.F.*, 253 F.3d 461, 473 (9th Cir. 2001)). Here, the intermediate appellate court decisions in California go both ways. However, the Ninth Circuit – which was likewise obligated to "predict" the California Supreme Court's ruling on this issue – has definitively held that a unilateral modification provision is substantively unconscionable under California law. *See Ingle*, 328 F.3d at 1179. The Ninth Circuit recently reaffirmed the validity of this determination. *Chavarria*, 733 F.3d at 926. Moreover, the Court is not entirely persuaded by the logic of *24 Hour Fitness* and *Serpa*, which conclude that the implied duty of good faith and fair dealing will prevent the drafting party from abusing its modification power to render a contract unfairly one-sided. But the duty of good faith will only prohibit Uber from imposing bad faith modifications, not all one-sided modifications. *See generally* Horton, *supra*, at 645-67 (explaining numerous reasons why unilateral modification provisions should be suspect, including that the power to alter procedural terms unilaterally "undermines the bedrock economic assumption that adherents can impose market discipline on procedural terms" because when drafters can freely alter terms, "they face little pressure to bow to adherents' preferences"). Put simply, the Court predicts that the California Supreme Court would follow *Ingle*, *Sparks*, *Chavarria*, and *Macias*, and hold that a unilateral modification provision is substantively unconscionable under these circumstances.

     5.    The 2013 Agreement is Permeated With Substantively Unconscionable Terms

     The Court has identified four substantively unconscionable terms that affect the arbitration provision in the 2013 Agreement *in addition* to the unconscionable PAGA waiver. While standing alone, none of these four additionally unconscionable clauses would necessitate a conclusion that the 2013 arbitration provision is "permeated with unconscionability," taken together such a conclusion is required. As the California Supreme Court has held, multiple substantively unconscionable terms in or related to an arbitration agreement "indicate a systemic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." *Armendariz*, 24 Cal. 4th at 124. At bottom, a trial court does not "abuse its

United States District Court
For the Northern District of California

discretion in concluding that [an] arbitration agreement is permeated by an unlawful purpose" where the arbitration agreement contains "multiple unlawful provisions." *Id.*; *see also Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1005-06 (9th Cir. 2010) (holding district court did not abuse its discretion by refusing to sever numerous substantively unconscionable terms from arbitration agreement). The Court finds that the presence of these four unconscionable terms, and in particular the arbitration fee-shifting and confidentiality provisions, render the 2013 Agreement's arbitration clause permeated with unconscionability. And the further presence of the unconscionable PAGA waiver bolsters this Court's conclusion that Uber's arbitration agreement was likely not simply designed to provide its drivers with an efficient alternate forum to litigation, but was instead designed to provide drivers "an inferior forum that works to [Uber's] advantage."[45] *Armendariz*, 24 Cal. 4th at 124.

     6.   <u>Conclusion</u>

     The 2013 Agreement's arbitration provision is unenforceable. The contract is clearly procedurally unconscionable because it contained no meaningful opt-out right and was presented to drivers on an adhesive basis. Moreover, the arbitration provision itself was highly inconspicuous. The provision is also substantively unconscionable. First, the provision is substantively unconscionable because it contains a PAGA waiver in violation of public policy. And because the 2013 Agreement expressly provides that the PAGA waiver "shall not be severable from this Arbitration Provision," the entire arbitration provision fails. 2013 Agreement at § 14.3(v)(c).

     Alternatively, the Court determines that the 2013 Agreement's arbitration provision is permeated with substantively unconscionable terms, in addition to the invalid PAGA waiver. Namely, the provision contains substantively unconscionable clauses regarding arbitration fees and arbitration confidentiality, an unconscionable term exempting Uber's most favored claims from arbitration while forcing drivers to arbitrate those claims that they are most likely to bring, and at least a moderately unconscionable clause permitting Uber to unilaterally modify the terms of the

---

[45] That the 2013 Agreement was interposed on drivers after Uber began facing class action lawsuits further suggests an improper motive to purposefully disable class members' rights. *See O'Connor*, 2013 WL 6407583.

United States District Court
For the Northern District of California

1    arbitration agreement at any time.  Even without the PAGA waiver, the Court would invalidate the

2    arbitration provision in light of these four unconscionable clauses.  The PAGA waiver bolsters the

3    Court's conclusion that the 2013 Agreement's arbitration provision is unenforceable.  Both

4    procedural and substantive unconscionability are substantial.  Uber's motion to compel Gillette's

5    case to individual arbitration pursuant to the 2013 Agreement is **DENIED**.

6    G.    The 2014 Agreements' Arbitration Provisions Are Unenforceable

7         Because the delegation clauses in the 2014 Agreement and 2014 Rasier Agreement are not

8    enforceable, the Court must determine the validity of the arbitration provisions in each of those

9    contracts as well.  *See* Sections III.B, III.D, *supra*.  Much of the discussion above applies.  As the

10   Court explains, the arbitration provisions in both 2014 agreements are unenforceable against

11   Mohamed.

12        1.    Procedural Unconscionability

13        As previously discussed, the 2014 agreements contain highly conspicuous and non-illusory

14   opt-out provisions that permit drivers to obtain all of the benefits of the contracts, while avoiding

15   any potential burdens of arbitration.[46]  This would suggest there is little, if any, procedural

16   unconscionability.  Under California law as announced by the California Supreme Court, however,

17   that is not the end of the procedural unconscionability analysis.  According to *Gentry*, a putative

18   employer must do more than simply provide a conspicuous opt-out right to render the contract

19   without any procedural unconscionability.  *See* Section III.D.1, *supra*.  In order to avoid a finding of

20   procedural unconscionability altogether, Uber needed to conspicuously disclose "the

21   disadvantageous terms of the arbitration agreement" in connection with the opt-out provision.  *See*

22   *Gentry*, 42 Cal. 4th at 472.  This is true because Mohamed and his fellow drivers likely "felt at least

23   some pressure not to opt out of the arbitration agreement."  *Id.*; *see also* Section III.D.1, *supra*.

24        The Court has already determined that the 2014 agreements did not conspicuously disclose

25   one disadvantageous term of the arbitration agreement – the fee-splitting provision.  *See* Section

26

27        [46]  While this Court previously approved the opt-out language for the purpose of controlling
     class communications under Rule 23(d), the Court expressly declined to consider the
28   unconscionability of 2014 agreements.  *O'Connor*, 2013 WL 6407583, at *2-3.

III.D, *supra*. It is quite obvious Uber did not disclose a number of other disadvantageous provisions of the arbitration provision either: the 2014 agreements contain the very same clauses the Court has found substantively unconscionable in the 2013 Agreement, namely a confidentiality provision, IP carve out provision, and unilateral modification term.[47] None of these unfavorable terms were called to drivers' attention when they were asked to assent to the 2014 agreements. Thus (though far less so than the 2013 Agreement) the Court concludes that the 2014 agreements present at least some degree of procedural unconscionability sufficient to permit the Court to at least consider the claimed substantive unconscionability of the contracts.[48]

### 2. Substantive Unconscionability

The 2014 agreements contain the same five substantively unconscionable terms this Court discussed in connection with the 2013 Agreement. *See* Sections III.E.2, III.F, *supra*. Just because the unconscionable clauses are nearly identical, however, does not compel the Court to reach the same result with respect to the 2014 contracts as it reached (in the alternative) with the 2013 Agreement (*i.e.*, that the arbitration provision is permeated with unconscionability and thus unenforceable). Unlike the 2013 Agreement's arbitration provision, which was procedurally unconscionable to a significant degree, the 2014 arbitration provisions display far less procedural unconscionability. Thus, under the California sliding scale test for unconscionability, it is uncertain whether the Court could find such overwhelming substantive unconscionability as to invalidate the 2014 arbitration provisions in their entirety, especially in light of the strong federal policy in favor of arbitration.[49] *See Concepcion*, 131 S. Ct. at 1745. In any event, the Court need not decide this

---

[47] The 2014 contracts also contain an unconscionable PAGA waiver, but this term *was* conspicuously disclosed to drivers in connection with their right to opt-out. *See* 2014 Agreement at 14.3.

[48] The Court notes additional reasons support its procedural unconscionability finding. For instance, Mohamed did not receive a paper copy of the relevant contracts and had to review the contracts on the small screen of his phone. Moreover, the Court has made a finding based on the evidence in front of it that Mohamed likely could not easily or obviously review the relevant agreements in his driver portal while he was still employed by Uber.

[49] This observation is not in tension with the Court's earlier conclusion that the *delegation clauses* of the 2014 agreements are sufficiently procedurally unconscionable to be unenforceable in light of the significantly substantively unconscionable fee-shifting provision. Notably, the delegation clauses in the 2014 agreements are both oppressive under *Gentry* and *highly* surprising

United States District Court
For the Northern District of California

question, because the 2014 agreements contain unenforceable PAGA waivers, and, like the 2013

Agreement, the 2014 contracts provide that the PAGA waivers cannot be severed from the

remainder of the arbitration provision. Thus, the Court need not attempt to balance substantive

unconscionability versus procedural unconscionability in order to determine whether the arbitration

agreements should fail in their entirety.

The 2014 Agreement provides:

> You and Uber agree to resolve any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis . . . If at any point this provision is determined to be unenforceable, the parties agree that this provision shall not be severable, unless it is determined that the Arbitration may still proceed on an individual basis only.

2014 Agreement at § 14.3(v). The 2014 Rasier Agreement contains a similar PAGA waiver. *See*

2014 Rasier Agreement at 14. The Court will not repeat its discussion of the invalidity of

representative PAGA waivers. Rather, it will only address Uber's additional arguments regarding

the PAGA waivers in the 2014 agreements that do not apply to the PAGA waiver in the 2013

Agreement.

a. The Court Must Consider the PAGA Waiver Even Though Mohamed Does Not Bring Any PAGA Claims

Uber argues that the Court should not consider the potential substantive unconscionability of

the PAGA waiver when analyzing the 2014 contracts because the only driver in this lawsuit bound

---

because the delegation clauses themselves were not specifically called to drivers' attention in any way. By contrast, the 2014 arbitration provisions, as a whole, were hardly surprising to drivers. Thus, the 2014 arbitration provisions are much less procedurally unconscionable than the specific delegation clauses contained therein. Moreover, unlike agreements to arbitrate in general, which are presumed valid and enforceable under federal law, agreements to delegate arbitrability to an arbitrator are not so favored. Indeed, as previously discussed, delegation clauses must meet the "clear and unmistakable" test because determining arbitrability is typically a task reserved for courts, not arbitrators. Thus, a term that requires drivers to pay significant fees just to get a threshold determination on arbitrability renders the delegation clause far more substantively unconscionable, and thus unenforceable.

**United States District Court**
For the Northern District of California

to the 2014 contracts, Mohamed, does not (and cannot)[50] raise any PAGA claims. Thus Uber argues

that no matter how unconscionable the PAGA waivers may be, they simply do not affect Mohamed

or, more importantly, Uber's ability to compel Mohamed's claims to arbitration. *See* Reply Br. at 1.

Uber cites only one case in support of its argument that the PAGA waiver's "enforceability is

irrelevant" to the Court's substantive unconscionability analysis in Mohamed's lawsuit.

Specifically, Uber claims that *West v. Henderson*, 227 Cal. App. 3d 1578 (1991), stands for the

proposition that a "portion of [an] arbitration provision not being enforced against a party in a

particular dispute is irrelevant to [a] claim of unconscionability." Reply Br. at 1-2 (citing *West*, 227

Cal. App. 3d at 1589). The Court does not believe that is what *West* holds.

The appellant in *West* signed a lease for a commercial property. *West*, 227 Cal. App. 3d at

1581. The lease contained a term that required the tenant-appellant to file any suit against the

lessor-appellee within six-months of the occurrence of a legal wrong. *Id.* at 1588. The lease

provided that the lessor, however, could file suit against its tenant anytime within an applicable

statutory limitations period. *Id.* The lessor brought suit against the tenant for breach of the lease,

and the tenant filed a cross-complaint. *Id.* at 1581. The trial court dismissed the tenant's cross-

complaint, finding that the causes of action in the cross-complaint were barred by the six-month

limitations provision contained in the lease. *Id.*

On appeal, the tenant claimed that the six-month limitations provision in the lease was

unconscionable and should not be enforced. *West*, 227 Cal. App. 3d at 1585. After first determining

that the tenant "has made a poor showing of procedural unconscionability," the panel went on to

analyze whether the six-month limitations provision was substantively unconscionable. *Id.* at 1587-

88. The Court of Appeal held that while the "lack of mutuality makes the provision suspect under

our analysis" there were reasonable justifications for the provision. *Id.* at 1588. For instance, while

pending "litigation initiated by the lessee could inhibit the lessor's ability to lease the property to

another party . . . pending litigation by the lessor against the lessee would probably not have the

same consequences." *Id.*

---

[50] Mohamed drove for Uber in Boston, not California.

In response to this justification, the tenant "present[ed] a hypothetical situation" to show that the one-sided six-month limitation period *could* have a substantively unconscionable effect in a particular situation that was not before the Court of Appeal. *West*, 227 Cal. App. 3d at 1588. Namely, if a lessor waited for the tenant's six-month window to file suit to expire, the lessor could then sue the tenant "and be immune to any defense raised by the lessee." *Id.* Because the Court of Appeal was unsure when, if ever, this peculiar hypothetical situation might obtain, the panel refused to consider this possibility in determining whether the six-month limitation clause was substantively unconscionable as applied to the appellant. As the panel explained, the "limitation of defenses is irrelevant to this case because it is not being asserted against West and could be subject to unconscionability review separately." *Id.*

The Court reads *West* more narrowly than Uber. The Court of Appeal did analyze the substantive unconscionability of the six-month limitation clause, which was the only contractual term the appellant asked the court to review. It refused, however, to analyze a potentially unconscionable *effect* that term might have where it was unclear whether the hypothetical situation postulated by the appellant could ever obtain. Put differently, the Court declined to analyze a certain aspect of the challenged term because it was speculative whether the term could ever have the putatively unconscionable effect appellant ascribed to it. *See West*, 227 Cal. App. 3d at 1588-89. By contrast here, the Court knows exactly what effect the PAGA waiver would have if it applied to Mohamed. It would be substantively unconscionable and void against public policy. Unlike the *West* panel, this Court does not need to speculate as to whether the challenged PAGA waiver *could* have unconscionable effects if it were ever invoked. Thus, *West* appears inapposite.

More fundamentally, even if *West* stands for the broader proposition Uber suggests, its holding would likely be inconsistent with California Supreme Court precedent that provides that when analyzing unconscionability, the court is to consider whether the clause or contract was "unconscionable at *the time it was made*." *Armendariz*, 24 Cal. 4th at 114 (emphasis added) (quoting Cal. Civ. Code § 1670.5(a)); *see also Sonic-Calabasas A*, 57 Cal. 4th at 1134. As the *Armendariz* court itself explained, the purpose of analyzing unconscionability at the time an agreement is drafted is to *deter* drafters from including such unconscionable terms in their

1    agreements in the first instance: "An employer will not be deterred from routinely inserting such . . .

2    illegal clause[s] into the arbitration agreement it mandates for its employees if it knows that the

3    worst penalty for such illegality is the severance of the clause after the employee has litigated the

4    matter." *Armendariz*, 24 Cal. 4th at 124 n.13; *see also Fitz*, 118 Cal. App. 4th at 727 (explaining

5    deterrence function of substantive unconscionability analysis); *Lou*, 2013 WL 2156316, at *6

6    (acknowledging that California unconscionability law is designed to encourage employers to "draft

7    fair agreements initially") (citations omitted).[51]  Indeed, even one of the dissenters in both *Sonic-*

8    *Calabasas A* and *Iskanian* has recognized that the Legislature mandated that unconscionability be

9    measured from the time an agreement was made in order to dissuade those drafting contracts from

10   inserting unconscionable terms in the first instance.  *See Sonic-Calabasas A*, 57 Cal. 4th at 1176

11   (Chin, J. concurring and dissenting) (explaining that the Legislature adopted the relevant rule

12   because "[t]he principle is one of *prevention* of oppression and unfair surprise and not of [post-hoc]

13   disturbance of allocation of risks because of superior bargaining power") (emphasis added)

14   (citations to legislative history omitted).

15            When the 2014 agreements were drafted, Uber had no way of knowing whether a particular

16   driver would or would not bring representative PAGA claims against it.  The mere fact that the

17   particular Uber driver suing here does not have any PAGA claims does not render the PAGA waiver

18   any less substantively unconscionable at the time when Uber drafted the provision and inserted it

19   into Mohamed's contract.  To so hold would undermine the deterrence rationale of evaluating

20   unconscionability at the time of contract formation.  *See Armendariz*, 24 Cal 4th at 124 n. 13; *Lou*,

21   2013 WL 2156316, at *6.  Thus the Court concludes that it should consider the substantive

22   unconscionability of the 2014 contracts' PAGA waivers in determining whether to compel

23   Mohamed's claims to arbitration pursuant to the 2014 agreements.

24   _____

25            [51]  The same rationale likely undergirds *Armendariz*'s holding that a party cannot render a
     contract conscionable by agreeing to strike or otherwise limit the application of an unconscionable
26   term after litigation has begun.  *See Armendariz*, 24 Cal. 4th at 125 (holding that a later concession
     to strike an unconscionable term "does not change the fact that the arbitration agreement *as written*
27   is unconscionable and contrary to public policy") (emphasis added).  If the Supreme Court was not
     concerned with deterring parties from drafting unconscionable contracts in the first instance, there
28   would be significantly less reason to adopt a rule that forbids a litigant from agreeing not to enforce
     unconscionable clauses after the fact.

b.     *Iskanian* Applies Despite Mohamed's Opportunity to Opt Out of the PAGA Waiver

Uber argues that *Iskanian*'s anti-waiver rule does not apply here because *Iskanian* did not involve an agreement with an opt out provision. By contrast, Uber points out that Mohamed had a reasonable opportunity to opt-out of the PAGA waivers in its 2014 contracts.

To be sure, some portions of the *Iskanian* opinion that Uber cites can be read as suggesting that the Supreme Court was only concerned with forbidding compelled or mandatory PAGA waivers. *See Iskanian*, 59 Cal. 4th at 360 ("We conclude that where, as here, an employment agreement compels the waiver of representative claims under the PAGA, it is contrary to public policy and unenforceable as a matter of state law."); *see also id.* at 383 (noting that it is contrary to public policy for an employment agreement to eliminate a worker's choice to bring a PAGA claim "altogether by requiring employees to waive the right to bring a PAGA action before any dispute arises"). Most notably, Uber cites the *Iskanian* majority's observation that "employees are free to choose whether or not to bring PAGA actions when they are aware of Labor Code violations"[52] but "it is contrary to public policy for an employment agreement to *eliminate this choice altogether* by *requiring* employees to waive the right to bring a PAGA action before any dispute arises." *Iskanian*, 59 Cal. 4th at 383 (emphases added). Uber thus contends that this Court should enforce the PAGA waivers in the 2014 contracts because those waivers were voluntarily accepted by Mohamed where he failed to opt-out. The Court disagrees. While *Iskanian* does not forbid the outright waiver of PAGA claims, only *post*-dispute waivers of PAGA claims are permitted under California law. *See Securitas Security Servs.*, 234 Cal. App. 4th at 1121; *see also Iskanian*, 59 Cal. 4th at 383.

The defendant in *Securitas* made the same argument that Uber makes here – that the *Iskanian* anti-waiver rule "only invalidates PAGA waivers within a mandatory agreement." *Securitas*, 234 Cal. App. 4th at 1121; *see also id.* ("Securitas maintains that because [plaintiff] has the express right to opt out of the agreements and did not do so, she voluntarily consented to the dispute resolution

---

[52] Even in this quote, the Court notes that the *Iskanian* majority tied the validity of a waiver of PAGA claims to an employee's "aware[ness] of Labor Code violations." *Iskanian*, 59 Cal. 4th at 383. Thus, even the passage Uber believes is most favorable to its position actually lends additional support to this Court's conclusion that pre-dispute PAGA waivers are not permitted under *Iskanian*.

67

United States District Court

For the Northern District of California

agreement and its PAGA waiver.").  The Court of Appeal rejected the argument, noting that "*Iskanian* compels us to conclude that the agreement's PAGA waiver violates public policy, notwithstanding the fact that [plaintiff] was not required or compelled to enter into it as a condition of employment."  *Id.*  As the *Securitas* court explained, "*Iskanian* repeatedly states that public policy would be contravened where an agreement required an employee to waive his or her PAGA rights *predispute* – 'before any dispute arises.'"  *Id.* at 1122  (emphasis in original) (quoting *Iskanian*, 59 Cal. 4th at 383).  And while *Iskanian* "does not preclude the possibility of a valid PAGA waiver" altogether, the *Securitas* court persuasively reasoned that the Supreme Court "suggests by its reference to footnote 8 in *Armendariz* that a valid PAGA waiver may occur where 'an employer and an employee knowingly and voluntarily enter into an arbitration agreement *after a dispute has arisen*.'"  *Securitas*, 234 Cal. App. 4th 1122 (emphasis in original) (quoting *Iskanian*, 59 Cal. 4th at 383) (citing *Armendariz*, 24 Cal. 4th at 103 n.8).  Indeed, the explanatory parenthetical the *Iskanian* court drafted to explain its citation to footnote 8 from the *Armendariz* opinion reads "waivers freely made *after* a dispute has arisen are not necessarily contrary to public policy."  *Iskanian*, 59 Cal. 4th at 383 (citing *Armendariz*, 24 Cal. 4th at 103 n.8) (emphasis added).  Thus, the court recognized employees may waive PAGA claims, but only *after* a dispute with the employer has already arisen.  In assenting to the 2014 contracts, Mohamed purportedly forfeited his right to bring a PAGA representative claim *before* this litigation began.  Hence, the rule of *Iskanian* applies, and the PAGA waivers contained in the 2014 agreements are unenforceable against Mohamed because they violate California public policy.

        3.    <u>The 2014 PAGA Waivers Are Not Severable</u>

      Like the 2013 Agreement, the 2014 contracts expressly provide that if a court determines that the PAGA waiver is unenforceable, the PAGA waiver "shall not be severable."  2014 Agreement at § 14.3(v); 2014 Rasier Agreement at 14.  Unlike the 2013 Agreement, Uber has never argued that the non-severability language in the 2014 contracts is ambiguous, and the Court concludes it is not.[53]  The Court must enforce the express terms of the parties' agreements.  Here, Uber specifically

---

    [53]  Indeed, the non-severability language in the 2014 contracts is even clearer than in the 2013 Agreement.

1   provided that the PAGA waiver "shall not be severable" if the Court determines it is unenforceable.

2   *Id.* It is unenforceable. Thus, the arbitration provisions in the 2014 contracts cannot be enforced

3   either.

4           4.      Conclusion

5           The 2014 Agreement and 2014 Rasier Agreement contain arbitration provisions that are at

6   least somewhat procedurally unconscionable under *Gentry*. And because the 2014 agreements

7   contain non-severable PAGA waivers, the Court finds that the arbitration provisions in those

8   contracts are unenforceable in their entirety. Hence, Uber's motion to compel Mohamed's claims to

9   arbitration pursuant to the 2014 agreements is **DENIED**.

10  H.      Hirease May Not Compel Arbitration of Mohamed's Claim Against It

11          Because none of Uber's arbitration agreements are enforceable against Mohamed, Hirease

12  may not compel Mohamed's claim against it to individual arbitration pursuant to the arbitration

13  agreements in Uber's contracts. Thus, Hirease's joinder in Uber's motion to compel is **DENIED.**

14                          **IV.    CONCLUSION**

15          The Court concludes that Gillette assented to be bound to the 2013 Agreement. The

16  delegation clause in the 2013 Agreement is not enforceable because the parties' intent to delegate

17  the determination of arbitrability to an arbitrator is not "clear and unmistakable." Alternatively, the

18  Court finds that the delegation clause in the 2013 Agreement is unenforceable because it is both

19  procedurally and substantively unconscionable. The Court further finds that the 2013 Agreement's

20  arbitration provision is unenforceable because it is both procedurally and substantively

21  unconscionable. Thus, Gillette's claims cannot be compelled to arbitration under the FAA.

22          The Court concludes that Mohamed assented to be bound to the 2013 Agreement, 2014

23  Agreement, and 2014 Rasier Agreement. Because the 2014 Agreement expressly superseded the

24  2013 Agreement, the Court determines that Mohamed is only currently bound to the two 2014

25  contracts.

26          The delegation clauses in the 2014 agreements are unenforceable because the intent of the

27  parties to delegate arbitrability to an arbitrator is not "clear and unmistakable." Alternatively, the

28  delegation clauses in the 2014 agreements are unenforceable because they are both procedurally and

United States District Court
For the Northern District of California

substantively unconscionable.  The arbitration provisions in the 2014 agreements are significantly less procedurally unconscionable than the 2014 delegation clauses, but nevertheless contain at least some procedural unconscionability, as well as substantively unconscionable PAGA waivers.  The PAGA waivers in those contracts are expressly non-severable from the remainder of the arbitration provisions.  Thus, Uber cannot compel Mohamed's claims to arbitration under the FAA.  Neither can non-signatory Hirease.

This order disposes of Docket Nos. 28 and 32 in Case No. 14-5200, and disposes of Docket No. 16 in Case No. 14-5241.

IT IS SO ORDERED.

Dated:  June 9, 2015

_____
EDWARD M. CHEN
United States District Judge